**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

**SERCO INC.,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant,**

**and**

**INDUS CORPORATION,**

**Defendant-Intervenor**

**and**

**ELECTRONIC DATA SYSTEMS CORP.**

**Defendant-Intervenor**

**and**

**INTERNATIONAL BUSINESS MACHINES CORPORATION,**

**Defendant-Intervenor**

**and**

**GENERAL DYNAMICS ONE SOURCE, LLC**

**Defendant-Intervenor**

No.1:07-CV-00691-FMA

Judge Allegra

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRAVE RECORD**

**REDACTED VERSION**

## TABLE OF CONTENTS

STATEMENT OF FACTS……………………………………………………………1

STANDARD OF REVIEW…………………………………………………………..4

SUMMARY OF ARGUMENT……………………………………………………….4

ARGUMENT…………………………………………………………………………5

I. GSA COMMITTED PREJUDICIAL ERRORS IN THE COST/PRICE EVALUATION……………………………………………………………………5

A. GSA Identified, But Failed to Address, Offerors Proposing Unreasonably High or Unrealistically Low Costs. ……………………………………7

B. GSA Made Other Errors in the Evaluation of Price and Cost…………12

C. Conclusion…………………………………………………………..14

II. GSA COMMITTED PREJUDICIAL ERRORS IN THE EVALUATION OF PAST PERFORMANCE…………………………………………………………...15

A. GSA Misevaluated a [redacted] Reference for Serco………………………15

B. GSA Failed to Give Serco an Opportunity to Rebut Negative Information………………………………………………..…17

C. GSA Evaluated Offerors Inconsistently, to the Detriment of Serco…..21

D. GSA Misevaluated Offerors Without Relevant Past Performance……22

E. Conclusion……………………………………………………………24

III. GSA COMMITTED PREJUDICIAL ERRORS IN THE EVALUATION OF THE BASIC CONTRACT PLAN…………………………………………………..25

A. GSA Ignored Important Aspects of the Serco's Proposal and Its Evaluation, and Treated Other Offerors Inconsistently, to the Detriment of Serco…………………………………..………………27

1. GSA Evaluated the Resources Subfactor Incompletely and Inconsistently……………………..………………….……….. 30
2. GSA Evaluated the Program Management Subfactor Incompletely and Inconsistently………………….……………………………..32
3. GSA Also Evaluated the Corporate Commitment Subfactor Improperly……………………………………..……………..33

B. GSA Failed to Factor Unrealistic Cost into the Technical Evaluation..34

C. These Errors Prejudiced Serco…………………………………...34

IV. GSA COMMITTED PREJUDICIAL ERRORS IN THE BEST VALUE EVALUATION……………………………………………………………..36

A. GSA Failed to Consider Cost or Price Meaningfully…………………36

B. GSA Erred With Respect to the Tradeoff Decisions It Made for Serco ……………………………………………………………..38

V. CONCLUSION………………………………………………………..43

Exhibit A……………………………………………………………………44

# TABLE OF AUTHORITIES

**Statutes**

42 U.S.C. § 405(j)(2)……………..……………………………………………………...22

**Regulations**

FAR 15.305……………….……………………………………………………………..22
FAR 15.402……………………………….……………………………….……………11,14
FAR 15.404-1…………………………………………………………………6,7,11,14

**Court Decisions**

*ARINC Engrg. Svcs, LLC v. United States*, 77 Fed. Cl. 196, 200-01 (2007)……..……..4
*Beta Analytics Int'l Inc v United States,* 67 Fed. Cl. 384, 398 (2005)……….....……26,36
*Erinys Iraq, Ltd., v. United States, et al.*, 78 Fed. Cl. 518, 533-35 (2007)……………..36
*Fort Carson Support Services, et al. v. United States,* 71 Fed. Cl. 571, 606 (2006)..19,21
*Metcalf Constr. Co., Inc. v. United States, et al.*, 53 Fed. Cl 617 (2002)………………23
*Synetics, Inc. v. United States,* 45 Fed. Cl. 1 , 10-11(1999)………………..………..…..9

**Administrative Decisions**

*Braswell Services Group, Inc.*, B-278921, June 17, 1998, 98-2 CPD ¶10……………..23
*Chicataw Constr. Inc.,* B-289592, 2002 CPD ¶62……………………………………..23
*Design Concepts, Inc.,* B-184658, Jan. 23, 1976, 76-1 CPD ¶ 39……………………..41
*Family Entertainment Services, Inc.*, B-298047.3, Sept. 30, 2006, 2007 CPD ¶ 59…..22
*Information Ventures, Inc.*, B-297276.2, Mar. 1, 2006, 2006 CPD ¶ 45………………14
*ITT Fed. Svcs. Int'l Corp.*, B-289863.4, *et al*., Dec. 16, 2002, 2002 CPD ¶ 216….……7
*J.A. Farrington Janitorial Svcs.,* B-296875, Oct. 18, 2005, 2005 CPD ¶ 187………...11
*Joint Management & Technology Services*, B-294229, 2004 CPD ¶208………..……...23
*Lockheed Martin Info. Sys.,* B-292836, *et al.*, Sec. 18, 2003, 2003 CPD ¶ 230……….36
*Medical Information Services*, B-287824, 2001 CPD ¶122……………………….…...…23
*Multimax, Inc., et al.,* B-2989249.6 *et al.*, Oct. 24, 2006, 2006 CPD ¶ 165……..……12
*The MIL Corporation,* B-294836, 2005 CPD ¶ 29…………………………………37,41
*PADCO, Inc.-Costs*, B-289096.3, May 3, 2002, 2002 CPD ¶ 135…………………..……14
*Reilly's Wholesale Produce v. United States,* 73 Fed. Cl. 705, 716 (2005)……………44
*Serco, Inc.,* B-298266, Aug. 9, 2006, 2006 CPD ¶ 120…………………………….……14

## STATEMENT OF FACTS

1. On September 29, 2006, the General Services Administration ("GSA") issued request for proposals (the "RFP" or the "solicitation") for a program called Alliant. Administrative Record ("AR") at 125ff. The RFP contemplated award of about 25 to 30 multiple-award task order contracts, which would last for ten years. (RFP, F.2, AR 141). Other Federal agencies could issue task orders under these contracts. (AR 122-23).

2. Task orders could be fixed-price, cost reimbursement, time-and-materials or labor-hour. (RFP, B.6, AR 123). Contractors were required to have an adequate cost accounting system for cost reimbursement type orders. (RFP, H.16, AR 160).

