**AGREED UPON REDACTED COPY**

[redacted]

**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| SERCO, INC.:<br>STANLEY ASSOCIATES, INC.;<br>CGI FEDERAL, INC.;<br>STG, INC.<br>ARTEL, INC.;<br>ADVANCED TECHNOLOGY SYSTEMS, INC.<br>APPTIS, INC.;<br>NORTEL GOVERNMENT SOLUTIONS, INC.;<br>and THE CENTECH GROUP, INC.<br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>INDUS CORP.;<br>ELECTRONIC DATA SYSTEMS CORP.;<br>INTERNATIONAL BUSINESS MACHINES CORP.<br>GENERAL DYNAMICS ONE SOURCE, LLC<br><br>Defendant-Intervenors. | Case No. 07-691C, 07-732C, 07-741C, 07-747C, 07-760C, 07-761C, 07-766C, 07-771C, and 07-803C<br>(Judge Allegra)<br><br>Filed Electronically<br>Under Seal On:<br>November 30, 2007<br><br>~~PROPOSED REDACTED VERSION~~ |

**PLAINTIFF ADVANCED TECHNOLOGY SYSTEMS, INC.'S**
**MEMORANDUM IN SUPPORT OF MOTION FOR**
**JUDGMENT ON THE ADMINISTRATIVE RECORD UNDER RULE 52.1**

Date: November 30, 2007

Respectfully submitted,

/s/Richard L. Moorhouse
Richard L. Moorhouse
GREENBERG TRAURIG, LLP
1750 Tysons Blvd.,
Suite 1200
McLean, VA 22102
Tel.: (703) 749-1311
Fax: (703) 714-8308

AGREED UPON REDACTED COPY

[redacted]

OF COUNSEL:
John G. Stafford
David T. Hickey
Sean M. Connolly
Emily C. Parker

**AGREED UPON REDACTED COPY**

[redacted]

**TABLE OF CONTENTS**


**I. STATEMENT OF THE CASE……………………………………………….……….. 6**

**II. STATEMENT OF RELEVANT FACTS………………………………………….…….. 8**

**III. ARGUMENT……………………………………………………………….…….. 13**

**A. GSA failed to conduct a proper best value determination in accordance with the Solicitation's requirements……….……………………………………… 14**

**B. GSA's Past Performance factor evaluation of ATS was arbitrary, capricious, and abuse of discretion, other not in accordance with law…………………… 18**

**1. GSA improperly denied ATS the opportunity to respond to an adverse past performance reference…………………………………………………….... 18**

**2. GSA failed to treat ATS and certain offers equally in evaluating past performance…………………………………………………………...…. 21**

**C. GSA's significant errors in its best value determination process and in its evaluation of ATS' past performance prejudiced ATS……………………..… 27**

**IV. INJUNCTIVE RELIEF…………………………………………………….…. 27**

**V. CONCLUSION………………………………………………………...... 28**

**AGREED UPON REDACTED COPY**

[redacted]

## TABLE OF AUTHORITIES

### Cases

Alfa Laval Separation, Inc. v. U.S.,
175 F.3d 1365, 1367 (Fed. Cir. 1999)........................................- 14 -

ARINC Engineering Services, LLC, v. U.S.,
77 Fed. Cl. 196 (2007)........................................- 13 -

Banknote Corp. of America,
365 F.3d 1345, 1351 (Fed. Cir. 2004)........................................- 13 -

Banknote Corp. of America,
56 Fed. Cl. at 377, 380-81 (2003), aff'd, 365 F.3d 345 (Fed. Cir. 2004)....................- 13 -, -14-

Data General Corp. v. Johnson,
78 F.3d 1556, 1562 (Fed. Cir. 1996)........................................- 13 -

JWK Intern. Corp. v. U.S.,
52 Fed.Cl. 650 (2002)........................................- 19 -

Seattle Sec. Services, Inc. v. United States,
45 Fed.Cl. 560, 569 (2000)........................................- 21 -, -22-, -27-, -28-, -29-

### Federal Statutes

5 U.S.C. § 706(2)(A) (2006)........................................- 12 -

28 U.S.C. § 1491(b)(4) (2006)........................................- 12 -

AGREED UPON REDACTED COPY

[redacted]

**Federal Regulations**


FAR 15.101-1 ........................................................................................................- 16 -

FAR 15.304(c)(1)...................................................................................................- 15 -

FAR § 15.306(b) ...................................................................................................- 19 -

FAR § 15.306(b)(1)(i)............................................................................................- 19 -

FAR § 15.306(b)(1)(ii)...........................................................................................- 19 -

FAR 15.306...........................................................................................................- 21 -

FAR 15.505(a) ......................................................................................................- 13 -

**AGREED UPON REDACTED COPY**

[redacted]

**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

**BID PROTEST**

SERCO, INC.:
STANLEY ASSOCIATES, INC.;
CGI FEDERAL, INC.;
STG, INC.; ARTEL, INC.;
ADVANCED TECHNOLOGY SYSTEMS, INC.
APPTIS, INC.;
NORTEL GOVERNMENT SOLUTIONS, INC.;
and THE CENTECH GROUP, INC.

