**Redacted Copy – May Be Made Public**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(Bid Protest)**

| | |
|---|---|
| **SERCO, INC.; STANLEY ASSOCIATES, INC.; CGI FEDERAL, INC.; STG, INC; ARTEL, INC.; ADVANCED TECHNOLOGY SYSTEMS, INC; APPTIS, INC.; NORTEL GOVERNMENT SOLUTIONS INCORPORATED; and THE CENTECH GROUP,** | |
| **Plaintiffs,** | |
| **v.** | **Nos. 07-691C, 07-732C, 07-741C, 07-747C, 7-760C, 07-761C, 07-766C, 07-771C, and 07-803C** |
| **THE UNITED STATES** | |
| **Defendant,** | **Judge Francis M. Allegra** |
| **and** | |
| **INDUS CORPORATION; ELECTRONIC DATA SYSTEMS CORPORATION; INTERNATIONAL BUSINESS MACHINES CORPORATION; and GENERAL DYNAMICS ONE SOURCE, LLC** | |
| **Defendant-Intervenors.** | |

**ARTEL, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Consolidated-Plaintiff ARTEL, Inc. ("ARTEL" or "Plaintiff"), by and through its undersigned counsel, hereby respectfully submits this Memorandum in Support of Its Motion for Judgment on the Administrative Record urging the United States Court of Federal Claims (the "Court") to set aside the General Services Administration's ( "GSA" or "Defendant") awards under Solicitation No. TQ2006MCB0001 (the "Solicitation") as arbitrary, capricious and not in accordance with applicable laws and regulations.

# TABLE OF CONTENTS


| | Page(s) |
|---|---|
| Table of Contents | 2 |
| Table of Cited Authorities | 3 |
| I. INTRODUCTION | 5 |
| II. PROCEDURAL HISTORY | 5 |
| III. STANDARD OF REVIEW | 6 |
| IV. QUESTIONS PRESENTED | 8 |
| V. STATEMENT OF THE CASE AND RELEVANT FACTS | 9 |
| VI. ARGUMENT | 13 |
| A. The GSA failed to consider price or the best value cost/technical trade-off before eliminating technically acceptable offerors from consideration for award | 13 |
| B. The GSA improperly weighted the Basic Contract Plan Technical Evaluation Factor such that it was significantly more important than, rather than equal to, Past Performance | 23 |
| VII. CONCLUSION | 28 |
| Certificate of Filing | 30 |

## TABLE OF CITED AUTHORITIES


| Cases | Page(s) |
|---|---|
| A&D Fire Prot., Inc., B-288852 (Dec. 12, 2001) | 15, 19 |
| Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365 (Fed. Cir. 1999) | 7 |
| Banknote Corp. of Am. v. United States, 365 F.3d 1345 (Fed. Cir. 2004) | 6, 7 |
| Bannum, Inc. v. United States, 404 F.3d 1346 (Fed. Cir. 2005) | 7, 22 |
| CACI, Inc. – Fed. v. United States, 719 F.2d 1567 (Fed. Cir. 1983) | 7 |
| CACI Field Services., Inc. v. United States, 13 Cl. Ct. 718 (1987) | 22 |
| C.W. Gov't Travel, Inc. v. United States, 61 Fed. Cl. 559 (2004) | 6 |
| Dyncorp Int'l. LLC, B-289863 (May 13, 2002) | 21 |
| Elec. Design, Inc., B-279662.2 (Aug. 31, 1998) | 19 |
| Galen Med. Associates, Inc. v. United States, 369 F.3d 1324 (Fed. Cir. 2004) | 7 |
| Hunt Bldg. Co., Ltd. v. United States, 61 Fed. Cl. 243 (2004) | 6, 7 |
| Impresa Constru. Geom. Dom. Garufi v. United States, 238 F.3d 1324 (Fed. Cir. 2001) | 7 |
| Info. Scis. Corp. v. United States, 73 Fed. Cl. 70 (2006) | 14, 21, 22, 23 |
| Info. Scis. Corp. v. United States, 75 Fed. Cl. 406 (2007) | 14, 15 |
| Int'l Outsourcing Services, L.L.C. v. United States, 69 Fed. Cl. 40 (2005) | 7, 8 |
| J.A. Jones Mgmt. Services, Inc., B-254941 (Mar. 16, 1994) | 24, 27 |
| Kathpal Tech., Inc.; Computer & Hi-Tech Mgmt., Inc., B-283137.3; B-283137.4; B-283137.5; B-283137.6 (Dec. 30, 1999) | 14, 15, 18, 20 |
| LaBarge Products, Inc. v. West, 46 F.3d 1547 (Fed. Cir. 1995) | 7 |
| M.W. Kellogg Co. v. United States, 10 Cl. Ct. 17 (1986) | 22 |
| MIL Corp., B-294836 (Dec. 30, 2004) | 13, 19, 20, 21 |
| SCIENTECH, Inc., B-277805.2 (Jan. 20, 1998) | 18 |
| Vantage Associates, Inc. v. United States, 59 Fed. Cl. 1 (2003) | 14, 23 |