3. Orders could be for a wide variety of information technology ("IT") services under three broad categories: infrastructure (RFP, C.3.1, AR 130), application services (*id.* at C.3.2, AR 132), and IT management services (*id*. at C.3.3, AR 136). Except for limited issues relating to scope, the order award process is immune from protest. (RFP, G.5, AR 145).

4. Alliant contractors rebate to GSA a Contract Access Fee of ¾ % of all amounts billed under the contract. (RFP, B.5, AR 122-23). This fee will be used to reimburse GSA for the cost of operating the Alliant program. (RFP, C.9.5, AR 148).

5. The RFP required offerors to provide, *inter alia*, three types of proposal information. First, they had to provide past performance information in two tables. Table 1 contained up to 20 references for experience with multiple-award contracting vehicles. (RFP, L.12.3, AR 228-29). Table 2 contained up to 50 references for IT services. (*Id.* at 229-31).

6. Second, offerors had to provide information about their capabilities and plans for performance in a proposal document entitled Basic Contract Plan. (RFP, AR 232ff).

7. Third, offerors had to provide cost/price information. This included 20 separate spreadsheets, named Attachments J-2 (AR 251ff ) and J-3 (AR 273ff). Attachment J-2 contained costs and prices for work at a Government site, and J-3 for work at a contractor's site. Each attachment consisted of 10 spreadsheets, one for each of the ten contract years. Each spreadsheet had blanks for 80 different labor categories. Each labor category had a fixed hourly price, which was broken down into direct cost components, indirect cost components, and profit. Offerors were required to provide complete price and cost information for all 80 labor categories[1] for all ten years, in each attachment. (RFP, Folder L, AR 237-38). For each labor category, the spreadsheet included a fixed number of estimated hours, specified by GSA, which was multiplied by the hourly rate. These numbers were then totaled to provide spreadsheet and attachment totals, that GSA used as the estimated price for evaluation purposes.

8. Offerors also had to provide other cost-related information, such as a basis of estimate, audit information, and a professional compensation plan. (RFP, L.6, AR 217.)

9. GSA received 66 offers by the closing date of November 17, 2006. (AR 994). Serco Inc. ("Serco") provided one of those proposals. (AR 460ff).

10. The solicitation contemplated award without discussions. (RFP, M.2(c), AR 241). No discussions were held. (AR 1003).

---

[1] Labor categories were defined in RFP Section J, Attachment 4, AR 185-97.

11. The solicitation announced that offers would be evaluated using a " 'best value' tradeoff, in which differences in non-price factors and evaluated price will be compared between the Offerors." (RFP, M.3(d), AR 242).

12. There were two technical factors – Past Performance and Basic Contract Plan – of approximately equal importance to each other. (RFP, Section M.2(b), AR 241). When combined, these two factors were significantly more important than cost or price. *Id.*

13. The two technical factors had various subfactors. (RFP, M.5, AR 243-47). Past performance would be evaluated by contacting about ten references for each offeror.

14. Cost and price would be evaluated using various techniques, including prce comparisons with other proposals, and cost analysis. (RFP, M.6, AR 247-49).

15. GSA determined that 62 of the 66 proposals were acceptable, and evaluated them. These evaluations were reported in a Technical Evaluation Team Report, which also included the results of the price/cost evaluation. AR 838-972.

16. The source selection authority, Steven J. Kempf, put his conclusions into writing, in a Source Selection Decision Memorandum ("SSDM"). (AR 973-1060). He accepted the Technical Team's report and its recommendation to award contracts to the 28 offerors with the highest-ranked technical scores. He also decided to award a contract to [redacted] a lower-ranked offeror [redacted] He did not award a contract to Serco.

17. GSA notified Serco that its proposal was unsuccessful (AR 1061-63), and provided a written debriefing (AR 1065-1098). Serco then filed this action, protesting the decision not to award a contract to it.

Additional facts appear where relevant in the argument below.

## STANDARD OF REVIEW

In order to obtain judgment in a bid protest case, a plaintiff has the burden to show: (1) that the Government's award decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, (*e.g.* , a clear violation of applicable statutes or regulations) and (2) that the error was prejudicial, which usually means that there was a substantial chance that it would have received contract award but for the error. *See ARINC Engrg. Svcs, LLC v. United States*, 77 Fed. Cl. 196, 200-01 (2007).

## SUMMARY OF ARGUMENT

As described more fully below, GSA made errors prejudicial to Serco in every aspect of the evaluation. In evaluating Past Performance, GSA misevaluated one reference and failed to give Serco an opportunity to rebut negative information in another reference. GSA also misevaluated offerors without relevant past performance. In evaluating Basic Contract Plan, GSA ignored important aspects of Serco's proposal, even though it found those same features to be noteworthy strengths in other offerors' proposals. In evaluating price, GSA identified proposals which were unreasonably high or unrealistically low, but failed to take appropriate action based on those findings. The best value determination rested on these other flawed evaluations and was therefore flawed. In addition, GSA selected 28 awardees without taking into account price or cost, and it did not make a proper cost/technical tradeoff decision as regards Serco. These errors, both individually and collectively, were prejudicial, and resulted in Serco not receiving a contract.

## ARGUMENT

### I. GSA COMMITTED PREJUDICIAL ERRORS IN THE COST/PRICE EVALUATION

The Alliant procurement was unusual in that the contemplated contract could accommodate multiple types of orders. Such orders could be fixed-price, cost-plus, or time-and-materials. (AR 123). Therefore, GSA had to subject proposals to both cost and price analysis.

As described in the statement of facts, *supra*, offerors had to supply both fixed hourly rates and cost breakdowns for 80 labor categories, for ten years, for work at either a contractor site or a Government site. Each spreadsheet calculated a bottom-line price by multiplying each hourly rate by a specific, GSA-prescribed, number of hours. (These numbers varied by labor category). The spreadsheet totaled the products of these multiplications to generate a bottom-line price for all ten years. (RFP, Attachs. J-2, AR 251ff, & J-3, AR 273ff.) The sum of the bottom line prices for the two spreadsheets (contractor site and Government site) became the price used for comparative evaluation purposes. (AR 857). The source selection documentation also ranked proposals by price, assigning first place to the lowest-priced offeror, *etc*. (AR 1010).

As noted above, for each hourly price, offerors provided a cost breakdown into Direct Labor Rate composite (*i.e.*, salary), labor escalation, fringe benefits, overhead, G&A (general and administrative expense), and profit. (Attachs. J-2,& J-3, *supra*).