Plaintiffs,

v.

THE UNITED STATES,

Defendant,

INDUS CORP.;
ELECTRONIC DATA SYSTEMS CORP.;
INTERNATIONAL BUSINESS MACHINES CORP.
GENERAL DYNAMICS ONE SOURCE, LLC

Defendant-Intervenors.

Nos. 07-691C, 07-732C, 07-741C, 07-747C, 07-760C, 07-761C, 07-766C, 07-771C, and 07-803C
(Judge Allegra)

Filed Electronically
Under Seal On:
November 30, 2007

~~PROPOSED REDACTED VERSION~~

**PLAINTIFF ADVANCED TECHNOLOGY SYSTEMS, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD UNDER RULE 52.1**

## I. STATEMENT OF THE CASE

This is a bid protest action brought by Advanced Technology Systems, Inc. ("ATS") challenging the methodology and source selection process used by the General Services Administration ("GSA") under Solicitation No. TQ2006MCB0001 ("Solicitation") to award contracts under what is commonly known as the "Alliant" procurement with an estimated value

**AGREED UPON REDACTED COPY**

[redacted]

of $50,000,000,000. The Alliant procurement is a Governmentwide Acquisition Contract ("GWAC")-type vehicle and is intended to result in the award a multiple number of contracts to telecommunications and information technology products and services providers. ATS challenges GSA's actions in the Alliant procurement resulting in ATS' exclusion from receiving an award as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The Administrative Record ("AR") shows specific GSA actions and decisions in the Alliant procurement that were irrational or involved a clear violation of applicable statutes and regulations. GSA's significant errors in the Alliant procurement process prejudiced ATS, and had those significant errors not occurred, there was a substantial chance ATS would have been one of the Alliant GWAC awardees. Accordingly, and especially where GSA announced its intent to award 25 to 30 contracts and awarded only 29 contracts, ATS it is entitled to injunctive relief in this case.

The particular errors in this procurement include GSA's flawed best value determination methodology which was improperly applied and which misapplication resulted in GSA's establishment of a list of presumptive awardees, or, in essence, an *ad hoc/de facto* competitive range based solely on technical ranking without initially considering whether any perceived technical advantages in higher-ranked proposals were worth the associated price premium. This is especially so where the scores on which the rankings were based were generally [redacted] numerically. Further, GSA's evaluation of ATS' proposal under the critical Past Performance major factor was arbitrary, capricious, an abuse of discretion and not in accordance with law because it denied ATS the opportunity to respond to one discrete piece of past performance

AGREED UPON REDACTED COPY

[redacted]

information which, unrebutted, and otherwise given undue emphasis by GSA, led to a significant [redacted] in ATS' Past Performance rating.

## II. STATEMENT OF RELEVANT FACTS

The Solicitation contemplated that GSA would make approximately 25-30 GWAC awards, but reserved GSA's right to make fewer or more awards based on a determination as to which offers represented the "best value" to the Government, with technical factors being significantly more important than price. AR 210. The Solicitation called for a tradeoff analysis between the technical and price factors as the basis for the best value determination. AR 242.

The three evaluation factors were: (1) Basic Contract Plan; (2)Past Performance; and (3) Cost or Price, with the two non-price factors equally weighted and of significantly more important than price. AR 241-2. However, the importance of price would increase the closer the offerors' technical scores were to one another. AR 242. GSA stated in the Solicitation that it intended to make award without discussions, except for clarifications, but reserved the right to conduct discussions if necessary. AR 241.

The Past Performance major factor included five subfactors of equal importance: (1) Quality of Service; (2) Schedule; (3) Cost Control; (4) Business Relations; and (5) Subcontract Management/Socioeconomic Goals. AR 244. According to the Alliant Source Selection Plan ("SSP"), past performance was to be evaluated according to the following evaluation criteria:

AGREED UPON REDACTED COPY

[redacted]