**TABLE OF CITED AUTHORITIES (cont'd)**


| **Laws and Regulations** | **Page(s)** |
|---|---|
| 5 U.S.C. § 706 .......... | 6 |
| 5 U.S.C. § 706(2)(A) .......... | 6 |
| 28 U.S.C. § 1491(b)(4) .......... | 6 |
| 40 U.S.C. § 1412(e) .......... | 9 |
| 48 C.F.R. § 15.101-1 .......... | 20 |
| 48 C.F.R. § 15.304(c)(1) .......... | 14, 15, 18 |
| 48 C.F.R. § 15.305(a) .......... | 14, 15, 18 |
| 48 C.F.R. § 15.306(c)(3) .......... | 23 |
| 48 C.F.R. § 15.306(c)(4) .......... | 23 |
| 48 C.F.R. § 15.308 .......... | 14, 15, 18, 20 |

## I. INTRODUCTION

The Administrative Record ("AR") establishes that GSA's evaluation and award decisions were flawed in numerous respects. From the outset, GSA's technical evaluation was fundamentally in error because it failed to give the technical factors – Basic Contract Plan and Past Performance – equal weight as required by the Solicitation. GSA then made award decisions based on technical merit alone, without first considering price or conducting the requisite cost/technical trade-off. Moreover, in making the award decisions based on technical merit alone, GSA improperly established *de facto* competitive ranges without complying with Federal Acquisition Regulations ("FAR") requirements. The Source Selection Authority ("SSA") then compounded these errors by failing to document his independent rationale for the award decisions, or by simply not making an independent award decision.

For all of these reasons, the AR clearly demonstrates that the GSA failed to comply with the terms of the Solicitation and applicable law and made awards on an unreasonable and irrational basis. These errors justify ruling on the AR in favor of ARTEL and granting the relief it hereby requests.

## II. PROCEDURAL HISTORY

On August 30, 2007, shortly after receiving notice that it had not been selected for award under the Solicitation, and after receiving its debriefing, ARTEL filed a bid protest with the U.S. Government Accountability Office ("GAO") challenging the propriety of the GSA's evaluation and its decision not to award a contract to ARTEL. See ARTEL's Complaint at ¶ 23. On September 26, 2007, Serco, Inc. ("Serco") filed a bid protest with this Court that was directly related to ARTEL's GAO protest. On October 1, 2007, GAO notified all protesters of Serco's filing and invited them to submit comments regarding whether their respective protests should be

dismissed. Id. at ¶ 25. ARTEL's comments requested that its protest continue before the GAO, but it was dismissed on October 24th because of Serco's related case. Id. at ¶ 27.

On October 30, 2007, ARTEL filed its Complaint with the Court after notifying the Department of Justice, the Clerk of this Court, GSA, and the 29 awardees of its intention to do so. Id. at ¶ 28. On November 2, 2007, the Court consolidated ARTEL's protest with the case filed by Serco on September 26, 2007. Also on November 2nd, the Court ordered ARTEL to file its initial brief on or before November 30, 2007. Pursuant to that order, ARTEL now simultaneously files the accompanying Motion for Judgment on the AR and this Memorandum in Support thereof.

## III. STANDARD OF REVIEW

The Court reviews bid protest actions pursuant to the Administrative Procedure Act standard of review. See 5 U.S.C. § 706; see also 28 U.S.C. § 1491(b)(4). Under this standard, the Court shall "[h]old unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A); see also C.W. Gov't Travel, Inc. v. United States, 61 Fed. Cl. 559, 567 (2004). The Court may set aside an award if the protester demonstrates by a preponderance of the evidence that: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Hunt Bldg. Co., Ltd. v. United States, 61 Fed. Cl. 243, 269 (2004) (citations omitted).

When a protester alleges that a contracting agency's decision lacked a rational basis, the test is whether the agency "provided a coherent and reasonable explanation of its exercise of discretion." Id. (citing Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004)). For example:

> [An] agency's failure to follow the terms of its own Solicitation and selection of an offeror based upon different requirements than those imposed upon the only other offeror are quintessential examples of conduct which lacks a rational basis. See, e.g., LaBarge Prod., Inc. v. West, 46 F.3d 1547, 1555 (Fed. Cir. 1995) (recognizing "the bastion of federal procurement policy that all offerors must possess equal knowledge of the same information in order to have a valid procurement"). The agency's failure to follow its own selection process embodied in the Solicitation is also a prejudicial violation of a procurement procedure established for the benefit of offerors. Banknote, 365 F.3d at 1351.

Hunt, 61 Fed. Cl. at 273. When the protester alleges a violation of regulation or procedure, it must demonstrate a "clear and prejudicial violation of applicable statutes or regulations." Impresa Constru. Geom. Dom. Garufi v. United States, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (citations omitted). In establishing prejudice, the protester need not demonstrate that it would have received the contract award but for the alleged error, Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (citation omitted), but rather, that it was "within the zone of active consideration" with a "substantial chance" for award absent the agency's error. Id. (quoting CACI, Inc. – Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983)); see also Galen Med. Associates, Inc. v. United States, 369 F.3d 1324, 1331 (Fed. Cir. 2004) (citation omitted).