In addition, the solicitation described additional price and cost evaluation methods for the cost/price proposals. These included the following:

> Cost/price proposals will be evaluated using proposal analysis techniques consistent with FAR 15.404-1 to ensure that proposed direct and indirect rates for each labor category during the base period and option period are fair, reasonable, and predictable for anticipated work under the Basic Contract. . . . Proposals that include unrealistically low labor rates, or that do not otherwise demonstrate cost realism, will be considered a high risk assessment and will be evaluated for award in accordance with that assessment. [Section M.6, AR 247-48].
>
> (b) Comparison of proposed Loaded Hourly Labor Rates received in response to the Solicitation. [Section M.6.1 Price Analysis, AR 248].
>
> (c) . . . if necessary, a cost realism analysis to demonstrate the Offeror's understanding of the requirements of this Solicitation." [Section M.6.2 Cost Analysis, AR 249].
>
> Offerors are cautioned against unbalanced and unrealistic pricing. [L.12.5 AR 235]

Since there would be cost-plus as well as fixed-price orders, the Federal Acquisition Regulation ("FAR")[2] required an evaluation of costs and cost realism, and not just price reasonableness. *Id.* at 15.404-1(d). Cost analysis requires ". . . the application of judgment to determine how well the proposed costs represent what the cost of the contract should be . . . ." FAR 15.404-1(c)(1). The purposes of a cost realism analysis include " . . .to determine whether the estimated proposed cost elements are realistic for the work to be performed; [and] reflect a clear understanding of the requirements . . . ."[3] FAR 15.404-1(d). (The latter goal, relevant to the technical proposal evaluation, is repeated in RFP Section M.6.2, quoted above.) The results of this analysis yield a probable cost, which is used for evaluation purposes if it differs from the

---

2 Codified at 48 C.F.R., Chapter 1.

3 A third purpose set forth in the regulation, to determine if the proposed costs "are consistent with the unique methods of performance and materials described in the offeror's technical proposal," is irrelevant here, because offerors were not proposing to perform any specific work.

proposed costs. *Id.* Probable costs are used for evaluation purposes because the Government is likely to bear the burden of a cost overrun. *See ITT Fed. Svcs. Int'l Corp.*, B-289863.4, *et al.*, Dec. 16, 2002, 2002 CPD ¶ 216. Using probable costs also compensates for some offerors' tendency to underestimate costs in order to win a contract competition.

GSA performed two comparative analyses to determine whether prices and costs were too high or too low. As discussed below, it did nothing with the results of this analysis, and otherwise failed to conduct an adequate evaluation of price and cost.

**A. GSA Identified, But Failed to Address, Offerors Proposing Unreasonably High or Unrealistically Low Costs.**

GSA used two methods sanctioned by the FAR to evaluate proposed prices. It compared the evaluated price of each offerors to the mean price proposed by offerors,[4] and to the Independent Government Cost Estimate ("IGCE"). (AR 857-62, 956-70, 1010). FAR 15.404-1(b)(2)(i) sanctions comparison of the proposed prices, and subpart (2)(v) does the same for comparison with an IGCE.

In fact, the costs and prices proposed varied [redacted], from a high of about $[redacted] million to a low of about $[redacted] million. (AR, 956-57; *see also* AR 857-59). Thus, the highest-priced proposal was [redacted]% higher than the lowest-priced proposal. The spread for awardees was [redacted]. The lowest-priced awardee, [redacted], was about $[redacted] million, and the highest-priced awardee, [redacted], was about $[redacted] million, or [redacted]% higher.

---

4 The mean price was computed without using the prices proposed by the four offerors whose proposals were unacceptable. (AR 858-59).

In comparing offerors' prices to the mean price, GSA used the statistical tool of standard deviation from the norm. It classified the prices offered as within one standard deviation, or within two standard deviations, or more than two standard deviations from the norm. (AR 857-59). This analysis, from the Technical Team report (AR 838, 957-58), appears without modification in the SSDM (AR 1010).

The mean evaluated price was about $[redacted] million. (AR 956). According to GSA's analysis, [redacted] proposals were [redacted] standard deviations below the mean. *Id.* Their prices varied from [redacted]% to [redacted]% below. [redacted] of these [redacted] offerors, [redacted], received awards. (AR 976-77).

In addition, [redacted] offerors were [redacted] standard deviations above the mean. (*Id.*) [redacted] of these [redacted] were more than [redacted] standard deviations above the mean. Their prices varied from [redacted]% to [redacted]% above. [redacted] of these [redacted] offerors, [redacted], received awards. Of these [redacted] awardees, the first [redacted] had prices [redacted] standard deviations above the mean.

GSA also compared offered prices to its IGCE, which was about $[redacted] million. (AR 956). Using this as a basis of comparison, the lowest prices seemed even more unrealistic. For instance, [redacted]'s price was [redacted]% lower than the IGCE, [redacted]'s was [redacted]% and [redacted]'s was [redacted]%.

Although GSA developed these tools to identify excessively high and low proposals, it took no action based on this analysis. As discussed below, the price/cost evaluation, which noted some problems with the outliers, did not explain why these discrepant prices and costs were still acceptable. The failure to make meaningful use of the standard deviation analysis is particularly improper because of the unique

circumstances of this procurement. First of all, unlike the usual case where there may be a half-dozen competitors, here there were 62 acceptable proposals, and therefore 62 data points for the analysis. Significant deviation is of greater importance when so many independent actors establish the norm. In fact, most proposals clustered within [redacted] standard deviation from the norm, as shown on the attached chart developed from the data at AR 1010.

[redacted]

Secondly, this is not a situation where variations in proposed costs or prices can be explained by a different technical approach, learning-curve effects, or other efficiencies in performance. *See, e.g., Synetics, Inc. v. United States,* 45 Fed. Cl. 1 , 10-11(1999)(differing costs explained by different technical approaches). Offerors here were not proposing to perform any specific tasks. Costs and prices were simply for an hour of labor. All offerors proposed the same 80 labor categories, and all were evaluated using the same estimated hours for each category. Therefore a very high total price can

only be the result of very high hourly labor prices, and a very low total price must be the result of very low hourly labor prices.

When basic labor rate prices vary by as much as they do here, the inescapable conclusion is that the outliers have submitted unreasonably high or unrealistically low costs and prices. The evaluated prices of the awarded contracts vary greatly; the highest-priced awardee is [redacted] times the price of the lowest awardee.