| | Exceptionally High Confidence | Significant Confidence | Acceptable Confidence | Marginal Confidence | Little to No Confidence |
|---|---|---|---|---|---|
| **Quality of Service** | The Offer has an outstanding track record for its quality of service, meeting all contractual requirements and exceeding many requirements to the Government's benefit. Risk factors are identified and Offeror employs effective innovative and unique quality assurance tools and methodologies to ensure efficient and effective design, development and implementation of quality solutions. Performance metrics and quality control solutions are comprehensive, verifiable and effective. Essentially no reasonable doubt exists that the Offeror will successfully perform the required effort and deliver high quality service and solutions under the Alliant Contract | The Offeror has an above average track record for quality of service, meeting all contractual requirements and exceeding some requirements to the Government's benefit. Risk factors are identified and Offeror employs innovative an quality assurance tools and methodologies to ensure efficient and effective design, development and implementation of quality solutions. Performance metrics and quality control solutions are comprehensive, verifiable and effective. Little doubt exists that the Offer will successfully perform the required effort and deliver high quality service and solutions under the Alliant Contract. | The Offeror has an acceptable track record for quality of service by meeting, but not exceeding, all contractual requirements. Risk factors are identified and Offeror employs methodologies to design, development and implementation of solutions. Performance metrics and quality control solutions are acceptable. Some doubt exists that the Offeror will successfully perform the required effort and deliver high quality service and solutions under the Alliant Contract. | The Offeror has a marginal or unstable track record for quality of service, marginally meeting contractual requirements (minimal information). Risk factors are not identified but Offeror does plan to establish methodologies for the design, development and implementation of solutions. Performance metrics and quality control solutions are acceptable. Substantial doubt exists that the Offeror will successfully perform the required effort and deliver high quality service and solutions under the Alliant Contract. | The Offeror's track record for quality of service does not meet many contractual requirements. Risk factors are not identified and Offer does not have methodologies for the design, development and implementation of solutions or performance metrics and quality control solutions. Significant doubt exists that the Offeror will successfully perform the required effort and deliver high quality service and solutions under the Alliant Contract. |
| **Schedule** | The Offeror has an outstanding track record of meeting all schedule goals related to completion of the contract, task orders, milestones, delivery schedules and administrative | The Offeror has an above-average track record of meeting all schedule goals related to completion of the contract, task orders, milestones, delivery schedules and administrative requirements timely | The Offeror has an acceptable track record of meeting all schedule goals related to completion of the contract, task orders, milestones, delivery schedules and administrative requirements timely | The Offeror has a marginal or unstable track record of meeting all schedule goals related to completion of the contract task orders, milestones, delivery schedules and administration of | There is an abundance of readily available adverse information on the Offeroror's ability to identify and manage schedule risk. Significant doubt exists that |

AGREED UPON REDACTED COPY

[redacted]

| | Exceptionally High Confidence | Significant Confidence | Acceptable Confidence | Marginal Confidence | Little to No Confidence |
|---|---|---|---|---|---|
| | requirements timely submission of accurate Small Business Subcontracting reports; invoices; contract closeout documentation, etc. Essentially no reasonable doubt exists that the Offeror will successfully meet schedule, reporting and contract administration requirements under the Alliant Contract. | submission of accurate Small Business Subcontracting reports; invoices; contract closeout documentation, etc. Little doubt exists that the Offeror will successfully meet schedule, reporting and contract administration requirements under the Alliant Contract | submission of accurate Small business Subcontracting reports; invoices; contract closeout documentation, etc. Some doubt exists that the Offeror will successfully meet schedule, reporting and contract administration requirements under the Alliant Contract. | requirements timely submissions of accurate Small business Subcontracting reports, invoices, contract closeout documentation, etc. Substantial doubt exists that the Offeror will successfully meet Schedule, reporting and contract administration requirements under the Alliant Contract. | the Offeror will successfully meet schedule, reporting and contract administration requirements under the Alliant Contract. |
| **Cost Control** | The Offeror has an outstanding track record of effectively forecasting, managing and controlling contract costs, as well as report and analyze variances. Essentially no reasonable doubt exists that the Offeror will successfully deliver a service at the agreed to price/cost. | The Offeror has an above-average track record of effectively forecasting, managing and controlling contract costs, as well as report and analyze variances. Little doubt exists that the Offeror will successfully deliver a service at the agreed to price/cost. | The Offeror ha san acceptable track record of effectively forecasting, managing and controlling contract costs, as well as report and analyze variances. Some doubt exists that the Offeror will successfully deliver a service at the agreed to price/cost. | The Offeror has a marginal or unstable track record of effectively forecasting, managing and controlling contract costs, as well as report and analyze variances. Substantial doubt exists that the Offeror will successfully deliver a service a the agreed to price/cost. | There is an abundance of readily available adverse information on the Offeror's ability to identify and manage cost risk. Significant doubt exists that the Offeror will successfully perform deliver a service at the agreed to price/cost. |
| **Business Relations** | The Offeror has an outstanding track record of integrating and coordinating all activity needed to execute contracts and has demonstrated outstanding success as an effective business partner. The Offeror provides a methodology for problem | The Offeror has an above-average track record of integrating and coordinating all activity needed to execute contracts and has demonstrated above-average success as an effective business partner. The Offeror provides a methodology for problem identification, and corrective action | The Offeror has an acceptable track record of integrating and coordinating all activity needed to execute contracts and has demonstrated success as an effective business partner. The Offeror provides a methodology for problem identification, and corrective action plans. Timeliness of | The Offeror has a marginal or unstable track record of integrating and coordinating all activity needed to execute contracts and has demonstrated marginal success as an effective business partner. The Offeror provides no corrective action plan. Timeliness of proposal submittals, change orders and | There is an abundance of readily available adverse information on the Offeror's ability to integrate and coordinate all activity needed to execute contracts and the Offeror has not demonstrated success as an effective business partner. The Offeror provides |