Lastly, summary judgment standards are not pertinent to judicial review upon an administrative record. Bannum, Inc. v. United States, 404 F.3d 1346, 1355-57 (Fed. Cir. 2005). Therefore, as the Court has held,

> [T]he existence of a fact question neither precludes the granting of a motion for judgment nor requires [the Court] to conduct a full blown evidentiary proceeding. Rather, such fact questions must be resolved by reference to the administrative record, as properly supplemented – in the words of the Federal Circuit, 'as if [this court] were conducting a trial on [that] record.'

Int'l Outsourcing Services, L.L.C. v. United States, 69 Fed. Cl. 40, 45-46 (2005) (quoting Bannum, 404 F.3d at 1357) (further citations omitted).

## IV. QUESTIONS PRESENTED

Pursuant to the Court's November 6th order, ARTEL filed a Statement of Issues on November 19th listing the questions presented in this proceeding. ARTEL's Statement of Issues, which describes the questions presented in the instant Motion as required by RCFC 5.3(a)(1)(C), is reproduced below:[1]

1. Was it improper for the GSA to ignore or not give appropriate consideration to price when making its preliminary award determinations? Moreover, was it improper for GSA to propose awards to the top 28 technically ranked offerors, without further evaluation, while other offerors presented significant cost savings to the government?

2. Was it improper for GSA to make a 29th award by only evaluating the offerors ranked 29-33 and was GSA's decision not to make a 30th award rational under the circumstances? Additionally, did GSA create a *de facto* competitive range, requiring GSA to conduct discussions and notify unsuccessful offerors, when it proposed to make awards to the top 28 technically ranked offerors and/or when it decided only to evaluate the offerors technically ranked 29-33 for a 29th award?

3. Did GSA fail to adequately perform the cost/technical trade-off analysis required by the Solicitation prior to making its preliminary and final award decisions? Additionally, did GSA fail to perform sufficient cost/technical trade-offs between all of the offerors to ensure the best value for the government?

---

1 Several of the questions from ARTEL's initial Statement of Issues have been eliminated from the Questions Presented because they are not addressed herein.

4. Given that ARTEL was ranked [redacted] for Past Performance and [redacted] for Basic Contract Plan, and the fact that each technical evaluation factor was to be treated equally, was it unreasonable for GSA to find that ARTEL was technically ranked [redacted] overall? Additionally, did GSA give too much weight to the basic contract plan, or too little weight to past performance when evaluating ARTEL's overall technical ranking?

5. Does the record indicate that GSA failed to follow the terms of the Solicitation when performing its past performance evaluation? Given that past performance and basic contract plan were to be given equal weight, was it improper for GSA to use the ranking system described in the source selection decision memorandum, when the use of such a system skewed the technical rankings in favor of those with higher basic contract plan scores?

## V. STATEMENT OF THE CASE AND RELEVANT FACTS

The key facts for ARTEL's Motion for Judgment on the AR pertain to: (1) the Solicitation's evaluation scheme; (2) the Source Selection Evaluation Team's ("SSET") evaluation results; and (3) the SSA's award decision. These facts, as well as general background regarding the Alliant procurement, are discussed more fully below.

### A. The Alliant Procurement

On September 29, 2006, pursuant to 40 U.S.C. § 1412(e), GSA issued the Solicitation seeking proposals for the Alliant Program, a Government-wide Acquisition Contracts ("GWACs") procurement. The maximum anticipated size of the Alliant Program is $50 billion, and contracts issued thereunder have one five-year base period and one possible five-year option period, for a total of 10 years. AR at 122, 141. The GWACs contemplated by the Solicitation would require offerors to perform a wide variety of infrastructure, application, and information

technology management services to support federal agencies' integrated information technology requirements. Id. at 198.

### B. Evaluation Criteria

The source selection process was described in Solicitation Section M.3. Id. at 242. According to the Solicitation, the GSA was required to first review all timely submitted Proposals to ensure that they met the "acceptability review." Id. Proposals that passed the acceptability review would then be evaluated according to the Technical Evaluation Factors (Past Performance and Basic Contract Plan) and Cost/Price. Id. The Technical Evaluation Factors were both approximately equal in importance to each other, and when combined, were significantly more important than Cost/Price.[2] Id.

The evaluation was conducted by two teams: (1) the Technical Evaluation Team ("TET"); and (2) the Cost/Price Evaluation Team ("CPET"). AR at 34. The TET consisted of two subgroups, representing the two technical evaluation factors – the Past Performance Evaluation Team ("PPET") and the Basic Contract Plan Evaluation Team ("BCPET"). The teams were required to reviewed each proposal, provide narrative comments and then assign an individual rating for the factors and sub-factors. Id.

Regarding Past Performance, the GSA was tasked to consider each offeror's history of success in delivering high quality service and solutions on contract efforts which are similar in scope and complexity to those anticipated under the Alliant Contract. Id. at 243. There were five subfactors, each approximately equal in importance to each other: (1) Quality of Service; (2)

---

2 However, the closer the technical scores of the various proposals were to one another, the more important cost or price considerations would become to the overall best value determination. Id. at 247.

Schedule; (3) Cost Control; (4) Business Relations; and (5) Subcontract Management and Socioeconomic Goals. Id. at 244.

With respect to the Basic Contract Plan, the GSA was required to look "prospectively" to determine its confidence level by evaluating three subfactors, listed in descending order of importance: (1) Resources; (2) Program Management; and (3) Corporate Commitment. Id. at 245. This was designed to evaluate an "offeror's overall capability to support the Alliant program by determining whether the plan sufficiently addresses any gaps or weaknesses not addressed in past performance." Id. at 245-246.