The record, however, contains no analysis explaining this broad disparity, or why it makes sense to award contracts to the outliers. Indeed, the cost analyses for these [redacted] awardees barely mention the fact that they are outliers, and provide no analysis to establish their reasonableness or realism. With respect to the [redacted] awardees with prices [redacted] standard deviations below the mean, [redacted], the evaluation notes only the following. [redacted] GSA remarked that some labor categories were above the mean, but ignored the fact that the total price was [redacted] standard deviations above the mean. (AR 1737-38). Indeed, it incorrectly states that [redacted] *Compare* AR 1738 *with* AR 958 & 1010. For [redacted], the analysis notes that [redacted] (AR 1765). For [redacted], no unusual items noted. In each case, most of the analysis is simply a checklist with the right boxes ticked off, with little or no explanation or analysis. Certainly there is no basis to conclude how each offeror was able to propose a price that was so significantly lower than other offerors.

This failure was inconsistent with the evaluation criteria of the solicitation and the FAR. GSA did not view these proposals with "a high risk assessment," as required by

RFP Section M.6, *supra*, even though they had "unrealistically low labor rates," and unrealistic costs. GSA did not make the cost realism adjustments required by FAR 15.404-1(d), and RFP Section M.6.2, *supra.* And there is no basis to conclude, as GSA must under FAR 15.402(a) & 15.404-1(a), that the prices are "reasonable."[5]

With respect to the [redacted] awardees with prices [redacted] standard deviations above the mean, [redacted], GSA's analysis is similarly weak. ([redacted]) GSA noted that [redacted] did not explain how it computed its indirect cost pools and did not have approved indirect cost rates or pools, and that there "is no way to verify that [sic] the rates on the spreadsheet were developed or if they are accurate." (AR 1724.)[6] GSA took no action on these observations. GSA noticed that [redacted]'s price was above the norm, but did not explain why its price was reasonable. For [redacted], the evaluation states that its labor prices are above the norm, its price for the Government site was the highest of all offerors, and that its overall price [redacted] standard deviations from the mean (AR 1778-79). But nothing more. These analyses of offerors are virtually identical to those of offerors significantly below the norm. In each case, most of the analysis is simply a checklist

---

5 GAO interprets price reasonableness as applying only to prices which are too high. *See J.A. Farrington Janitorial Svcs.,* B-296875, Oct. 18, 2005, 2005 CPD ¶ 187. However, the language of the FAR does not contain this limitation.

6 The RFP required that: "Offerors shall submit supporting documentation for the basis of direct labor, labor escalation, and each indirect cost consistent with their organization's cost accounting system and, if applicable, provisional billing rates and forward pricing rate agreements." Further: "Offerors shall state the methodology used in computing their organization's indirect costs (i.e., Fringe Benefits, Overhead, and G&A), applied to Direct Labor and explain how the indirect costs were derived. (ii) Offerors shall state the methodology used in computing their organization's indirect costs (i.e., G&A, and/or material handling, and/or subcontract handling), applied to Other Direct Costs (i.e., Subcontracts, Materials, and Travel) and explain how the indirect costs were derived." RFP, L.2.5, AR 235-36. *See also,* Facts, ¶ 2, *supra.*

with boxes ticked off, and little or no explanation or analysis. Certainly there is no basis to conclude that the offerors' very high prices were reasonable.

Ironically, in a recent decision, GAO criticized a comparison based on standard deviations from the mean price as *too lax*. In *Multimax, Inc., et al.,* B-2989249.6 *et al.*, Oct. 24, 2006, 2006 CPD ¶ 165, the agency identified labor rates which were more than two standard deviations from the norm as outliers, and questioned offerors about them. GAO upheld the protest on the ground that the agency had not "reviewed the results of the formula to assure that the prices at the extreme end of the ranges reflected reasonable pricing . . . ." *Id.* at 8. Here, GSA identified these outliers but it did nothing to assure that their prices were reasonable. It also did not apply any such analysis to the individual labor rates proposed.

GSA utterly failed to use its analyses meaningfully. It disqualified no offeror for either an unreasonably high or unrealistically low price or cost.[7] It made no cost realism adjustments. And it did not disqualify [redacted] for failure to observe instructions about proposal preparation, even though it announced a policy of strict enforcement. (RFP, M.4(c), AR 243). The award decisions based on these faulty analyses cannot stand.

**B. GSA Made Other Errors in the Evaluation of Price and Cost.**

In the RFP, GSA committed itself to evaluate "proposed direct and indirect rates for each labor category," and "proposed Loaded Hourly Labor Rates." (Sections M.6 and M.6.1, *supra*). Since there were 80 labor categories and 20 spreadsheets, this meant evaluating 1,600 prices for each offeror, or almost 100,000 prices for the 62 offerors.

---

[7] Compensation plans, which presumably are affected by an unreasonably low price, are subject to a pass/fail evaluation under the RFP, Section M.8. (AR 249). All the awardees passed, including the three with prices two standard deviations from the norm.

This was surely a daunting task, but it was required by both the RFP and FAR 15.404-1(a), since the only prices proposed were hourly rates.

There is no evidence in the record, however, that GSA actually conducted such an analysis. If it had, it would have discovered [redacted] disparities like these:

| Labor Category | Site | Year | Awardee | Hourly Wage | Hourly Price | AR |
|---|---|---|---|---|---|---|
| Data Architect | Gov't | 1 | [redacted] | [redacted] | [redacted] | 4814 |
| | | | [redacted] | [redacted] | [redacted] | 10381 |
| ERP Business/ Architectural Specialist | Gov't | 10 | [redacted] | [redacted] | [redacted] | 6966 |
| | | | [redacted] | [redacted] | [redacted] | 11411 |
| Helpdesk Specialist (Entry Level) | Contractor | 10 | [redacted] | [redacted] | [redacted] | 4855 |
| | | | [redacted] | [redacted] | [redacted] | 11390 |
| Technical Editor | Contractor | 1 | [redacted] | [redacted] | [redacted] | 6971 |
| | | | [redacted] | [redacted] | [redacted] | 10360 |

The record contains no explanation for why prices for the same labor category should be [redacted], or why it is reasonable to pay the higher price. Neither does it explain why the lower labor cost is realistic. For instance, how can [redacted]? One has to wonder whether these awardees are offering the same services.

Moreover, GSA made no proper evaluation of unbalanced pricing, as required by FAR 15.404-1(g). The only cost factor analyzed for unbalanced pricing was the labor escalation rate. *See, e.g.,* AR 1737 [redacted]) 1753 ([redacted] & 1778 ([redacted]); *see also* AR 12389 & 12431-12747. GSA made no analysis of direct labor costs or prices to determine if an offeror had engaged in unbalanced pricing. As seen above, there was great disparity in such costs. This procurement was especially susceptible to unbalanced pricing because of the procedures for issuing orders. Before a contractor performs any work, it must first respond to a Task Order Request issued by the

Government with a proposal. (RFP, Clause G.9, AR 147). An offeror could propose very low prices for some labor categories, win a contract, and then not respond to task order requests for such work. *Id.* GSA's failure to conduct a proper analysis of unbalanced pricing left it vulnerable to this strategem.