AGREED UPON REDACTED COPY

[redacted]

| | Exceptionally High Confidence | Significant Confidence | Acceptable Confidence | Marginal Confidence | Little to No Confidence |
|---|---|---|---|---|---|
| | identification and corrective action plans. timeliness of proposal submittals, change orders and task order requests (TORs) were completed and of the highest quality. Essentially no reasonable doubt exists that the Offeror strives to provide highest customer satisfaction. | plans. Timeliness of proposal submittals, change orders and task order requests (TORs) were completed and of the highest quality. Little doubt exists that the Offeror strives to provide highest customer satisfaction. | proposal submittals, change orders and task order requests (TORs) are mostly completed and are satisfactory. Some doubt exists that the Offeror can provide customer satisfaction. | task order requests (TORs) were not completed and are unsatisfactory. Substantial doubt exists that the Offeror can provide customer satisfaction. | no methodology for corrective action plans. Significant doubt exists that the Offeror can provide customer satisfaction. |
| **Subcontractor Management/ Socio-economic Goals** | The Offeror has an outstanding track record in managing subcontracts and have exceeded many small business goals in the past. Essentially no reasonable doubt exists that the Offeror can successfully manage subcontractors and achieve its small business goals under the Alliant Contract | The Offeror has a good track record in managing subcontracts and have exceeded some small business goals. Little doubt exists that the Offeror can successfully manage subcontractors and achieve its small business goals under the Alliant Contract. | The Offeror has an acceptable track record in managing subcontracts and have met all its small business goals. Some doubt exists that the Offer can successfully manage subcontractors and achieve its small business goals under the Alliant Contract. | The Offeror has a marginal or unstable track record in managing subcontracts and have marginally met small business goals. Substantial doubt exists that the Offeror can manage subcontractors effectively or achieve its small business goals under the Alliant Contract. | The Offeror's track record of managing subcontracts and have not met small business goals. Significant doubt exists that the Offeror can manage subcontractors or achieve its small business goals under the Alliant Contract. |

AR 77.

Offerors were required to submit information regarding their past performance efforts in two tabular formats. AR 227-31. These tables included Contract Point-of-Contact and Program Office Point-of-Contact information for each past performance effort. Id. Offerors were permitted to submit up to 20 efforts and references for Table 1 and up to 50 efforts and references for Table 2. AR 228-229. GSA stated in the Solicitation that it would use reasonable

**AGREED UPON REDACTED COPY**

[redacted]

efforts to check approximately 10 references for each Offeror, but reserved the right to check more or less references[1]. AR 231.

Under the Source Selection Plan ("SSP") procedures established for the Alliant procurement, GSA outsourced the task of contacting the past performance references, conducting interviews and producing transcripts of the interviews to a third party contractor. AR 47. Once an interview transcript was complete, under the SSP procedures, the contractor's personnel were to transmit a copy of the transcript for verification and confirmation to the respective reference. Id. The confirmed transcripts of these interviews were then to be reviewed by GSA's past performance evaluators. Id. If the evaluators came across adverse past performance information in the interviews, the established procedures required the evaluators to forward the information to the Contracting Officer to determine whether to provide the affected offeror with an opportunity to respond to the negative information. AR 51.

ATS' proposal listed [redacted] for Table 1 and [redacted] for Table 2. AR 22146-48. Of these [redacted], GSA contacted [redacted] references. AR 22282-22306.

The Source Selection Evaluation Team ("SSET") briefed the Source Selection Authority ("SSA") on May 25, 2007 regarding their evaluations. AR 996, 12377-12414. The SSET's presentation indicated that the SSET had determined there was a [redacted] between the [redacted] highest-ranked offerors technically and the remaining competitors. AR 12398. The SSET recommended that the [redacted] offerors above the [redacted] be considered for award and that the remaining offerors below the [redacted] technical ranking be considered unsuccessful. AR 12413.

[1] The Source Selection Plan ("SSP") states that the Agency intended to check nine past performance efforts from Tables 1 and 2. AR 46.

**AGREED UPON REDACTED COPY**

[redacted]

This occurred prior to any best value tradeoff. In other words, placement above the [redacted] point created an *ad hoc/de facto* competitive range based solely upon technical rankings, with price being considered only after such placement. GSA actually made award to the [redacted] highest technically-ranked offerors and one additional offeror ranked [redacted]. This offeror had a [redacted] than the offerors ranked [redacted]. AR 998; AR Supp. Ex. C, pp. EC-1-EC-2.