Cost/Price was to be analyzed consistent with 48 C.F.R. section 15.404-1 to ensure fairness, reasonableness, and predictability. Id. at 247. The Solicitation detailed how both cost and price would be analyzed. Id. at 248-249. The offerors were then ranked according to their overall cost to the government. Id. at 1010.

Once the technical and cost/price evaluations were completed, the Solicitation required the GSA to conduct a "best value" trade-off among the offerors "in which differences in non-price factors and evaluated price [would] be compared between the Offerors in order to determine which Offeror represents the best value to the Government." Id. at 242. Awards would then be made based on the best value determination, and subject to a responsibility determination. Id.

**C. Evaluation Results and Award Decision**

Of the 66 proposals GSA received in response to the Solicitation, four were found to be unacceptable and eliminated from the competition without further review. Id. at 994. ARTEL's proposal was not one of those that were eliminated. Id.

On May 25, 2007, the SSET met with the SSA to [redacted] Id at 996. The SSA found that the SSET [redacted] because the SSET members [redacted] and [redacted] Id. Subsequently, "[o]ver the coming weeks," the SSET [redacted] Id. at 996.

During the May 25th meeting, the SSET recommended to the SSA that awards be made to the top 28 technically ranked awardees. Id. at 997. The SSA agreed with this recommendation [redacted] which purportedly differentiated the 28th technically ranked proposal from those ranked 29th and 30th. Id. at 998. There is no indication in the AR that [redacted]

Shortly after making the presumptive award to the top 28 technically ranked offerors, the SSA also found reason to make a 29th award [redacted]. Id. After this "tentative selection" of the 29 awardees, the SSA turned his attention to the remaining proposals and performed the cost/technical trade-off to determine if [redacted] Id. at 998, 22814 There is no indication in the AR that [redacted]

In the case of ARTEL, the Source Selection Decision Memorandum ("SSDM") indicates it was ranked [redacted] for Past Performance (with a consensus score of [redacted]) and [redacted] for Basic Contract Plan (with an average score of [redacted]), giving it an overall technical ranking of [redacted]

(with a weighted BCP-PP score of [redacted]). Id. at 22768; see also id. at 1006. Additionally, ARTEL's price ranking was [redacted]. Id. at 22768.

The offerors' numerical scores were calculated by applying a formula outlined in the introduction to the SSDM. Id. at 839-857. Specifically, the average adjectival ratings given by the evaluators for each offeror's Basic Contract Plan and Past Performance proposals were reduced to numerical scores in ascending order of value from 1 to 5. Id. at 992. The overall numerical scores for Basic Contract Plan and Past Performance were then combined to produce the offeror's overall technical score, which was ranked against all other offerors. Id. at 839-40. To ensure that the technical evaluation achieved the requisite equality between Basic Contract Plan and Past Performance, the Solicitation instructed the evaluators to use "discriminators" to differentiate offerors who were found to be "virtually equivalent." Id. at 245-247. The discriminators were unique for each technical evaluation factor. Id.

## VI. ARGUMENT

The following discusses the reasons why ARTEL's Motion for Judgment on the AR should be granted and its protest sustained.

### A. The GSA failed to consider price or the best value cost/technical trade-off before eliminating technically acceptable offerors from consideration for award.[3]

A key question in this proceeding is whether the GSA considered price and performed the best value cost/technical trade-off for all offerors prior to removing certain offerors from consideration for award. As a threshold matter, it is well-settled that cost must be evaluated in all federal procurements. See, e.g., MIL Corp., B-294836 (Dec. 30, 2004) ("An evaluation and source selection that fail to give meaningful consideration to cost or price is inconsistent with

---

3 This argument addresses Questions Presented 1-3.

CICA [The Competition in Contracting Act of 1984] and cannot serve as a reasonable basis for award.") (citation omitted); see also Kathpal Tech., Inc.; Computer & Hi-Tech Mgmt., Inc., B-283137.3; B-283137.4; B-283137.5; B-283137.6 (Dec. 30, 1999) ("Cost or price to the government must be included in every RFP as an evaluation factor, and agencies must consider cost or price to the government in evaluating competitive proposals.") (citing 48 C.F.R. § 15.304(c)(1)) (further citations omitted). Consistent with this requirement, cost was an evaluation factor in the Solicitation. AR at 52-54 (describing the GSA's methods for evaluating offerors' cost and prices in the Solicitation). The Solicitation also specified that the GSA would conduct a best value cost/technical trade-off "in which differences in non-price factors and evaluated price will be compared between the Offerors in order to determine which Offeror represents the best value to the Government." Id. at 242.

The FAR require evaluation of proposals based on the factors specified in the solicitation. See 48 C.F.R. § 15.305(a); see also Vantage Associates, Inc. v. United States, 59 Fed. Cl. 1, 23 (2003) ("Agencies must evaluate proposals and make awards based on the criteria stated in the solicitation."). Indeed, under 48 C.F.R. section 15.308, the SSA's award determinations must be "based on a comparative assessment of proposals against all source selection criteria in the solicitation."[4] Therefore, because cost and the best value cost/technical trade-off were undisputedly factors specified in the Solicitation, the GSA had to consider price and perform the best value trade-off prior to excluding technically acceptable proposals from the award decision.