**C. Conclusion.**

Given such wide differences, it was not enough for the SSDM simply to conclude, as it did for every awardee, that ". . . this Offeror's *labor rates* were considered fair and reasonable." (Emphasis in original). Offerors with unreasonably high prices should have been eliminated pursuant to FAR 15.402(a) & 15.404-1(a). Offerors with unreasonably low prices should have been eliminated, based on the RFP's ban on unrealistic pricing, and its caution that such proposals would be considered as "high risk." With so many competitive proposals, there was no reason to accept one posing a high risk. At a minimum, such proposals should have been subject to downgrading in the technical evaluation, as failing to understand the requirements,[8] and been subject to a cost realism adjustment for evaluation purposes, both as required by FAR 15.404-1(d)(1).[9] If GSA had done so, it would have not have awarded contracts to at least [redacted] offerors: [redacted] Without those [redacted] awards, Serco had a high likelihood of receiving a contract.

---

8 *See Serco, Inc.,* B-298266, Aug. 9, 2006, 2006 CPD ¶ 120 (protest sustained for failure to take cost realism adjustment into account in technical evaluation); *Information Ventures, Inc.*, B-297276.2, Mar. 1, 2006, 2006 CPD ¶ 45 (protest sustained where technical evaluation found approach satisfactory but cost evaluation found insufficient staffing levels);

9 *See PADCO, Inc.-Costs*, B-289096.3, May 3, 2002, 2002 CPD ¶ 135 (protest clearly meritorious where agency simply accepts, without analysis, offeror's discrepant costs).

## II. GSA COMMITTED PREJUDICIAL ERRORS IN THE EVALUATION OF PAST PERFORMANCE.

The Technical Evaluation factor was made up of two equal subfactors, Past Performance and Basic Contract Plan. RFP, Section M.2(b) (AR 241). GSA averaged point scores for Past Performance and Basic Contract Plan to obtain a final technical evaluation score. (AR 1006-07). This score was determined technical rank. *Id.*

Past Performance had five subfactors, of approximately equal weight, according to RFP Section M.2(b). (AR 241 & 244). GSA averaged point scores for these five subfactors to arrive at a final point score for Past Performance. (AR 856-57, 945-55). Since the point scores for the subfactors were expressed only as whole integers, [redacted]. For instance, there were [redacted] offerors with a score of [redacted], and [redacted] with a score of [redacted]. (AR 1009).

### A. GSA Misevaluated a [redacted] Reference for Serco

The past performance evaluation of Serco noted two references with negative comments. One was a [redacted] contract [redacted]) obtained from an automated system called PPIRS. However, GSA took a few negative comments from this reference out of context, and inflated them unreasonably.

Serco's consensus past performance evaluation for the Quality of Service subfactor stated that [redacted] (AR 749). The evaluation documentation also stated that [redacted]" *Id.* GSA's consensus evaluation report noted [redacted] by Serco, but concluded that:

---

[10] Identified as "PPIRS Reference [redacted]." PPIRS refers to an automated system for recording past performance information about Federal contractors.

> [redacted] [*Id.*]

However, GSA took [redacted] comments out of context. The PPIRS report for this contract appears at AR 743-45. Since this copy is hard to read, we have attached a legible copy of the same report, obtained from the PPIRS database, as Exhibit A.[11] The [redacted] assessment reported the following:

> [redacted]

Thus, it was very misleading to state, as the TEB did, that [redacted].

The evaluators also mistakenly expressed concern in the consensus report about [redacted]." [redacted]

---

[11] Government counsel referred us to this database to obtain a more legible copy of the document. *See* Index to the Supplement to the Administrative Record, filed Oct. 17, 2007, at 2.

[12] [redacted]

[redacted][13] The consensus report's concerns about these issues have no basis in the record and ignore its own conclusions.

The evaluators repeated this mistake for the Schedule[14] and the Cost Control[15] subfactors. They ignored positive aspects and exaggerated negative ones in the [redacted] PPRIS report. Moreover, this report shows that [redacted] (AR 749; Ex. A at 5). In fact, this reference should have been evaluated as a positive one for Serco.

B. **GSA Failed to Give Serco an Opportunity to Rebut Negative Information**.

[redacted]

13 All quotations are at AR 749.

14 The consensus report interpreted the [redacted] The actual PPIRS report stated that [redacted]

[redacted]

[redacted], FAR 15.306 provides in subsection (a) for the agency to communicate with an offeror, even when it does not conduct formal "discussions,"[17] in order to obtain certain clarifications. These explicitly include "adverse past performance information to which the offeror has not previously had an opportunity to respond." FAR 15.306(a).

In the same vein, the solicitation stated that "[t]he Government intends to evaluate proposals and award contracts without discussions with Offerors, except for clarifications, as described in FAR 15.306(a)." (RFP, M.2(c), AR 241).

GSA obtained a past performance reference for Serco from [redacted] (AR 713-15). This contract was designated [redacted] in the evaluation documents. (*Id.* )

GSA clearly considered the [redacted] information to be adverse. The consensus past performance evaluation for Serco lists [redacted]

---

16 This clause continues: [redacted]

17 This is a term of art that implies negotiations with certain required content, and the submission and evaluation of revised proposals. FAR 15.306(d).

so this information was adverse. *See Fort Carson Support Services, et al. v. United States,* 71 Fed. Cl. 571, 606 (2006).

However, Serco had never had an opportunity to address, much less rebut, the [redacted] comments. [redacted]

GSA did not contact Serco for its input and apparently never considered doing so.[18] However, GSA could have contacted Serco for its input on this matter without opening formal "discussions" under FAR 15.306(a).

If GSA had contacted Serco, it would have been able to provide significant information in rebuttal and in mitigation. Specifically,

- [redacted][19]
- [redacted].

[18] Government counsel has represented that "there is no documentation of additional contact with Serco regarding past performance." *See* Index to the Supplement to the Administrative Record, filed Oct. 17, 2007, at 2.

[19] Compare this with the treatment of [redacted]

[redacted]

- [redacted]
- [redacted]
- [redacted]

Thus, GSA's failure to contact Serco about this reference denied it the opportunity to rebut, mitigate, and put into proper context the negative comments that found their way into the consensus evaluation, and the resulting ratings. Under the FAR provisions cited

above, GSA could have given Serco this opportunity without opening formal "discussions." Therefore, GSA's failure to provide an opportunity to rebut was an abuse of discretion. Clearly, Serco was prejudiced by this failure, as the accompanying declarations show. *Cf. Fort Carson Support Services, et al. v. U.S., supra,* at 606-07. Consideration of Serco's point of view would have resulted in a higher past performance score and ranking.