GSA subsequently notified ATS by letter that it was not an awardee, and that award had been made to 29 offerors out of the 66 offers received. AR 22416-18. Out of the 66 offers received, four offers were rejected prior to being evaluated. AR 22419. ATS timely requested in writing a post-award debriefing in accordance with FAR 15.505(a). Id. ATS received GSA's written debriefing on August 21, 2007. AR 22419-22429. After filing an initial protest with the Government Accountability Office ("GAO"), along with other disappointed Alliant offerors, ATS is now before this Court in this consolidated case.

## III. ARGUMENT

This Court will enjoin agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (2006); 28 U.S.C. § 1491(b)(4) (2006). Thus, ATS must show that GSA's conduct of the Alliant procurement is either irrational or involved a clear violation of applicable statutes and regulations. ARINC Engineering Services, LLC, v. U.S., 77 Fed. Cl. 196 (2007); citing Banknote Corp. of America, 365 F.3d 1345, 1351 (Fed. Cir. 2004). ATS must also show that GSA's significant errors in the Alliant procurement process prejudiced ATS. Id., citing Data General Corp. v. Johnson, 78 F.3d

AGREED UPON REDACTED COPY

[redacted]

1556, 1562 (Fed. Cir. 1996). To demonstrate prejudice, ATS must show that there was a substantial chance it would have received the contract award but for the errors discussed below. Id. citing Alfa Laval Separation, Inc. v. U.S., 175 F.3d 1365, 1367 (Fed. Cir. 1999). Finally, ATS must demonstrate that it is entitled to injunctive relief. See Banknote Corp. of America, 56 Fed. Cl. at 377, 380-81 (2003), aff'd, 365 F.3d 345 (Fed. Cir. 2004). The following arguments demonstrate that ATS meets all hurdles because GSA's actions were arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law, were otherwise irrational, and that those actions prejudiced ATS, an actual offeror and, thus, an "interested party" with standing to bring this action against the conduct of the Alliant procurement.

**A. GSA failed to conduct a proper best value determination in accordance with the Solicitation's requirements.**

GSA failed to conduct a proper best value determination process under the Solicitation. Instead, GSA established a presumptive list of awardees based solely on their technical ranking without ever developing an overall best value rank order considering both the non-price factors and price. This is directly contrary to the terms of Section M.3(d) of the Solicitation. The Solicitation's applicable provision states:

> Consistent with FAR 15.101-1, the Government will conduct a "best value" tradeoff, in which differences in non-price factors and evaluated price will be compared between the Offerors in order to determine which Offeror represents the best value to the Government. The technical factors combined are significantly more important than cost or price; however, the closer the technical scores of the various proposals are to one another, the more important cost or price considerations become in determining the overall best-value for the Government.

[redacted]

AR 242 (emphasis added). Here, GSA conducted a best value tradeoff analysis only after establishing a ranked list of expected awardees above the purported [redacted] The tradeoff analysis was flawed and perfunctory because it only compared an offeror already on the list with offerors who were not on the list, and ultimately resulted in a determination that all offerors already on the list should retain their position and that unsuccessful offerors which did not make the initial "cut" based on their technical rank alone should continue to be excluded from the list, regardless of their respective offered prices. In effect, as noted above, by using the [redacted] rankings list, GSA established an *ad hoc*/*de facto* competitive range of presumptive awardees before ever conducting a best value analysis. That was irrational and contrary to the stated evaluation criteria.

While the technical factors together are significantly more important than price, as noted above, the Solicitation did not allow GSA to determine the presumptive awardees without first conducting a cost/technical tradeoff and best value analysis. GSA was required to evaluate price under FAR 15.304(c)(1), and it was required to consider price as more important the closer the technical scores became. AR 242. Here, the record clearly shows that most of the technical scores were [redacted] of each other, AR Supp., Ex. C, pp. EC-1-EC-2. As such, GSA should have paid particular and greater attention to the offerors' prices. GSA's evaluation process instead improperly and unreasonably left its established technical rank order intact as the sole basis for prospective award consideration without first determining whether a particular technical ranking indicated real technical superiority worth the offered higher price. For example, [redacted], the offeror ranked [redacted], also offered one of the [redacted] prices. [redacted]

AGREED UPON REDACTED COPY

[redacted]

was placed within the *ad hoc/de facto* competitive range without GSA first determining whether [redacted] offered price, more than [redacted] above the mean price submitted by all offerors, or, in dollar terms, some [redacted], still would be a "best value" to the Government given [redacted] overall technical ranking which, reflected a combined Basic Contract Plan and Past Performance numeric score of [redacted] AR Supp., Ex. C, p. EC-1.