---

4 The SSA's decision must also be reflective of the SSA's independent judgment and adequately documented in the record. 48 C.F.R. § 15.308. Thus, for example, it would be improper for the SSA to simply adopt the SSET's recommendations without documenting in the AR an independent rationale for that agreement. Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 121 (2006) (citing 48 C.F.R. § 15.308) ("Info. Scis. I"). This is addressed more fully in Section VI.A.2 herein.

See, e.g., Info. Scis. Corp. v. United States, 75 Fed. Cl. 406, 411 (2007) (finding that because price was one of the four evaluation factors required under the solicitation, the agency was required to consider price in establishing the competitive range) ("Info. Scis. II"); see also A&D Fire Prot., Inc., B-288852 (Dec. 12, 2001) ("The elimination of . . . proposals without meaningful consideration of price is inconsistent with the agency's obligation to evaluate proposals under all of the solicitation's criteria, including price.") (citing Kathpal, B-283137.3).

In accordance with the foregoing precedent and the Solicitation's evaluation criteria, the GSA's source selection would be noncompliant with 48 C.F.R. sections 15.304(c)(1), 15.305(a) and 15.308 if the GSA did not consider price or perform the best value trade-off before ARTEL was effectively eliminated from consideration.

**1. The GSA initially screened the offerors based only on their technical rankings and failed to comparatively assess proposals against all of the evaluation criteria.**

The AR includes multiple indications that the offerors were initially screened, and awardees were determined, based only on technical rankings. For example, the SSA stated that [redacted] AR at 997 (emphasis added). The SSA then went on to [redacted] only those 28 offerors and then added a 29th awardee from among the offerors technically ranked between 29 and 33. Id. at 997-98. At the conclusion of these assessments, the SSA stated that:

[redacted]

[redacted]

Id. at 998 (emphasis added). This passage tellingly describes the different stages of the GSA's evaluation – first, the GSA made preliminary award determinations based purely on the [redacted], and only after doing so did the GSA then look to the lower technically ranked offerors and perform the requisite "trade-off analysis."

The AR provides further indication that the timeline for the award determination and cost/technical trade-off did not comport with the Solicitation in that award decisions were made prior to the cost/technical trade-offs. In the SSDM, the SSA noted that [redacted] Id. at 996. Again, the Solicitation required the cost/technical trade-off be performed as a part of, rather than after, the SSET's evaluation.

The individual offeror exhibits to the SSDM (Exhibits C1-C28) confirm that awards were made to the top 28 technically ranked offerors based purely on their technical rankings. For example, the GSA stated that:

[redacted]

Id. at 1870 (emphasis added); see also id. at 1018 (containing the same language in regards to [redacted], which was [redacted] in technical but [redacted] in price). The emphasized language clearly indicates that award decisions were based only on technical rankings. Additionally, the

after-the-fact examination of price to determine whether awards would be retained indicates the best value cost/technical trade-off was perfunctory, at best.[5] In effect, it served as a coronation, rather than a part of the examination as required.

The SSDM exhibit for [redacted] is also illustrative of ARTEL's contention. [redacted] became the 29th awardee after the GSA essentially re-opened the competition for one more award and again restricted the competition based on technical rankings. AR at 22814 ("After re-analyzing those companies ranked 29th through 33rd based upon their technical merit, the SSA decided to make award to the Offeror technically ranked 31st as the 29th awardee, because this Offeror proposed substantially lower prices than any of the other Offerors in that zone . . . .") (emphasis added). In relevant part, the [redacted] exhibit stated that:

[redacted]

Id. at 1909 (emphasis added). As discussed above, the best value cost/technical trade-off was specified in the Solicitation to be a preliminary, rather than postliminary, step to the GSA's award decision. Nevertheless, the GSA again plainly stated that award decisions were made based only on technical rankings, but not price, and before the cost/technical trade-off. Also, the GSA's use of "if" regarding whether it would [redacted] suggests a freedom to choose not to conduct the best value trade-off that the GSA simply did not have under the terms of the Solicitation.

---

5 Notably, none of the top 28 technically ranked offerors [redacted].

The lack of indication in the AR that the cost/technical trade-off was conducted for all offerors prior to the award decisions is significant. Coupled with the above-quoted statements in the AR, this provides a reasonable basis upon which to conclude that "[p]rice did not become a discriminator at the point at which the most highly rated offerors were determined. Consequently, at the initial screening phase, there was not the traditional price/technical trade-off." Kathpal, B-283137.3.[6] Instead, the GSA, like the agency in Kathpal, made an initial determination regarding those offerors that were "highly competitive" based on the offerors' ratings under only one evaluation factor (here, the technical factor) without considering the offerors' complete proposals via the cost/technical trade-off. Id. This was arbitrary, capricious, and in violation of 48 C.F.R. sections 15.304(c)(1), 15.305(a) and 15.308.