C. **GSA Evaluated Offerors Inconsistently, to the Detriment of Serco**.

In addition to these errors, GSA treated Serco inconsistently, as compared to other awardees. For instance, Serco had the same Quality of Service rating as [redacted] AR 946, 952. However, unlike Serco, [redacted]. [redacted] It was unfair and irrational to give Serco the same rating for this subfactor [redacted]. Instead, Serco should have received the next higher rating [redacted]).

Similarly, GSA discounted negative comments from [redacted]

[redacted]

Disparate treatment in the evaluation of past performance justifies granting a bid protest. *See Family Entertainment Services, Inc.*, B-298047.3, Sept. 30, 2006, 2007 CPD ¶ 59; *see also* cases cited in section III.B, *infra.*

**D. GSA Misevaluated Offerors Without Relevant Past Performance.**

For some subfactors, GSA determined that the offeror had no relevant past performance. Title 42 U.S.C. § 405(j)(2) and FAR 15.305(a)(2)(iv) prescribe that in the case of an offeror without a record of relevant past performance or for whom information on past performance is not available, "the offeror may not be evaluated favorably or unfavorably" on past performance. This is sometimes referred to as a "neutral" rating.

GSA did not do that here. Instead, it merely ignored these subfactors, and evaluated past performance by averaging the scores for those subfactors where the offeror did have relevant past performance. In effect, the subfactors where there was no relevant past performance received the same score as the average of the other factors. If that average was favorable, those subfactors received a favorable evaluation.

Decisions by the Comptroller General have interpret the meaning of a "neutral" rating where, as here, the agency uses a spectrum of hierarchical scores for the evaluation. In that case, a "neutral" evaluation equates to the midpoint of the scores. *See*

*Joint Management & Technology Services*, B-294229, 2004 CPD ¶208; *Chicataw Constr. Inc.,* B-289592, 2002 CPD ¶62; *Medical Information Services*, B-287824, 2001 CPD ¶122; *Braswell Services Group, Inc.*, B-278921, June 17, 1998, 98-2 CPD ¶10.[20] Here, the spectrum of scores was from 1 to 5, and so the midpoint was 3.

The evaluation of [redacted]s past performance illustrates this error. The subfactors and overall evaluation for [redacted] were as follows:

| | | |
|---|---|---|
| Offeror Number | 23 | |
| Offeror Name | [redacted] | |
| Rating | ADJ | NUM |
| Sub-factor/Element | | |
| **Final Rating** | [redacted] | [redacted] |
| Quality of Service | [redacted] | [redacted] |
| Schedule | [redacted] | [redacted] |
| Cost Control | [redacted] | [redacted] |
| Business Relations | [redacted] | [redacted] |
| Subcontract Management/Socioeconomic Goals | [redacted] | [redacted] |

AR 948. ([redacted]. *See* AR 856-57). However, if GSA had used the midpoint of 3 [redacted]

| | | |
|---|---|---|
| Offeror Number | 23 | |
| Offeror Name | [redacted] | |
| Rating | ADJ | NUM |
| Sub-factor/Element | | |
| **Final Rating** | [redacted] | [redacted] |
| Quality of Service | [redacted] | [redacted] |
| Schedule | [redacted] | [redacted] |
| Cost Control | [redacted] | [redacted] |
| Business Relations | [redacted] | [redacted] |
| Subcontract Management/Socioeconomic Goals | [redacted] | [redacted] |

[20] Senior Judge Gibson reached the opposite conclusion in the case of *Metcalf Constr. Co., Inc. v. United States, et al.*, 53 Fed. Cl. 617 (2002). He determined that the statute requires the agency to ignore the past performance factor entirely, and to evaluate the offeror only on the other factors in the solicitation. We submit that ignoring the factor does not meet the statutory mandate for the reasons set forth above, and that if the statute had intended that result it would simply have said so directly.

[redacted] *See* AR 1006 & 998ff.

Indeed, GSA made this error multiple times. If it had [redacted] In addition to [redacted]. AR 945-55. [redacted]

E. **Conclusion.**

As discussed above, GSA misevaluated Serco's past performance with respect to [redacted]. [redacted]. As discussed above, Serco should have received a rating of [redacted]. [redacted]

---

[21] The adjustments, calculated as above for [redacted]

### III. GSA COMMITTED PREJUDICIAL ERRORS IN THE EVALUATION OF THE BASIC CONTRACT PLAN.

The Basic Contract Plan was one of two equally-weighted elements which went into the technical evaluation (the other, of course, being past performance). The Basic Contract Plan presented an offeror's intended methods of contract performance, condensed into a tight 30 pages (plus two more pages for an executive summary). (AR 223). The evaluation of Basic Contract Plan consisted of three subfactors: (1) Resources, (2) Program Management, and (3) Corporate Commitment. According to the evaluation criteria in the solicitation, these three subfactors were listed "in descending order of importance." (RFP, Section M.2(b), AR 241). The numerical weights used in the evaluation process were 50%, 30%, and 20%, respectively. (AR 843). [redacted]

The Administrative Record shows that GSA used the following methodology to evaluate the Basic Contract Plan. [redacted]

[redacted]

However, that was not the end of the evaluation. [redacted] GSA assigned a technical evaluation ranking for each offeror based on these technical evaluation scores. As discussed below, that ranking was used to determine 28 of the 29 awardees [redacted].

There was one final, and curious, step in the evaluation of the Basic Contract Plan. [redacted]

22 [redacted].

[redacted]

A. **GSA Ignored Important Aspects of the Serco's Proposal and Its Evaluation, and Treated Other Offerors Inconsistently, to the Detriment of Serco**.