Both the SSA's Source Selection Decision ("SSD") and the SSET Chair's debriefing letter to ATS acknowledge that the SSA agreed with the SSET Chair's recommendation to award contracts to the [redacted] highest technically-ranked offerors. AR 997 and 22426. While the SSA's decision asserts that GSA conducted a best value tradeoff consistent with FAR 15.101-1, and that the SSA worked closely with the SSET and agency legal advisors AR 996-7 in doing so, the Administrative Record makes clear, and to the contrary, that the SSA's decision was solely based on the SSET's predisposition to recommend that the SSA award contracts to the [redacted] technically-ranked offerors without first considering price as part of a true best value determination process, and one consistent with the Solicitation.

Rather, in conducting its belated tradeoff analysis, GSA compared offerors to offerors it had already designated as "unsuccessful" offerors. While GSA may believe that the relevant record documentation shows that it conducted an appropriate best value analysis, the contrary is true. The record in fact demonstrates that GSA effectively reached award decisions based on technical ranking alone prior to any tradeoff analysis. GSA did not conduct an independent and meaningful best value tradeoff of all offerors. Rather, GSA unreasonably approached its tradeoff

AGREED UPON REDACTED COPY

[redacted]

analysis with a list of expected awardees and a list of "unsuccessful" offerors already in hand.[2]

The SSA's decision to award [redacted] further demonstrates GSA's lack of a true best value tradeoff analysis under this Solicitation, and suggests that the real flaw in the evaluation process is the SSET's early conclusion there was a [redacted] at the [redacted] position. The SSA, similar to the SSET's previous [redacted] concept, states in his decision that he saw a [redacted] following the [redacted] technically-ranked offeror. AR 997. But there are no evident [redacted] based purely on technical scores. As but one example, [redacted]

Following his selection of the 29 awardees, only then did the SSA review the remaining proposals, stating that his [redacted] AR 998. Had the GSA conducted a meaningful best value tradeoff analysis among all

---

[redacted]

**AGREED UPON REDACTED COPY**

[redacted]

offerors, and not just a selective number of already-deemed "unsuccessful" offerors to compare against the 29 offerors already selected for award, GSA would have a basis to argue that it met the requirements of the Solicitation and applicable regulation -- but it cannot on this record.

Moreover, the [redacted] to the list of presumptive awardees ever after the belated tradeoff process underscores the flawed nature of GSA's best value analysis. Logically, one would expect [redacted] in the rankings of 62 offerors between the time of the initial technical evaluation and the time that the best value determination was concluded. [redacted] This lends significant support to the argument that GSA's methodology was unsound. Coupled with GSA's clear failure to follow the Solicitation's provisions enhancing the importance of price as technical scores become closer, this should invalidate the source selection results.

The failure to adequately consider price and the offerors' price ranking where technical scores were [redacted], and to develop a true best value ranking following a proper tradeoff analysis, one considering the technical evaluation results and price together, severely prejudiced ATS. [redacted] GSA never determined, as it should have done in conducting a proper best value analysis, whether, for example, [redacted] ranked technical score justified its inclusion on the list of likely awardees notwithstanding its [redacted] ranked price, and then whether ATS or any other offeror significantly lower in price than [redacted] should displace [redacted], or otherwise be entitled to one of the awards, because any advantages or strengths perceived in SAIC's technical proposal or in its past performance record might not warrant a large price premium.

AGREED UPON REDACTED COPY

[redacted]

**B. <u>GSA's Past Performance factor evaluation of ATS was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.</u>**

1. <u>GSA improperly denied ATS the opportunity to respond to an adverse past performance reference.</u>

An agency's evaluation of an offeror's past performance must be reasonable, consistent with the stated evaluation criteria and comply with relevant statutory and regulatory requirements. <u>JWK Intern. Corp. v. U.S.</u>, 52 Fed.Cl. 650 (2002). Here, GSA's past performance evaluation of ATS failed to meet that standard.

FAR § 15.306(b) governs "Communications with offerors before establishment of the competitive range," and addresses "exchanges aimed at determining whether an offeror should be included in the competitive range." <u>JWK</u> 52 Fed. Cl. at 662. If a competitive range is established, communications "[s]hall be held with offerors whose past performance information is the determining factor preventing them from being placed within the competitive range," <u>Id</u>. <u>citing</u> FAR § 15.306(b)(1)(i), and may only be held with offerors "whose exclusion from, or inclusion in, the competitive range is uncertain." FAR § 15.306(b)(1)(ii). Given GSA's conduct in this procurement and its establishment of an *ad hoc/de facto* competitive range, these FAR requirements regarding the conduct of exchanges to address certain ATS' past performance information must apply.

As noted above, while the Solicitation did not expressly call for the establishment of a competitive range, GSA effectively established an *ad hoc/de facto* competitive range when it determined that the [redacted] technically-ranked offerors were in line for award. Although the rest of the offerors including ATS were not formally excluded from further consideration, GSA had

AGREED UPON REDACTED COPY

[redacted]

in fact deemed them "unsuccessful" offerors. Since ATS' past performance evaluation was critical to its elimination from the list of the [redacted] offerors, GSA should have inquired about certain negative past performance information arising during ATS' past performance evaluation which was inconsistent with and anomalous to its otherwise very commendable record. GSA's failure to conduct exchanges with ATS and, presumably other offerors similarly situated, was contrary to the FAR and irrational.