ARTEL submits that the Court should find the GSA's evaluation to be irrational and contrary to law for the same reasons the GAO sustained the Kathpal protest. Because the GSA performed the cost/technical trade-off after it determined the presumptive awardees based solely on technical rankings, and even then did so only to confirm that the presumptive awardees should retain their place among the awardees, the initial screening effectively eliminated ARTEL's technically acceptable proposal from consideration for award without first accounting for its cost to the government. Kathpal, B-283137.3 (citing SCIENTECH, Inc., B-277805.2 (Jan. 20, 1998)). Indeed, the AR evinces the GSA's belief that offerors not technically ranked between 1 and 28 would not receive an award. In Kathpal, the GAO found this to be unreasonable because, like here, the initial screening did not account for price. Id. The GAO further noted that "[a]lthough agencies have considerable discretion in determining the

---

6 As in the instant case, the Kathpal solicitation provided that non-price factors were significantly more important than price.

appropriate method for evaluation of cost or price, they do not have the discretion to eliminate . . . offerors from competition without meaningful consideration of price . . . [and] merely assessing the reasonableness of proposed pricing does not satisfy this obligation . . . ." Id. (internal citation omitted).

The GAO also rejected a similar "two-stage" evaluation in A&D Fire. In that case, the agency indicated that it eliminated offerors judged to have low technical capabilities without any consideration of price. A&D Fire, B-288852. This is precisely what happened here – first the GSA eliminated the lower technically rated proposals and then it considered the prices of only the most highly rated offerors simply to ensure their place among the awardees.[7] Because the GAO found in A&D Fire that this two-stage approach failed to meaningfully consider price at the first stage when proposals were eliminated from consideration, the protest was sustained. Given the similarities to the instant case, A&D Fire is instructive of the resolution that ARTEL submits should be reached in the instant case.

The GAO's decision in MIL Corp. is similarly instructive. As here, the agency in MIL Corp. failed to document the cost/technical trade-offs it made in choosing one offeror over another. MIL Corp., B-294836. Rather, the agency "mechanically made award to all . . . proposals that received "blue" ratings for two non-price factors . . . ." Id. The GAO found that:

> This mechanical approach failed to make a qualitative assessment of the technical differences among the competing proposals to determine whether the perceived technical superiority of those proposals receiving "blue" ratings for all nonprice factors justified paying the evaluated price premium associated with those proposals that did not receive a "blue" price rating.

7 And, it was not until after these two stages that the SSA considered the rest of the offerors. AR at 998.

Id. In the same way, the GSA's initial screening "mechanically" made award to the top 28 technically ranked offerors, and the GSA qualitatively assessed cost versus technical benefits only after the award decision was made. Thus, the GSA's evaluation and source selection decision "so minimize[d] the potential impact of cost or price as to make it a nominal evaluation factor." Id. (citing Elec. Design, Inc., B-279662.2 (Aug. 31, 1998)). This provided a basis upon which to sustain the protest in MIL Corp., and ARTEL submits that the same result should be reached here.

ARTEL was prejudiced by the above-described evaluation errors because the GSA's determination of which offerors were the presumptive awardees "was made without consideration of offerors' complete proposals, including . . . price, and therefore [GSA] does not have a reasonable basis to conclude that [ARTEL]'s proposal[] would not be in line for award." Kathpal, B-283137.3. In this regard, it is worth noting that ARTEL's total evaluated price, ranked [redacted] among the 62 offerors, was [redacted], in the absence of any cost/technical trade-off, to be the presumptive awardees.[8] AR at 1006.

**2. The SSA did not document an independent rationale for his agreement with the SSET's recommendation.**

Although the AR contains conclusory statements regarding the GSA's consideration of cost and the best value trade-off, AR at 997 ([redacted]), there is inadequate documentation evincing that a cost/technical trade-off was performed for all offerors prior to the GSA's selection of the presumptive awardees. In fact, the AR reflects that the opposite occurred – the GSA determined

8 ARTEL's total evaluated price [redacted].

it wanted to award to the top 28 technically rated offerors and then performed a belated (and essentially superfluous) best value trade-off to substantiate its award determination. In and of itself, the lack of documentation in the AR regarding the cost/technical trade-off for all offerors is arbitrary, capricious and contrary to law. See 48 C.F.R. § 15.308 ("The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA."); see also MIL Corp., B-294836 ("The price/technical tradeoff decision must be documented, and the documentation must include the rationale for any tradeoffs made, including the benefits associated with additional costs.") (citations omitted).

The lack of sufficient documentation in the record extends to the SSA's use of independent judgment, which ARTEL submits is a reflection of the SSA's failure to comply with this requirement. See, e.g., Info. Scis. I, 73 Fed. Cl. at 120 (noting the GAO's discussion of FAR 15.308 in Dyncorp Int'l. LLC, B-289863 (May 13, 2002)), and emphasizing that source selection officials are "bound by the fundamental requirement that their independent judgments be reasonable, consistent with the evaluation scheme and adequately documented"). The lack of independent judgment is manifested in the AR in three ways.

First, after noting that he agreed with the SSET's recommendation of the top 28 technically ranked offerors, AR at 997, the SSA primarily regurgitated the SSET's findings by summarizing the evaluated merits of the top 28 technically ranked proposals. AR at 997-98. Repeating the evaluators' conclusions does not explain the SSA's own rationale for adopting the SSET's recommendation. Info. Scis. I, 73 Fed. Cl. at 120 (criticizing the SSA for providing only a "verbatim restatement" of evaluators' rationale as the justification for his decision).