In the process of deciding which aspects of Serco's proposal deserved to given special mention in the final consensus evaluation, GSA's evaluators neglected, ignored, and dropped important features of that proposal. There is no explanation in the record for why these many features were dropped from the consensus evaluation, especially when they appear to represent important proposal strengths. Indeed, these same features, when present in the proposals of other offerors, were included in the final consensus evaluation as strengths worthy of special mention. These offerors received higher scores than Serco for the applicable subfactors, thus showing that (1) GSA regarded these features as valuable, and (2) their omission prejudiced Serco. A table on the next two pages presents the factual basis for the discussion of this issue that follows the table:

**TABLE 1: INCONSISTENCIES IN EVALUATION OF BASIC CONTRACT PLAN**

Note: Offerors generally have the same abbreviations as used by GSA (AR 866).

| Serco Proposal Reference | Serco's consensus evaluation | Serco's SSDM Exhibit C | Mention in other offerors' consensus evaluation as a **STRENGTH** |
|---|---|---|---|
| | | **Resources -** [redacted] | |
| [redacted] | [redacted] | [redacted] | [redacted] |
| | | **Resources –** [redacted] | |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted]). |

| Serco Proposal Reference | Serco's consensus evaluation | Serco's SSDM Exhibit C | Mention in other offerors' consensus evaluation as a **STRENGTH** |
|---|---|---|---|
| **Program Management –** [redacted] | | | |
| [redacted] | [redacted] | [redacted] | [redacted] |
| **Program Management –** [redacted] | | | |
| [redacted] | [redacted] | [redacted] | [redacted] |
| **Program Management –Quality Controls, Surveillance Methodologies** | | | |
| [redacted] | [redacted] | [redacted] | [redacted] |

1. **GSA Evaluated the Resources Subfactor Incompletely and Inconsistently**.

The consensus narrative for the Resources subfactor lists [redacted] Nonetheless, Serco's evaluation for this subfactor was [redacted] Serco was not evaluated consistently with other offerors, however, and should have received a higher rating. The table that appears on the preceding two pages provides details for this subfactor.

Specifically, GSA treated Serco unfairly and inconsistently for the subfactors of Business Systems and OCONUS Capabilities and Continuity of Operations. With respect to [redacted] There is no justification in the record for the vastly different treatment of Serco's proposal.

With respect to [redacted] GSA again ignored critical aspects of Serco's proposal in the consensus evaluation report. But [redacted].

25 [redacted]

[redacted]

The same sort of discrepancy characterized [redacted] As Serco described in its proposal, [redacted]

Although Serco received a score of [redacted], other offerors with similar or less capability received scores [redacted] The record has no adequate explanation for this disparity.

[redacted] Both had [redacted].

[redacted]

26 [redacted]

[redacted] GSA clearly erred in giving Serco only a score of [redacted] for Resources.

**2. GSA Evaluated the Program Management Subfactor Incompletely and Inconsistently.**

Program Management [redacted], and GSA evaluated Serco's proposal improperly and inconsistently [redacted] as demonstrated in the table on pages 29 - 30. Generally speaking, the issues here were the same as for Resources. GSA ignored important features of the Serco proposal in the consensus evaluation. [redacted] The same features, however, were prominently mentioned in the consensus evaluations of other offerors, who received higher scores.

With regard to [redacted], GSA consensus evaluation for many offerors [redacted]

27 [redacted]

[redacted]

The picture is a bit different for [redacted].[31] This is an instance where [redacted]

Other offerors with [redacted] got higher scores, [redacted] There is no reason for Serco to have received a lower score than these identically situated offerors.

3. **GSA Also Evaluated the Corporate Commitment Subfactor Improperly.**

[redacted].

30 [redacted]

[redacted]

> [redacted]

> [redacted]

[redacted]

**B. GSA Failed to Factor Unrealistic Cost into the Technical Evaluation.**

As discussed above, an unrealistic cost indicates that the offeror doesn't understand contract requirements. *Supra*, at 6. Although several offerors, including [redacted], [redacted], this did not affect their technical scores, as it should have.

**C. These Errors Prejudiced Serco.**

If GSA had evaluated Serco's proposal properly, and consistently with the way if evaluated other offerors, Serco's score for Basic Contract Plan would have been much higher. Assuming that Serco's subfactors scores were [redacted] (and ignoring for the moment problems with the evaluation

33 [redacted]

of Corporate Commitment), that would have elevated its total score as shown in the following table (increased scores appear in red), using GSA’s spreadsheet and formulas:

[redacted]

([redacted]). A score of [redacted], when averaged with Serco’s [redacted], would result in an overall technical score of [redacted]. This would rank Serco as the [redacted] highest technical score, and along with [redacted], would qualify it for award.

In procurements like Alliant, FAR 15.305(a) requires that “[t]he relative strengths, deficiencies, significant weaknesses, and risks supporting proposal evaluation shall be documented in the contract file.” GSA’s consensus evaluation, and the scoring based on it, ignored important aspects of Serco’s proposal, and so failed this standard. These ignored aspects were mentioned in the consensus evaluations of offerors with higher subfactor scores. Such disparate and unequal treatment is obviously arbitrary and

capricious, as the Court of Federal Claims and GAO have held. *See, Erinys Iraq, Ltd., v. United States, et al.*, 78 Fed. Cl. 518, 533-35 (2007); *see also Beta Analytics Int'l Inc. v. United States, supra; Lockheed Martin Info. Sys.,*B-292836, *et al.*, Sec. 18, 2003, 2003 CPD ¶ 230, at 4. Accordingly, the Court should grant Serco relief on this ground as well.

## IV. GSA COMMITTED PREJUDICIAL ERRORS IN THE BEST VALUE EVALUATION.

As discussed above, the RFP described an evaluation method in which the combined technical factors were significantly more important than price. It also stated that:

> . . . the closer the technical scores of the various proposals are to one another, the more important cost or price considerations become in determining the overall best-value or the Government. [RFP, M.3(d) & M.6, AR 242, 247].

The preceding sections described in detail prejudicial errors in the evaluation of cost/price, past performance, and Basic Contract Plan. Since the best value decision rested on these flawed bases, it cannot stand. The best value decision also had independent errors, discussed below.

### A. **GSA Failed to Consider Cost or Price Meaningfully**.

In fact, GSA failed to consider cost or price meaningfully for 28 of the 29 awardees. According to the SSDM: [redacted] The SSDM also claims that, for the [redacted] [redacted], analyses in Exhibit C describe why they are worth the added price. (AR 998).

As discussed in detail above in section I on the cost/price analysis, the awardees varied enormously in price and estimated cost. The highest-priced awardee is [redacted] times the price of the lowest awardee. Also as discussed above, GSA never came to grips with the outliers – high and low – and never determined that their prices and costs were both reasonable and realistic. GSA also failed to analyze the individual labor category prices and costs. The record shows that, contrary to the SSDM's assertions, [redacted]

Put another way, if GSA was "buying" technical excellence in the form of evaluation points, [redacted]. There is no explanation in the record of why perceived technical excellence should have such a [redacted] variance in price. Certainly, there is no explanation of why the perceived technical quality of the three highest-priced awardees was worth the extra cost. The narratives simply recite their supposed superior technical features [redacted]

The failure to consider price and cost meaningfully violates 41 U.S.C. § 253a(c) and FAR 15.304(c)(1), which require that cost or price to the Federal Government must always be considered in the evaluation of proposals. GSA did not do so here. *See The*

*MIL Corporation,* B-294836, 2005 CPD ¶ 29 (award to all highly-rated offerors without regard to price violates obligation to consider cost or price).