Because the combined technical scores numerically were [redacted] among offerors, even a small change to a past performance factor rating would materially impact a technical score. In ATS' case, GSA's unreasonable failure to provide ATS an opportunity to respond to the negative past performance information received from ATS "Reference 5" in one subfactor area severely prejudiced ATS. Reference 5 was the only reference out of ATS' [redacted] past performance references who provided any negative comments regarding ATS' [redacted]. Other ATS references provided [redacted] with ATS' performance. AR 22283-22306. This should have put GSA on notice that Reference 5's criticisms regarding ATS' alleged [redacted] issues in one specific contract may not have been reliable or accurate, or could have been taken out of context. Reference 5 in fact was the program office point of contact, not the contract administration point of contact, ATS had listed for its [redacted] contract. AR 22146.

Had GSA actually followed its own stated past performance procedures regarding adverse past performance information, ATS' technical score would have seen significant improvement. The Alliant SSP, as noted above, required reference interview transcripts to be

AGREED UPON REDACTED COPY

[redacted]

verified, and also required evaluators who received adverse past performance information to provide such information to the Contracting Officer, who then would determine whether to provide the offeror a chance to respond to such information. AR 51. [redacted] Id. The Administrative Record contains no evidence that Reference 5's transcribed remarks were verified or, even more importantly, that ATS' adverse past performance information was brought to the Contracting Officer's attention for a decision whether ATS should be contacted regarding this information. Had GSA even minimally inquired with ATS about Reference 5's comments regarding ATS' [redacted] efforts, ATS would have had an opportunity to rebut or correct any erroneous information or misconstrued statements and could well have received [redacted] ATS' Past Performance score on that basis alone would then have [redacted] to [redacted], resulting in an [redacted] in its combined weighted technical score to [redacted] overall. ATS' asserts that this adverse past performance information was a significant factor in ATS' being labeled an "unsuccessful" offeror early on despite the fact that ATS was ranked [redacted] as to its its Basic Contract Plan score and ranked number [redacted] in terms of price. AR Supp., Exhibit C, p. EC-1. It was contrary to the FAR, irrational, and highly prejudicial for GSA to fail to conduct clarifications with ATS allowing ATS to address Reference 5's adverse past performance information.

2. GSA failed to treat ATS and certain offers equally in evaluating past performance.

It is fundamental that the contracting agency must treat all offerors equally; it must evaluate offers evenhandedly against common requirements and evaluation criteria. See Seattle

AGREED UPON REDACTED COPY

[redacted]

Sec. Services, Inc. v. United States, 45 Fed.Cl. 560, 569 (2000) (finding that the agency there failed to evaluate offerors past performance consistently where the plaintiff was evaluated according to a rigid point system, but the awardee was not). Here, GSA did not treat ATS equally in comparison with a number of other offerors when evaluating past performance.

GSA overemphasized and misinterpreted ATS' adverse past performance information and then failed to give appropriate weight to [redacted] past performance reference regarding the [redacted] subfactor. AR 22283- 222306. For example, ATS Reference 7 stated he would give ATS [redacted]. AR 22298. Other references [redacted] ATS for [redacted] AR 22293, 22291, 22299. Yet, the Consensus Evaluation Report for ATS' past performance, while acknowledging [redacted] the adverse comments made by References 5 and 7. The evaluators referred to Reference 5's comments regarding the [redacted] issue discussed above and an ambiguous reference to ATS' [redacted] AR 22375. And, the evaluators referenced Reference 7's remark that [redacted] Id.

The evaluators incorrectly considered Reference 5's comments as a [redacted] subfactor weaknesses. Reference 5 stated that ATS was [redacted] but there were [redacted] although ATS was [redacted] AR 22293. According to Reference 5, ATS [redacted] Id.

AGREED UPON REDACTED COPY

[redacted]

Yet, the evaluators irrationally cited both of these statements as [redacted] weaknesses. AR 22439. These statements made by Reference 5 cannot be reasonably read in context as a negative reference regarding ATS' [redacted]. Moreover, regarding [redacted], the evaluation team already accounted for Reference 5's comments regarding [redacted] issues in its evaluation of ATS' [redacted] subfactor. AR 22375. To consider a [redacted] issue under the [redacted] subfactor evaluation contradicts the Solicitation's stated evaluation criteria and is unfair "double counting." AR 22431-43.

The Consensus Evaluation Report also placed undue weight on Reference 7's comments. While Reference 7 noted the [redacted] issue cited above, the reference acknowledged the [redacted] AR 22298. Moreover, Reference 7 is the <u>same individual</u> who rated ATS an [redacted] AR 22298-99.