Second, in the only paragraph that contains rationale written from the SSA's first person perspective, the SSA stated that he primarily focused on the offerors ranked between [redacted] for their technical proposals, and within that "zone," he looked more closely at the [redacted] technical proposals. AR at 998. It appears from these statements that whatever independent judgment the SSA may have exercised was limited to comparatively assessing only a few of the 62 offerors.

Third, the SSA expressly stated that he did not independently assess the bulk of the offerors until after he confirmed the SSET's recommendation to award to the top 29 technically ranked offerors. Id. The fact that the award decision was already made rendered these assessments meaningless.

ARTEL was prejudiced by the SSA's failure to exercise or document independent judgment because ARTEL's chances of receiving an award undoubtedly would have been increased if the SSA complied with 48 C.F.R. section 15.308 and independently assessed each offeror's cost and technical merits. See Info. Scis. I, 73 Fed. Cl. at 121 (citing Bannum, 404 F.3d at 1538). Indeed, the lack of independent judgment permitted ARTEL's proposal to be effectively eliminated from the competition before its price was assessed in the required cost/technical trade-off.

**3. The GSA established a *de facto* competitive range without considering price or providing a notice or debriefing to the excluded offerors.**

An agency, through its actions, can establish a *de facto* competitive range even if a formal competitive range determination is not made. See CACI Field Services, Inc. v. United States, 13 Cl. Ct. 718, 730 (1987) (notwithstanding the lack of a formal competitive range, a *de facto* competitive range was established when the agency conducted discussions) (citing M.W.

Kellogg Co. v. United States, 10 Cl. Ct. 17, 23 (1986)). ARTEL submits that this occurred in the instant case when the GSA screened the top 28 technically ranked offerors and presumptively awarded contracts, and again when the GSA looked to only offerors technically ranked 29-33, rather than 29-62, for the 29th award.

Several evaluation flaws emanate from the GSA's establishment of a *de facto* competitive range. The AR reflects that the 1-28 and 29-33 *de facto* competitive ranges were established solely based upon the offerors' technical rankings, and any consideration of price in the cost/technical trade-off did not occur until after the ranges were established. Because price was clearly an evaluation factor specified in the Solicitation, the GSA improperly failed to consider it in establishing the competitive range. Info. Scis. I, 73 Fed. Cl. at 115 (finding that because price was an evaluation factor, the contracting officer was required to consider it in establishing the competitive range) (citing Vantage, 59 Fed. Cl. at 23). Also, when a competitive range is established, the agency must notify excluded offerors and provide them with the opportunity for a debriefing. 48 C.F.R. § 15.306(c)(3)-(4). ARTEL was prejudiced by not being afforded these procedures, and no justification for the GSA's decision to withhold them appears in the AR.

**B. The GSA improperly weighted the Basic Contract Plan Technical Evaluation Factor such that it was significantly more important than, rather than equal to, Past Performance.**[9]

As discussed above, the Solicitation required equal weight to be accorded to the Basic Contract Plan and Past Performance factors. AR at 241. Anticipating that too many similar scores among the offerors in one of the two factors would diminish that factor's weight and undermine the desired equality, the Solicitation required the application of various "discriminators" to differentiate virtually identical offerors. Id. at 245-247. However, as

9 This argument addresses Questions Presented 4 and 5.

discussed more fully below, the AR reflects a largely non-discriminated evaluation of Past Performance, which prevented it from carrying the same weight as the Basic Contract Plan factor and skewed the overall technical rankings in favor of the offerors with higher Basic Contract Plan rankings.

### 1. The Solicitation required discrimination of offerors in both the Basic Contract Plan and Past Performance evaluations.

The adjectival ratings for Basic Contract Plan and Past Performance were reduced to numerical scores in ascending order of value from 1 to 5. Id. at 992. The overall numerical scores for Basic Contract Plan and Past Performance were then combined to produce the offeror's overall technical score, which was ranked against all other offerors. Id. at 839-40. Because both factors were to be equal, the final average scores for Basic Contract Plan and Past Performance should have held roughly the same weight when creating the overall technical evaluation score. See J.A. Jones Mgmt. Services, Inc., B-254941 (Mar. 16, 1994) (finding that "where an RFP lists a number of evaluation factors of stated importance, a single one cannot be accorded more than the weight prescribed in the RFP's evaluation methodology").

To ensure that the technical evaluation achieved the requisite equality between Basic Contract Plan and Past Performance, the Solicitation instructed the evaluators to use "discriminators" to differentiate offerors who were found to be "virtually equivalent." AR at 245-247. The discriminators allowed for the creation of a smooth, negative linear regression of the ratings for all offerors, from the highest rated to the lowest rated, and for both Basic Contract Plan and Past Performance. In other words, the proper use of discriminators would virtually eliminate ties between the offerors by finding small differences between them and ranking them

accordingly.[10] Id. Conversely, if one of the factors was not properly discriminated, its significance as an equal component of the overall technical score would be diminished, if not eliminated.[11]

**2. The GSA failed to properly discriminate the offerors' Past Performance ratings, which diminished their significance in the calculation of the overall scores.**

The AR reflects that the Basic Contract Plan and Past Performance scores did not weigh equally in the determination of overall technical scores, as required, because the Past Performance scores were inadequately discriminated. ARTEL prepared the charts on the following page from the information contained in column C at AR 1008 and column E at AR 1009, respectively, to demonstrate the discrepancy. These charts clearly show that while the Basic Contract Plan scores varied among nearly all of the offerors, a majority of the offerors received a score of either [redacted] or [redacted] for Past Performance.[12]

---

10 The discriminators should produce a result where the average of the Basic Contract Plan and Past Performance rankings equals the offerors' overall technical ranking. For ARTEL, this would mean its Basic Contract Plan ranking of [redacted] and Past Performance ranking of [redacted] would equal an overall technical ranking of [redacted].