**B. GSA Erred With Respect to the Tradeoff Decisions It Made for Serco.**

Exhibit C38 compared Serco with other higher-priced offerors selected for award. However it concluded that Serco should not receive an award because [redacted] (AR 1057 (emphasis added)).

[redacted]

Indeed, the record shows quite convincingly that there is no clear relationship between price and technical scores. If the association between low price and low technical merit were to hold true, then offerors with a low price (and therefore a better price rank, since the lowest price received rank #1) would tend to have lower technical scores (and therefore a worse technical rank, since the lowest technical score was ranked #62). Conversely, offerors with a high price (and therefore a worse price rank, since the highest price was ranked #62) would tend to have higher technical scores (and a better technical rank, since the highest technical score was ranked #1).

The accompanying chart shows one point for each of the 62 offerors, positioned in the location determined by its price and technical ranks in GSA's evaluation. (Data is from AR 1010). The technical rank has the higher-scored offerors to the left (with ranks #1, 2, 3, etc.) and the price rank is in reverse order, with the higher priced offerors at the bottom (with ranks from # 62, 61, 60, *etc*.). If the association claimed by GSA were true,

the points would tend to cluster along the $45^{o}$ line. Thus, an offeror with a high price,and thus low price rank, would also have a high technical score and thus high price rank; and one with a low price, and high price rank, would also have a low technical score and low technical rank. [redacted]

[redacted]

GSA also erred in the specific comparisons it made in Serco's case, and in those it failed to make, wholly apart from the evaluation problems discussed in sections I, II, and III, above. In Exhibit C38, GSA compared Serco's proposal to [redacted] The first part of this analysis simply repeats the fact that these other offerors have [redacted]

The analysis then turns to three categories of what it calls "discriminators." (AR 1059-60). Only the first of these is actually referred to as a "discriminator" in the RFP. However, its placement as a subsection in RFP Section M.5.1.3 indicates that it is a method for distinguishing between offerors whose *past performance* scores were "virtually equivalent." (AR 245). In spite of the many offerors whose past performance scores were actually equivalent, GSA did not use this discriminator to distinguish between them. Its use to differentiate offerors whose *total* technical evaluations were similar, as GSA did in Exhibit C38, is inappropriate and inconsistent with the RFP.

The other two "discriminators" aren't that at all. Instead, they are criteria indicating how an offeror can get a good evaluation for the subfactors of Resources – Internal Resources and Program Management (EVMS subfactor) respectively. (AR 246-47). Nothing in the RFP suggests that they would or could be used a second time, as determinative features in a cost/technical tradeoff decision.

In the Exhibit C38 analysis, [redacted]

[redacted].

The most serious failure of Exhibit C38 is that it is not what it purports to be, a tradeoff between cost and technical factors. The FAR has some explicit guidance on this:

> **15.101-1 Tradeoff process.**
> (a) A tradeoff process is appropriate when it may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror.
> (b) When using a tradeoff process, the following apply:
> (1) All evaluation factors and significant subfactors that will affect contract award and their relative importance shall be clearly stated in the solicitation; and
> (2) The solicitation shall state whether all evaluation factors other than cost or price, when combined, are significantly more important than, approximately equal to, or significantly less important than cost or price.
> (c) This process permits tradeoffs among cost or price and non-cost factors and allows the Government to accept other than the lowest priced proposal. **The perceived benefits of the higher priced proposal shall merit the additional cost, and the rationale for tradeoffs must be documented in the file** in accordance with 15.406.[35] [Emphasis added]. [36]

GSA failed most notably in this last part. It did not explain how the perceived benefits of higher-priced proposals were worth the additional cost. The GSA analysis simply assumes that *any* perceived technical benefit is worth *any* additional cost. Even where technical factors are of predominant weight, a slight difference in technical score is not worth a large disparity in price. *See Design Concepts, Inc.,* B-184658, Jan. 23, 1976, 76-1 CPD ¶ 39; *cf. The MIL Corporation, supra*.

GSA also erred in the superficial specific tradeoff decisions it made in Exhibit C38 of the SSDM. With respect to the comparison to [redacted], Exhibit C38 fails to note that [redacted]

---

[35] Also, FAR 15.305(a)(3) requires that, where a tradeoff is performed, as here, there be "appropriate supporting narrative, of each technical proposal using the evaluation factors."

[36] The RFP described this process in similar terms. *See* Facts, ¶ 11, *supra*.

[redacted]

Also, GSA erred by not making additional tradeoff comparisons, which would have been favorable for Serco. For instance, [redacted]

- [redacted]
- [redacted]
- [redacted]
- [redacted]

[redacted]

Finally, GSA did not make a tradeoff analysis between Serco and [redacted]

## V. CONCLUSION

As described above, GSA has made errors, prejudicial to Plaintiff, in the evaluation of cost/price, past performance, Basic Contract Plan, and the best value (cost-technical tradeoff) decision. These errors include clear violations of statute and regulation, and arbitrary and capricious actions. Plaintiff has met the statutory standard for relief in a bid protest action.

Plaintiff is entitled to declaratory relief, detailing the violations of law in this procurement. Plaintiff is also entitled to a permanent injunction, either directing award to

---

37 [redacted].

Plaintiff, or else directing Defendant to re-evaluate offers properly, and take other action necessary to cure the various defects demonstrated above. An injunction would be consistent with the public interest, which lies in preserving the integrity of the competitive procurement process. *See Reilly's Wholesale Produce v. United States,* 73 Fed. Cl. 705, 716 (2005). Also, since the solicitation contemplated multiple awards, a contract award to Plaintiff would not require divesting any other party – including intervenors – of their awarded contracts. (Indeed, an award to Plaintiff would be within the non-binding target of 25 to 30 awards set forth in the solicitation (AR 210)). Accordingly, Plaintiff respectfully requests judgment in its favor.

Respectfully submitted,

s/ Joseph J. Petrillo, Esq.

**PETRILLO & POWELL, PLLC**
5335 Wisconsin Ave., Suite 440
Washington, DC 20015
(202) 887-0405
(202) 478-1656 fax
jp@petrillopowell.com

Counsel of Record for Plaintiff
Serco Inc.

Dated: November 30, 2007

Of Counsel:
Karen D. Powell, Esq.
Eliane S. Herring, Esq.
**PETRILLO & POWELL, PLLC**

Exhibit A: Legible copy of PPIRS entry: Contract Performance Assessment Report for Contract [redacted].