Overall, the feed back from all references concerning ATS' appropriate [redacted] subfactor rating indicates that its performance essentially was [redacted] The record demonstrates that ATS has an [redacted] AR 22431. It was therefore unreasonable for the evaluators to assign ATS [redacted] rating for the [redacted] subfactor in light of the [redacted] it received from most of its past performance references and only minimal criticisms.

AGREED UPON REDACTED COPY

[redacted]

An adjustment in this additional area would [redacted] ATS' overall combined technical score to [redacted]

In contrast to this past performance evaluation of ATS, the record indicates that GSA unreasonably and unfairly minimized past performance weakness in other offerors. ATS' [redacted] subfactor is even more unreasonable when compared to the serious weaknesses perceived with respect to other offerors that also received a [redacted] rating for this subfactor.

[redacted]

AGREED UPON REDACTED COPY

[redacted]

[redacted] is yet another example that further supports the contention that GSA was harsher in evaluating ATS. [redacted]

[redacted] an unreasonable attempt to discount that company's past performance weaknesses. [redacted]

AGREED UPON REDACTED COPY

[redacted]

[redacted] indicate that GSA did not adequately consider [redacted] negative past performance information and failed to follow the stated evaluation criteria in assigning [redacted] past performance ratings. [redacted]

**AGREED UPON REDACTED COPY**

[redacted]

The past performance worksheets of the individual evaluators further indicate that [redacted] past performance weaknesses were not given adequate consideration. [redacted]

**C.** **GSA's significant errors in its best value determination process and in its evaluation of ATS' past performance prejudiced ATS**.

GSA's improper best value determination methods and unfair past performance evaluation prejudiced ATS. In order to show prejudice, ATS must show that there was a reasonable likelihood that it would have received a contract award but for the errors. See Seattle Security Service, Inc., supra, at 570. In this case, had it not been for the errors in the procurement process, there was a reasonable likelihood that ATS would have been awarded one of the Alliant contracts. ATS was ranked [redacted] technically and ranked [redacted] according to price. That [redacted] rank would have been [redacted] if GSA had conducted a proper technical

AGREED UPON REDACTED COPY

[redacted]

evaluation and had not [redacted] ATS so [redacted] in the Past Performance area and had conducted its Past Performance with the evaluation "benefit of the doubt" afforded to the offerors discussed above. As noted, of the 29 awardees, [redacted] offered a [redacted] evaluated price than ATS with [redacted] of the awardees [redacted] ATS' price [redacted] AR Supp., Ex. C., p. EC-1. Had GSA conducted a proper best value determination and ranked offerors on all factors, both price and non-price, rather than merely on the basis of the combined technical scores, ATS would have had a reasonable likelihood of receiving an award.

## IV. INJUNCTIVE RELIEF

Since GSA conducted a legally flawed procurement that prejudiced ATS, injunctive relief is appropriate. First, ATS clearly succeeds on the merits. Second, ATS will suffer specific irreparable injury if the Alliant awards are not enjoined. Third, the harm to be suffered by ATS outweighs the harm to the government and third parties if an injunction were issued. Fourth, ATS' requested relief serves the public interest.

In the absence of a permanent injunction, ATS will not have an adequate remedy to correct the flaws in this procurement. Seattle Security Services, Inc., supra. The maximum value of the Alliant GWAC, not even including options, is $50,000,000,000. AR 122. Thus, if ATS does not receive an award, it will never realize any work or profit under this very major procurement and will suffer significant irreparable harm given its large value.

In terms of the balance of hardships, the harm to the Government and to the other awardees if injunctive relief is afforded is far less significant than the harm to ATS if it is not. No awardee will lose any opportunity to compete for task order work under the Alliant GWAC if

AGREED UPON REDACTED COPY

[redacted]

an additional award is made to ATS. As noted above, under the terms of the Solicitation, GSA clearly has the discretion to award more contracts than the 29 contracts already awarded.

The public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid. Correction of GSA's errors in this procurement, however, would not involve excessive judicial infringement on GSA's discretion. Seattle Security Services, Inc., supra, at 572. Thus, granting ATS' request for a permanent injunction would not be contrary to the public interest.

**V. CONCLUSION**

For the reasons stated above, ATS has demonstrated by clear and convincing evidence that GSA's best value methodology was arbitrary and capricious and not in accordance with the Solicitation; that GSA acted unreasonably in evaluating ATS' past performance; and that GSA's actions prejudiced ATS from obtaining an Alliant GWAC award. Thus, ATS' motion for judgment on the administrative record should be granted.

Dated: November 30, 2007

Respectfully submitted,

/s/Richard L. Moorhouse
GREENBERG TRAURIG, LLP
1750 Tysons Blvd.
Suite 1200
McLean, VA 22101
Tel.: (703)749-1311
Fax: (703)714-8308

AGREED UPON REDACTED COPY

[redacted]

OF COUNSEL:
John G. Stafford
David T. Hickey
Sean M. Connolly
Emily C. Parker