11 For example, if each offeror received a different score for Basic Contract Plan, but the same score for Past Performance, the Past Performance scores would have no impact on the overall technical rating, which would be entirely determined by the differences in the Basic Contract Plan scores.

12 Specifically, [redacted] offerors received a Past Performance score of [redacted], while [redacted] offerors received a Past Performance score of [redacted]. Conversely, [redacted] of the [redacted] offerors received unique scores for Basic Contract Plan, while only [redacted] shared a score with one other offeror.

[redacted]

[redacted]

The extensive discrimination among the Basic Contract Plan scores, and the paucity of discrimination among the Past Performance scores, is readily apparent from these charts. This violated the Solicitation's requirement that both sets of scores be discriminated to differentiate

between offerors that were "virtually equivalent." Moreover, the practical impact of the undiversified Past Performance scores on the evaluation was the diminishment of Past Performance as an equal factor in the calculation of the overall technical scores and rankings. For example, ARTEL's overall ranking of [redacted] indicates that its [redacted] ranking for Past Performance mattered little when it was combined with its [redacted] ranking for Basic Contract Plan.

The impact is particularly evident in the scores for the [redacted] offerors ranked directly below ARTEL for Past Performance. ARTEL was the [redacted] ranked offeror for Past Performance and received a score of [redacted]. AR at 1009, column E. The next [redacted] ranked offerors, from [redacted], received either a [redacted] or [redacted]. Id. Conversely, the scores for the same ranked positions, [redacted], under the Basic Contract Plan ranged from [redacted]. Id. at 1008, column C. The practical effect of this was that the Basic Contract Plan scores were nearly three times more important to the overall technical rankings than the corresponding Past Performance scores.[13] Clearly, this violates the Solicitation's mandate that the two technical factors should be equally weighted, as well as the well-settled principle that an agency's evaluation methodology may not "greatly exaggerate the importance of any one listed factor" when the Solicitation mandates that the factors be rated equally. J.A. Jones, B-254941.

The flawed Past Performance evaluation materially prejudiced ARTEL because its high Past Performance ranking should have given it a substantial chance of receiving an award. However, in actuality, ARTEL's Past Performance ranking had little impact on its overall ranking. This was arbitrary, capricious, and not in accordance with the law.

---

13 The range in scores received by the [redacted] Past Performance offerors was .[redacted] while the range in scores received by the [redacted] Basic Contract Plan offerors was .[redacted].

## VII. CONCLUSION

For the reasons detailed above, the AR clearly demonstrates that the GSA's award decisions lacked a rational basis and violated applicable regulations. ARTEL, a highly rated offeror for Past Performance with a low price, was materially prejudiced by the GSA's flawed award procedure. As such, ARTEL requests that the Court enter judgment in favor of ARTEL on the AR sustaining its protest and grant ARTEL the following relief: (i) find that the GSA's evaluation and subsequent award determinations lacked a rational basis and were arbitrary, capricious, and in violation of applicable laws and regulations; (ii) recommend that at least one of the current awards be terminated in favor of an award to ARTEL; or (iii) in the alternative, recommend that a new evaluation panel be convened and a new evaluation be conducted in accordance with the Solicitation; and (iv) award ARTEL its costs and expenses, including legal fees, incurred in the preparation and pursuit of this action.

Respectfully submitted,

/s/ *Philip M. Dearborn, III*

Philip M. Dearborn, III, Esq.
PilieroMazza PLLC
888 17th Street, N.W., Suite 1100
Washington, D.C. 20006
(202) 857-1000
(202) 857-0200 (Facsimile)
pdearborn@pilieromazza.com

*Counsel of Record for Plaintiff ARTEL, Inc.*

Dated: November 30, 2007

Of Counsel:

Pamela J. Mazza, Esq.
Jonathan T. Williams, Esq.
Isaias "Cy" Alba, IV, Esq.
Gunjan R. Talati, Esq.
888 17th Street, N.W., Suite 1100
Washington, D.C. 20006
(202) 857-1000
(202) 857-0200 (Facsimile)
pmazza@pilieromazza.com
jwilliams@pilieromazza.com
ialba@pilieromazza.com
gtalati@pilieromazza.com

**CERTIFICATE OF FILING**

I hereby certify that a copy of the foregoing Memorandum in Support of ARTEL's Motion for Judgment on the Administrative Record was electronically filed on this 30th day of November, 2007. I understand that this document will be sent to all parties via the Court's electronic filing system.

/s/ *Philip M. Dearborn, III*

Philip M. Dearborn, III