**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(BID PROTEST)

| | |
|---|---|
| SERCO, INC., et al.,<br>Plaintiffs,<br>v.<br>THE UNITED STATES,<br>Defendant,<br>and<br>INDUS CORPORATION, et al.,<br>Defendant-Intervenors | Consolidated Nos. 07-691C, 07-732C, 07-741C, 07-747C, 07-760C, 07-761C, 07-766C, 07-771C, and 07-803C<br><br>Judge Allegra<br><br>~~FILED UNDER SEAL~~ |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF CGI FEDERAL INC.'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Respectfully submitted,
/s/ Patricia H. Wittie

Patricia H. Wittie
Counsel of Record

OLDAKER BIDEN & BELAIR LLP
818 Connecticut Ave., NW
Washington, D.C. 20006
Phone: 202-496-3493
Fax: 202-293-6111

OF COUNSEL:
Karla J. Letsche
Kathryn E. Swisher
Oldaker Biden & Belair LLP
818 Connecticut Ave., NW
Washington, D.C. 20006

Dated: November 30, 2007

**TABLE OF CONTENTS**

**PRELIMINARY STATEMENT OF FACTS AND ISSUES** .......... 1

**JURISDICTION AND STANDARD OF REVIEW** .......... 2

**STANDING** .......... 3

**DISCUSSION** .......... 3

**I. GSA's Past Performance Evaluation Lacked a Rational Basis and Violated Applicable Laws and Regulations** .......... 3

**A. GSA's evaluation methodology resulted in disparate treatment of Plaintiff CGI and unfairly favored other offerors** .......... 4

**B. GSA's past performance "scripts" lacked a rational basis and encouraged arbitrary and inconsistent responses** .......... 16

**C. GSA's evaluation of CGI's past performance was arbitrary and lacked a rational basis** .......... 21

**D. GSA's arbitrary and unreasonable evaluation prejudiced CGI** .......... 29

**II. GSA's Basic Contract Plan Evaluation Lacked a Rational Basis, Violated Applicable Laws and Regulations, and Was Characterized by Disparate Treatment of CGI's Proposal** .......... 33

**A. Explanation of BCP scoring process** .......... 33

**B. GSA arbitrarily failed to evaluate [redacted] in CGI's proposal solely in accordance with the stated evaluation criteria** .......... 34

**C. GSA arbitrarily reassessed certain BCP scores, in a manner that treated CGI unequally** .......... 37

**D. For [redacted], only one BCP evaluator explained his adjectival rating; that explanation is not supported by the record; and it is based on unstated evaluation criteria** .......... 40

**III. GSA's Method of Evaluating Price and Performing Its Tradeoff Analysis Lacked a Rational Basis and Resulted in Prejudice to All Offerors, Including CGI** .......... 42

**A. Price was not an evaluation factor, in violation of applicable law and regulations and despite the express terms of the RFP** .......... 43

**B. GSA's purported evaluation of price reasonableness was meaningless and lacked a rational basis** ..... 43

**C. GSA failed to perform a meaningful cost realism analysis** ..... 45

**IV. Prejudice ..... 47**

**V. Remedies ..... 47**

**A. Irreparable injury** ..... 48

**B. Balancing of Harms** ..... 48

**C. Public Interest** ..... 49

**VI. Conclusion ..... 49**

## TABLE OF AUTHORITIES

**Cases**

ARINC Eng'g Services, LLC v. United States, 77 Fed. Cl. 196 (2007)……………………3

Banknote Corp. of Am. v. United States, 365 F.3d 1345 (Fed. Cir. 2004)………………..3

Cardinal Maint. Serv., Inc. v. United States, 63 Fed. Cl. 98 (2004)………………………48

Dismas Charities, Inc., Comp. Gen. B-292091, 2003 WL 21665202 (C.G. June 26, 2003)…………………………………………………………………………………..19, 32

DynCorp Int'l LLC v. United States, 76 Fed. Cl. 528 (2007)……………………………..3

Earl Indus., LLC, Comp. Gen. B-309996, B-309996.4, 2007 WL 3313104 (C.G. Nov. 5, 2007)……………………………………………………………………………………42, 45

Family Entm't Services, Inc., Comp. Gen. B-298047.3, 2006 WL 4480999 (C.G. Sept. 20, 2006)…………………………………………………………………………………..30

Gentex Corp. v. United States, 58 Fed. Cl. 634 (2003)…………………………………..3

Global Analytic Info. Tech., Comp. Gen. B-298840.2, 2007 WL 1063064 (C.G. Feb. 6, 2007)…………………………………………………………………………………….41

Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243………………………………………..48

IDEA Int'l, Inc. v. United States, 74 Fed. Cl. 129 (2006)………………………………..48

Metcalf Constr. Co. v. United States, 53 Fed. Cl. 617 (2002)……………………………49

Panacea Consulting, Inc., Comp. Gen. B-299307.4, B-299308.4, 2007 WL 2296507 (C.G. July 27, 2007)………………………………………………………………………..42

Priority One Services, Inc., Comp. Gen. B-288836, B-288836.2, 2001 WL 1872433 (C.G. Dec. 17, 2001)………………………………………………………………………..46

Sci-Tec Gauging, Inc., Comp. Gen. B-252406, B-252406.2, 1993 WL 245616 (C.G. June 25, 1993)………………………………………………………………………………..4

Seattle Sec. Services, Inc. v. United States, 45 Fed. Cl. 560 (2000)……4, 30, 31, 32, 49

Multimax, Inc., Comp. Gen. B-298249.6-20, 2006 WL 3300346 (C.G. Oct. 24, 2006)...........................................................................................................................45

**Statutes**

5 U.S.C. §§ 701-706 (2000)……………………………………………………………2

10 U.S.C. § 2305 (2000)……………………………………………….…………21, 42

28 U.S.C. § 1491 (2000)……………………………………………………………..2

41 U.S.C. § 253a (2000)……………………………………………………………42

41 U.S.C. § 253b (2000)……………………………………………………………21

**Regulations**

48 C.F.R. § 7.105 (2006)…………………………………………………………..35

48 C.F.R. § 15.304 (2006)…………………………………………………………42

48 C.F.R. § 15.305 (2006)……………………………………………..………21, 34, 45

48 C.F.R. § 15.306 (2006)………………………………………………………4, 30, 32

48 C.F.R. § 16.202-1 (2006)……………………………………………………….22

48 C.F.R. § 16.301-1 (2006)……………………………………………………….22

48 C.F.R. § 34.201 (2006)…………………………………………………………35

48 C.F.R. § 34.202 (2006)…………………………………………………………35

**Other**

Dep't of Def., Contractor Performance Assessment Reporting System (CPARS) Policy Guide (2007)…………………………………………………………………………17

Nat'l Institutes of Health, NIH Policy Manual 6015-2, Past Performance Information (2005)……………………………………………………………………………..17

Office of Mgmt. & Budget, Office of Fed. Procurement Policy ("OFPP"), Best Practices for Collecting and Using Past Performance Information (2000)………………………….17

## PRELIMINARY STATEMENT OF FACTS AND ISSUES

This post-award bid protest involves Solicitation No. TQ2006MCB001 (the "RFP") issued by the General Services Administration ("GSA"), seeking proposals for information technology services to be provided under multiple government-wide, indefinite quantity-indefinite delivery contracts. GSA refers to this program as "Alliant," and anticipates that it will result in up to $50 billion in task order awards over the 10-year life of the resulting contracts, which will include a five-year base term and one five-year option. Administrative Record ("AR") 121-122. GSA stated its intention to award between 25 and 30 contracts, while expressly reserving the right to award more. AR 210.

Offerors were to be rated on two Technical Evaluation Factors of approximately equal importance, Past Performance and Basic Contract Plan, each of which had several subfactors. Cost/Price was also an evaluation factor, although of significantly less importance than the Technical Evaluation Factors. AR 241-47. Proposals were submitted by 66 offerors, including Plaintiff CGI Federal Inc. ("CGI") on November 17, 2006. On July 31, 2007, GSA announced that it had awarded 29 contracts, but that CGI was not an awardee. AR 3624-27.

This protest is based on three fundamental and significant errors in the source selection process:

**First**, GSA's methodology for collecting and evaluating past performance information was critically flawed, resulting in disparate treatment of offerors and strikingly disparate treatment of CGI. GSA was aware of the need to treat offerors

consistently, but deliberately refused to take actions for CGI that it took for, and which benefited other, identically situated offerors – including one awardee.

**Second**, GSA's evaluation of CGI's Basic Contract Plan ("BCP") was inconsistent with stated evaluation criteria; failed to address directly relevant information in CGI's proposal; and was unequal as to CGI.

**Third**, GSA failed to consider price in its award decision and best value tradeoff, and performed no meaningful cost realism analysis.

CGI was prejudiced by all of these errors. Were it not for the flaws in GSA's procurement process, as demonstrated below, CGI's technical score would have been substantially higher and a proper best value tradeoff would have resulted in an award to CGI. CGI seeks a permanent injunction, directing GSA to make an award to CGI, or alternatively, directing GSA to restructure its past performance evaluation process to remedy the defects, and then to re-evaluate all proposals, including CGI's, under both technical evaluation factors in a rational manner and in accordance with the stated evaluation criteria, and perform a new best value tradeoff in order to arrive at a proper and lawful award decision.

Additional facts, with supporting citations to the Administrative Record, are stated in the Discussion below.

## JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction over this post-award bid protest under 28 U.S.C. § 1491(b)(1). In bid protest cases, the Court reviews an agency's decisions under the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and the Court must "hold unlawful and set aside agency action, findings, and

conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004). An award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure, provided that the protester can demonstrate prejudice. See ARINC Eng'g Services, LLC v. United States, 77 Fed. Cl. 196, 201 (2007) (citing Banknote, 365 F.3d at 1351).

**STANDING**

CGI submitted a timely, acceptable proposal in response to GSA's solicitation, which included a fair and reasonable price. As such, it is an actual offeror whose direct economic interest is affected by the award or failure to award a contract. Banknote, 365 F.3d at 1352. GSA's improper failure to award CGI a contract, as discussed below, severely prejudiced CGI and affected its direct economic interest. As demonstrated herein, but for GSA's unlawful evaluation methodology and the Agency's unlawful, irrational, and arbitrary evaluation of CGI's proposal, there is a substantial chance that CGI would have been awarded a contract. See DynCorp Int'l LLC v. United States, 76 Fed. Cl. 528, 537 (2007).

**DISCUSSION**

**I. GSA's Past Performance Evaluation Lacked a Rational Basis and Violated Applicable Laws and Regulations**

It is fundamental that procuring Federal agencies must treat all offerors equally, and consistently apply the evaluation factors listed in the solicitation. Gentex Corp. v United States, 58 Fed. Cl. 634, 653 (2003) (citing TLT Constr. Corp. v. United States, 50 Fed.Cl. 212, 216 (2001)). The Federal Acquisition Regulation ("FAR") expressly

provides that Government personnel involved in an acquisition shall not engage in conduct that favors one offeror over another. 48 C.F.R. § 15.306(e)(1) (2006). Where an evaluation involves past performance, agencies have discretion to determine the scope of the offerors' performance histories to be considered, but always subject to the fundamental requirement that all proposals must be evaluated on the same basis and consistent with the solicitation requirements. Seattle Sec. Services, Inc. v. United States, 45 Fed. Cl. 560, 569 (2000) (quoting Wind Gap Knitwear, Inc., Comp. Gen. B-261045, 1995 WL 368421, at *2 (C.G. June 20, 1995)). In short, "contracting agencies must treat all offerors equally, which includes . . . not disparately evaluating offerors with respect to the same requirements." Sci-Tec Gauging, Inc., Comp. Gen. B-252406, B-252406.2, 1993 WL 245616, at *5 (C.G. June 25, 1993).[1]

In this case, GSA's past performance evaluation process was fundamentally flawed in violation of these well-established principles. GSA's methodology, as designed and as implemented, resulted in disparate treatment of offerors, and starkly disparate treatment of CGI.

**A. GSA's evaluation methodology resulted in disparate treatment of Plaintiff CGI and unfairly favored other offerors.**

In the RFP, GSA announced that its past performance evaluation would look retrospectively and consider offerors' "history of success" in delivering high quality service and solutions. AR 243. GSA's Source Selection Plan ("SSP") stated that GSA would "evaluate its confidence level" in offerors' abilities "by assigning adjectival/ confidence ratings." AR 44. The SSP's Technical Evaluation Standards for ratings

---

[1] Although GAO decisions are not binding on this Court, they may be used for guidance when they are found to be reasonable and persuasive. See, e.g., Seattle Sec. Services, Inc. v. United States, 45 Fed. Cl. 560, 567-68 n.11 (2000).

translated the term “history of success” as a “track record” to be found by evaluators for each past performance subfactor. AR 77-79. GSA determined that “[n]ine (9) efforts are considered to be a reasonable sample size to establish a ‘track record’ for the Offeror.” AR 46. Thus, GSA’s goal was to obtain nine references for each offeror.

Offerors were required to provide lists of up to 70 past performance references or “efforts” in their proposals. AR 228-30. According to a complex methodology, GSA used these lists to create a “call list” for each offeror. Designed to obtain nine references, the call lists identified twice that many as “targeted efforts” so that 18 individuals (“Points of Contact” (“POCs”’)) were listed for each offeror: nine primary and nine alternate references. AR 47-51; 85-86. GSA hired Calyptus Consulting Group (“Calyptus” or “Contractor”) to gather past performance information from the references for each offeror. AR 19742-43. Calyptus was to contact the POCs; read them a list of questions created by GSA (the “scripts”); transcribe the responses; send the transcripts to the POCs for confirmation of their accuracy; and submit the completed transcripts to GSA for evaluation. AR 47; 19734-36.

If Calyptus was unable to reach a POC after three attempts (via phone or email), allowing 24 hours between each attempt, the reference was to be marked as “not available” and one of the alternates was to be contacted. AR 46. Three attempts, 24 hours apart, were also required for alternate references, and Calyptus was to report to GSA the date, time, and method of the initial and subsequent contact attempts. AR 19735-37. As a general matter – although not with respect to CGI – GSA monitored Calyptus’ efforts and results, always with an eye toward obtaining a sufficient number of references to permit evaluators to find a “track record.”

**1. GSA arbitrarily and unreasonably refused to make the same efforts to obtain past performance information for Plaintiff CGI as it made for every similarly situated offeror.**

CGI was the **only offeror** for whom GSA evaluated [redacted] past performance references. As to every other offeror for whom obtaining nine (or close to nine) past performance references proved difficult, GSA made additional efforts beyond those contemplated in its established methodology, and obtained more references before performing its evaluation. In a clear example of prejudicial disparate treatment, GSA made no similar efforts for CGI.

For most offerors, GSA had little difficulty obtaining nine references to determine a "track record" for evaluation purposes. In those cases where Calyptus was unable to interview nine references from GSA's call list, GSA would check the government-wide Past Performance Information Retrieval System (PPIRS) to obtain additional references, and thereby reach the desired total of nine. See, e.g., AR 20211 (for [redacted] when Calyptus completed only seven interviews, Past Performance Team ("PPET") Lead [redacted] stated "we will try to find at least 2 PPIRS references to meet the nine reference goal"); see also AR 46, 47. GSA evaluated nine or more references (including PPIRS) for 21 of the awardees; six awardees had eight references (including PPIRS); two had seven.[2] None had [redacted].

GSA had trouble obtaining the targeted nine references for some offerors, due to non-responsive references, the reported inability of Calyptus callers to reach a sufficient number of references, a lack of PPIRS, or the reluctance of references to provide past

---

[2] See AR Tab 11A (transcripts) and AR Tab 13A (consensus summaries, referencing PPIRs) for all awardees and protesters; for other non-awardees, see CGI Documentation Exhibit B (transcripts) and Stanley Designations Exhibit F (Exhibit C's to Source Selection Decision Memo ("SSD Memo")).

performance information to the non-government Calyptus employees. In most instances, GSA overcame these difficulties and achieved, or came very close to, its targeted nine references, by directing Calyptus to make more calls; by permitting reluctant references to provide information to GSA's Program Manager rather than to Calyptus; or – for at least four Offerors – by having the Contracting Officer and/or [redacted] **personally** take steps to obtain additional past performance information. No such steps were taken for CGI.

### a. *GSA made only minimal efforts to obtain past performance information for CGI.*

On April 6, Calyptus sent to GSA a purportedly complete set of interview transcripts for CGI. Prepared by Calyptus employee [redacted] ("GD"), the "set" included [redacted] completed interviews, and [redacted] blank transcript forms. AR 21582; 21643-21662. See also 3496-3516. [redacted] (AR 3516), [redacted], e.g., [redacted] and [redacted]. AR 7936-57; 15212-33. PPET Lead [redacted] recognized that this was problematic with respect to CGI, however, since CGI only had [redacted] reference transcripts; he sent an email to [redacted], the [redacted] and Chair of the Source Selection Evaluation Team ("SSET"), noting: "CGI had [redacted] responses and [redacted] . . . We like to get nine . . . ." AR 3657.

GSA did nothing further to address this situation for CGI. The agency made no attempt to obtain any additional past performance information to be used in GSA's evaluation of CGI. Instead, based solely on [redacted] transcripts of GD interviews – [redacted] – GSA performed an evaluation and

"found" a track record, documented in the April 19 CGI past performance consensus review. AR 3538-47. GSA treated other similarly situated offerors very differently.

**b. *GSA made additional efforts on behalf of Awardee [redacted].***

On February 23, Calyptus sent GSA a set of interviews for [redacted], also performed by GD. Like CGI's, the [redacted]. AR 20466-84. Also like CGI, [redacted] number of references. Thus GSA had [redacted] – [redacted].

[redacted], however, [redacted]. Instead, [redacted]. [redacted] (AR 1409-12)), and [redacted]. AR 1425-31. [redacted]. [redacted].

**c. *GSA made additional efforts on behalf of other offerors.***

GSA made similar efforts to obtain additional past performance references for other offerors, when Calyptus' initial results yielded a small number of completed interviews. For example, on March 12, Calyptus sent a set of "completed" transcripts for offeror [redacted], apparently including [redacted] interviews, again performed by caller

GD. AR 21137, 21144.[3] GSA also located one PPIR for [redacted] (AR 13356), bringing its total number of past performance references to [redacted] like CGI's. On March 30, however, [redacted] announced that she had **created an additional call list** for [redacted]:

> I've made a second selection for [redacted] As you know we followed all the steps in our source selection methodology (interviews and PPIRS) and **we are still in need of past performance reviews to establish a track record for** [redacted] . . . I have reviewed [redacted] interview list and revisited the tables, and **I have chosen new efforts to resubmit to Calyptus**.

AR 21563 (emphasis added). GSA's **second** [redacted] call list identified new references to be contacted, and also directed Calyptus to try again to contact certain non-responsive references from the initial list. Compare AR 19836-37 (original [redacted] call list) with AR 21564-66 (second [redacted] call list). Calyptus produced four more transcripts in response to this [redacted] "resubmission" (AR 21825-34), but, on April 24, [redacted] announced that "we'd like to make one more attempt." She provided a **third** call list identifying two more [redacted] references to be called (AR 21946, AR 21947-48), which resulted in one more Calyptus transcript. AR 22010-12. As a result of these efforts to obtain additional past performance information, GSA ultimately obtained the targeted nine references for [redacted] eight reference interviews, plus one PPIR, are identified and relied upon in the Source Selection Decision Memorandum's discussion of [redacted] past performance consensus rating. AR 13356-57.

Similarly, [redacted] personally made special efforts to obtain additional past performance information for [redacted]. The first set of Calyptus transcripts included [redacted] completed interviews, [redacted] were with the same individual (for different task orders).

---

[3] These transcripts are inexplicably missing from the administrative record, but Exhibit C43 to the Source Selection Decision Memorandum cites comments from [redacted] References: [redacted]. AR 13356-7. See also AR 20175.

AR 21517-36. [redacted] created a second call list, asking Calyptus to "try for additional past performance responses for [redacted]." AR 21925-26. "We are lacking info for this offeror and want to make every effort to check what we have (though it is slim pickings.)" AR 21934. Subsequently, GSA told Calyptus not to attempt to contact one of the new call list references because "the CO was able to finally track him down and we're going to do the interview directly." AR 22003. As a result of the personal efforts of the Contracting Officer and others in "tracking down" references for [redacted], GSA ultimately obtained 10 completed interviews. AR 13356. Although many of these were later discounted as repetitive or duplicative, GSA's substantial extra efforts to obtain past performance references before performing an evaluation for this offeror again stand in striking contrast to its refusal to make any additional efforts for CGI.

Finally, GSA took similar additional actions for [redacted], an offeror with [redacted] initial interview responses. AR 21808-24. [redacted] made another call list and noted, "I think there may be only one more recall list – for [redacted]. Then we're done with any 'extra' interviews on Alliant." AR 21946. Ultimately, [redacted] was disqualified for other reasons. AR 994-95.

**2. GSA arbitrarily and unreasonably failed to monitor the efforts of Calyptus to collect past performance information for Plaintiff CGI, in contrast to its consistent monitoring of Calyptus' efforts for other offerors.**

GSA ignored clear evidence that in attempting to contact CGI's references, Calyptus caller GD failed to comply with GSA's established written procedures, thus contributing to the shortage of CGI interview transcripts.

According to the transcripts submitted to GSA, GD made no attempts to contact alternates when two of CGI's primary references did not respond, nor did he document

the required attempts to reach other references he reported as "not responsive." GD produced a blank interview transcript for CGI's Primary Reference #4 showing the POC's name, a single "date contacted" of 3/02/2007, and the vague notation "3 or more calls (or emails) without response. No response after multiple calls and email." AR 3504. GD's blank transcript for CGI's Primary Reference #9 has identical notations. AR 3514-15. These notes contrast with GD's notes on CGI's Reference #6 and #8 transcripts, which state "no response after 3 or more calls **to each primary and alternate**." AR 3508; 3512 (emphasis added). In clear disregard of GSA's required procedures, there is no evidence that GD ever made the required attempts to contact Alternate References #4 or #9, identified on GSA's CGI call list.

Although GD's failure to make required attempts to contact CGI references was evident on the face of documents reviewed by GSA, the record reflects no GSA follow-up with Calyptus to address or correct this failure. In contrast, GSA was diligent in monitoring Calyptus transcripts for other offerors, and, where appropriate, questioning Calyptus efforts and methods. For example, [redacted] noticed the following details on transcripts for [redacted] references:

> [T]here are two responses from reference #4 (different people, but same category, high dollar FFP – primary and alternate). So, after checking the call sheet, it is apparent that there was no reference called for category #9, High Dollar T&M/LH. We should have one reference from that category to ensure consistency. I would evaluate the additional reference for #4, but we need to see if Calyptus can call and receive a response from reference #9.

AR 29786. Similarly, when an [redacted] transcript indicated that a reference might relate to a contract that was "too old," [redacted] said "we could ask the Calyptus [sic] to make an additional call to the alternate reference **which would help the track record too**." AR 21299 (emphasis added). [redacted] noticed when a caller used the wrong script for a

particular reference (AR 21299); he commented when callers submitted a transcript that did not have the "look of the other transcripts" (AR 20211); he noticed when for [redacted] he received "the same response for two references [redacted] (AR 20211); and he personally called [redacted] references who were "not responsive" to GD. GSA [redacted] also questioned Calyptus about why one set of transcripts indicated that only seven references were called instead of nine (AR 21126-27), and provided clarifications on when alternates should be called. AR 19955. Finally, in commenting on the need to locate alternate POCs if a listed POC is not current or appropriate, [redacted] said, "We just need to be consistent with all offerors." AR 19994.

For CGI, however, GSA did nothing to follow up on the deficient transcripts submitted by Calyptus. GSA also ignored the fact that GD's reported efforts for CGI -- the uninformative "3 or more calls (or emails)" -- were less than efforts reported by other Calyptus callers, who frequently made more than three attempts to contact identified POCs, and as required, described their efforts in detail.[4]

### 3. GSA's disparate treatment was prejudicial to CGI.

---

[4] See, e.g., AR 10888 (for [redacted] JR called "on 2/5, 2/8, 2/9, and 2/12" and sent email on 2/13"); AR 19210 (for [redacted] SS contacted "1/31, 2/7, 2/8, 2/12"); AR 20654 (for [redacted], SS "called and emailed 2/9, 2/13, 2/15, 2/16, 2/23"); AR 11875 (for [redacted] SS called primary "1/31/07 10:15; 2/7/07 16:25; 2/8/07 11:00," and alternate "called & emailed 2/14/07, 2/15/07, 2/16/07"); AR 20704 (for [redacted], JR made 3 calls to primary, then call to alternate who had no relevant knowledge, then 2 more calls to primary); AR 21854 (for [redacted] JR "called 3/29 (10:24am . . .3/30 (8:30 am) . . . 4/2 (9:04 am). . . 4/3 (8:48 am). . . 4/4 (9:36 am). . .4/5 (8:34 am). . . 4/6 (8:32 am)").

PPET Lead [redacted] was well aware that Calyptus' production of only five interviews for CGI created a problem, and he sought Ms. Beasley's "permission" to ignore it:

> [redacted] We like to get nine, **but if we can't because of nonparticipation (this includes some [redacted] COs by the way), there is not much more we can do.** Calyptus made their efforts per their SOW. We still have not heard back on [redacted] with the new call list.
>
> [redacted]? I will remind Calyptus on Monday to notify [redacted] and I when this happens well before they "submit" the transcripts to [redacted]

AR 3657 (emphasis added). [redacted] email fails to explain GSA's actions; it only serves to paper the record in a manner that distorts the facts.

[redacted] assertion that "if we can't [get nine] because of nonparticipation . . . there is not much more we can do" was disingenuous. For others, GSA addressed non-responsive references by creating additional call lists or requiring additional contact attempts. For [redacted] and [redacted], [redacted] and [redacted] **personally** remedied the identical "nonparticipation" situation by "tracking down" the missing references and making additional calls; there is no reason why they could not have done so for CGI. Alternatively, creation of an additional call list for CGI (as [redacted] did for [redacted] and [redacted]) would have been effortless. CGI's proposal listed [redacted] past performance "efforts;" after removing duplicates of the POCs listed in GSA's initial call list, there were at least [redacted] additional CGI references that GSA could have contacted. AR 3453a, 3453b, 3454; 19979-80.

In addition, the fact, noted by [redacted], that some CGI references [redacted]" was not unique, although his statement suggests that it was. What was unique was GSA's failure to do anything about it. Moreover, [redacted] observation that some of CGI's non-responsive references were [redacted] Contracting Officers merely emphasizes that GSA clearly could have done more. If [redacted] could pick up the phone and call two references at other agencies for [redacted], he certainly could have picked up the phone and called contracting officers [redacted] for CGI. If [redacted] could "track down" one of [redacted] references and call him herself, she certainly could have done the same thing with CGI's non-responsive references – but she did not.

Finally, the fact that there [redacted] in CGI's call list was also not unique. For other offerors, GSA accepted [redacted][5] and in any event, CGI had many additional [redacted]. But GSA refused to make those calls.

CGI was prejudiced by GSA's disparate treatment because, unlike every other offeror, CGI's consensus past performance evaluation was based on [redacted] references. For other offerors, GSA kept working and deliberately delayed its evaluation until additional references had been obtained, confirming that the sheer number of references available was material to GSA's evaluation process.

---

5 See AR 21189; AR 10424, 10427 ([redacted] #6, #7); AR 15722, 15730 ([redacted] #6, #9); AR 16614, 16616 ([redacted] #5, #6); AR 16219, 16284 ([redacted] #2, #9); AR 18172, 18184, 18174, 18178 ([redacted] #2, #8 and #3, #5); AR 18688, 18697, 18691, 18707 ([redacted] #2, #5 and #3, #8); AR 1382, 1397 ([redacted] #2, #7); AR 1317, 1334 ([redacted] #3, #9).

Thus, for example, when [redacted] had only seven interviewed references, [redacted] wrote, "we will try to find at least 2 PPIRS references to meet the nine reference goal," and commented that, if Calyptus noticed a call sheet error reducing the number of references obtained, "they either use an alternate, or we can re-sort the call sheet to find another reference to call." AR 20211. Similarly, [redacted] refused to evaluate [redacted] until a suggestion that there might only be six reference responses, had been cleared up: "We could ask the Calyptus [sic] to make an additional call to the alternate R#1 reference. . .which would help the track record too." AR 21299.

For [redacted] GSA's evaluators reviewed the [redacted] initial Calyptus interview transcripts on or about March 5 (AR 1450, 1510), but [redacted] conducted his additional interviews on March 9 and 13, before the [redacted] consensus evaluation was prepared on March 15. [redacted] consensus evaluation prominently cited the two references contacted by [redacted] in the discussion of every subfactor, demonstrating the material effect, on [redacted] evaluation, of the additional past performance information obtained through GSA's extra efforts. See generally, AR 1588-92. For the Quality of Service, Schedule, and Cost Control subfactors, comments from the two [redacted] interviews account for **over half** of the total, including the entirety of the entries for "Weaknesses/Risks." AR 1588-90. For the subfactor of Subcontract Management/Socioeconomic Goals, the consensus evaluation cites **only** comments from the references interviewed by [redacted]. AR 1592.

GSA similarly delayed its [redacted] and [redacted] evaluations until after the successful completion of its additional efforts to obtain more past performance information. See supra Section I.A.1.c.

GSA has not articulated any reason for its decision to "get a track record" for CGI based on [redacted] references, when the Agency failed to take that short-cut for [redacted] or [redacted] and made successful efforts to avoid the issue altogether for ***all other*** offerors. It is beyond dispute that with more information, a more accurate and complete "track record" could have been "found" for CGI; GSA's determination that a "reasonable sample" was nine references, and its efforts to obtain that number for other offerors, confirms this fact. As demonstrated below, the number of references available for CGI clearly affected evaluators' "confidence level" and their resulting ratings. CGI was prejudiced by GSA's action because the basis for GSA's track record determination for all other offerors was materially different than it was for CGI. GSA ignored its own finding that a reasonable sample size to establish a track record was nine references, and without explanation or rational basis, simply "declared" a track record for CGI based on a sample [redacted] size that GSA deemed to be "reasonable."

**B. <u>GSA's past performance "scripts" lacked a rational basis and encouraged arbitrary and inconsistent responses.</u>**

GSA provided Calyptus with a list of questions to capture and record past performance information. AR 87-90. These scripts were fundamentally flawed such that their use was arbitrary and resulted in evaluations that lacked a rational basis.

**1. GSA's "scripts" did not provide a common point of reference for past performance responses.**

Although Federal agencies are generally urged to provide past performance information by means of rating systems with defined terms to be used uniformly by all

references, ensuring a fair baseline for comparison of responses,[6] GSA's past performance scripts provided no common point of reference or baseline for responses to the scripted questions. Use of a uniform rating scale not only "enhances interagency sharing of past performance informationm" as OFPP notes, but failure to provide references with a uniform rating scale – or some other common baseline – can only lead to inconsistent responses and evaluations that cannot rationally be compared. GSA's scripts did not provide to references or to Calyptus any rating scale, definitions, or common baseline to inform the responses. Instead, GSA's scripted questions were open-ended: "**how effectively** did the Offeror" perform in a particular area; "**to what extent**" did the Offeror do something; or "**to what degree** was the Offeror an effective business partner.**"** AR 87-90. Without the benefit of a defined rating scale, these questions understandably elicited from references a wide variety of differently worded responses, resulting in no basis for rational comparisons, or consistent and fair evaluations.

In general, notwithstanding the fact that no reference was informed that "[redacted]" was the highest possible rating in GSA's eyes, and that a response of "[redacted]" was regarded as a **lesser** response, GSA's evaluators performed their evaluation on that basis. That is, GSA concluded that certain words from references should result in higher scores than certain other words; but the references were never

[6] See, e.g., Office of Mgmt. & Budget, Office of Fed. Procurement Policy ("OFPP"), Best Practices for Collecting and Using Past Performance Information (2000) (defining five basic ratings to be used to "enhance interagency sharing of past performance information"). See also Dep't of Def., Contractor Performance Assessment Reporting System (CPARS) Policy Guide (2007); Nat'l Institutes of Health, NIH Policy Manual 6015-2, Past Performance Information (2005) (following the OFPP best practices guidance, and provide uniform ratings and definitions to be used by those who file performance assessment reports).

told which words they should use as the highest praise and which words they should use when they wanted to provide a less favorable response. Human nature and the English language being what they are, the result was a clear disconnect in which references used (and Calyptus transcribed) a wide variety of words and phrases – and GSA arbitrarily determined that some were the equivalent of “exceptionally high confidence” and others were the equivalent of “satisfactory confidence.”

Sections I.C. and D. below demonstrate the prejudice to CGI resulting from GSA’s failure to establish a rating scale or any common baseline for references to use in providing their responses, and the resulting disparate treatment of offerors.

**2. GSA’s scripted questions also failed to elicit material information concerning RFP evaluation factors.**

In addition to the absence of a rating scale to be used by references in responding to GSA’s scripted questions, the scripts were flawed because they failed to elicit material information concerning mandatory RFP evaluation factors. For example, under the Quality of Service subfactor, GSA was to evaluate “the Offeror’s ability to provide a service that met the customer’s quality requirements and conformed to contract requirements.” AR 244. The highest ratings, EH, were reserved for offerors whose past performance references established that they had *exceeded* contractual requirements, not just “conformed to” them. AR 77. GSA’s scripts did not ask that question. Instead, the scripts asked only, “How effectively did the Offeror manage your requirement?” AR 89. This question invites a response such as “very effectively,” but does not elicit information as to whether or not the offeror met, exceeded, or fell short of contractual requirements.

Where an RFP clearly contemplates evaluation of whether an offeror met or exceeded requirements, failure of the agency to ask past performance references questions designed to elicit such information, is improper. See Dismas Charities, Inc., Comp. Gen. B-292091, 2003 WL 21665202 (C.G. June 26, 2003) (sustaining protest where the RFP clearly contemplated assessment of, among other things, whether an offeror's past performance exceeded minimum contract requirements but a majority of the protester's references were not requested to provide that information). Had CGI's references been asked whether CGI exceeded contractual requirements, they would have had the opportunity to respond affirmatively and in great detail.

**3. GSA encouraged unscripted follow-up questions, but only some Calyptus callers – not including GD – asked such additional questions.**

In its "Past Performance Guide for Reference Callers," GSA encouraged its contracted reference callers to ask unscripted follow-up questions:

> Please encourage the reference to be as specific as possible about how the Offeror performed a task or accomplished a milestone. Attempt to identify specific performance metrics that were met or exceeded. For example, the following narrative…"the Offeror exceeded the performance metric which decreased turnaround time by 25% on average:" is better than just stating that the Offeror did a "good" job. If the reference identifies problems, be sure to ask what corrective actions were taken, if any, to address the problem. The key is assessing the Offeror's performance risk, so encourage the responder to describe how something was accomplished or why a certain action took place. Again, please encourage your interviewee to provide you with objective, quantifiable, or specific statements in your transcript whenever possible.

AR 107 (emphasis in original). GSA's methodology included no mechanism to assure that the GSA instructions concerning follow-up questions would be implemented at all, much less implemented consistently by individual callers and/or among references. They were not.

GSA's instructions to callers demonstrate that the agency was very concerned about having to base evaluations on short responses lacking in detail, and it expressed that continuing concern as the data collection process progressed. For example, on February 21, PPET Lead [redacted] commented on the Calyptus transcripts to GSA's [redacted]:

> I know some of these references are not great talkers . . . However, **we will need more than one or two word adjectives for question responses**. Encourage the callers again to ask "how" or give a brief example. **Otherwise we will not have enough detail to support our ratings (confidence level).**

AR 20211 (emphasis added). [redacted] passed the comment to Calyptus, noting

> I know we've discussed this and you certainly can't 'interrogate' these PoCs, but anything your folks can do to get more substantial verbiage from the PoCs will be immensely helpful.

Id. Despite these repeated requests, however, almost every transcript produced by CGI's reference caller GD includes primarily the kind of one- or two-word responses that [redacted] deemed insufficient. For example, on the Schedule subfactor, GD's recorded responses from CGI references to the question "How effectively did the Offeror meet schedule goals such as milestones and delivery schedules?" were: "[redacted]"; "[redacted]"; "[redacted]"; and "[redacted]," with [redacted] lengthier reply. AR 3496, 3499, 3502, 3506, 3510.

Transcripts produced by other Calyptus callers, or by [redacted] himself, include much more detailed responses, suggesting that those callers, unlike GD, followed GSA's instructions and asked follow-up questions. For example, [redacted] transcript of an [redacted] reference's response to the Schedule question, was:

> [redacted]

AR 1426. See also, e.g., AR 8890-92 (caller "KM" for [redacted]); AR 1362-64 (caller "SS" for [redacted]); AR 9387-89 (caller "JR" for [redacted]); AR 13936-38 (caller "DD" for [redacted]).

The striking differences in the interview transcripts alone evidences the disparate treatment that actually resulted from GSA's flawed methodology, and its failure to monitor its implementation. The resulting prejudice to CGI is discussed below.

**C. GSA's evaluation of CGI's past performance was arbitrary and lacked a rational basis.**

**1. GSA arbitrarily assigned [redacted], on grounds that were expressly prohibited by the RFP.**

GSA's evaluation of CGI's past performance on the [redacted] subfactor relied upon comments from references for [redacted] contracts, when doing so was expressly prohibited by the RFP. This constituted a clear and prejudicial violation of 10 U.S.C. § 2305(b)(1); 41 U.S.C. § 253b(a); and 48 C.F.R. § 15.305(a) (Federal agencies must evaluate proposals and make award solely on the basis of the evaluation factors stated in the solicitation).

The RFP defined the [redacted] as follows:

(c) [redacted].

AR 244 (emphasis added). GSA's distinction between [redacted] contracts is logical and consistent with the Federal Acquisition Regulation. Under an [redacted]. See

48 C.F.R. §§ 16.202-1, 16.301-1 (2006). Thus, [redacted].

Under this RFP and as a matter of logic, past performance references [redacted] contracts should not have been asked [redacted], and [redacted] comments from [redacted] contract references should have been ignored. GSA's scripts did not distinguish between [redacted], however; scripted [redacted] questions were improperly asked of all references, including those for [redacted] contracts. AR 87-90.

This prejudiced CGI in two ways. First, GSA assigned CGI a [redacted] based solely on one reference's irrelevant mention of [redacted]:

[redacted]

AR 3502-03; 3541-42. Assigning [redacted] based on this answer was clearly inconsistent with the stated evaluation criteria ("[redacted]"). Moreover, there is no rational basis for assigning CGI [redacted] based on this comment. Without some explanation, the fact that there [redacted] says nothing about [redacted]. Perhaps [redacted] Under no circumstances can [redacted] be rationally considered [redacted]."

GSA's consensus evaluation conceded: [redacted] AR 3542. CGI should

have been [redacted]. A proper evaluation of the other superlative references received by CGI for this subfactor, would have resulted in an [redacted] CGI received.

In addition to assigning [redacted] CGI's proposal, GSA repeatedly violated 48 C.F.R. § 15.305(a) by evaluating almost all offerors under [redacted] For many awardees, positive comments from [redacted] contributed substantially to the "strength" of their evaluations and clearly impacted their ratings. For example:

- [redacted]: An [redacted] accounted for one-third of the favorable comments cited in the consensus summary. AR 11929; 11868-69.
- [redacted]: [redacted] accounted for almost 40% of the favorable comments cited in the consensus summary. AR 7066; 7001-08.
- [redacted]: An [redacted] accounted for one-quarter of the favorable comments cited in the consensus summary. AR 18224; 18166-67
- [redacted]: An [redacted] accounted for one-third of the favorable comments cited in the consensus summary. AR 1559; 1286-87.
- [redacted]: An [redacted] accounted for one-fifth of the favorable comments cited in the consensus summary. AR 14847; 14789-94.

Deletion of 20% to 40% of the positive comments from the evaluation of these awardees (and others) – as required by the plain words of the RFP – would have a material impact on their final ratings, especially since GSA sought to find a "track record" and more references were better than fewer. A re-evaluation under the [redacted]

[redacted] would enhance CGI's score by [redacted]" and lowering the scores of many awardees through elimination of [redacted].

### 2. GSA arbitrarily assigned a [redacted] subfactors, while assigning an [redacted] rating to awardees with comparable references.

For the [redacted] past performance subfactor, GSA gave CGI [redacted]. AR 3541. This rating was arbitrary and lacked a rational basis, in that certain awardees with comparable or less favorable references received higher ratings. The following chart compares CGI's [redacted] references' comments to those of two awardees who received [redacted].[7] All emphases are added.

| **CGI References *Rating*** [redacted] | [redacted] | [redacted] |
|---|---|---|
| [redacted] (AR 3496) | [redacted] (AR 14797) | [redacted] (AR 11428) |
| [redacted] (AR 3498) | [redacted] (AR 14799) | [redacted] (AR 11431) |
| [redacted] (AR 3501) | … [redacted] (AR 14801) | [redacted] (AR 11434) |

[7] The scripted questions for [redacted] AR 87, 89.

| | | |
|---|---|---|
| [redacted] (AR 3506) | [redacted] (AR 14803) | ... [redacted] (AR 11437) |
| [redacted] (AR 3510) | [redacted] (AR 14807) | [redacted] (AR 11440) |
| | [redacted] . . . . (AR 14809) | [redacted] (AR 11443) |
| | [redacted] (AR 14811) | [redacted] (AR 11446) |
| | [redacted] (AR 14813) | [redacted] (AR 11449) |
| | [redacted] (AR 14815) | [redacted] (AR 11452) |

CGI was unfairly and arbitrarily denied [redacted] for the [redacted] subfactor. Its references used the same adjectives and descriptions as references for [redacted] and others who received [redacted]. See AR 9903-9920 (ITS); AR 13934-54 (SII). There is no rational distinction between "[redacted]" and "[redacted];" or between "[redacted]" and "[redacted];" or between

"[redacted]" and "[redacted]." The record is devoid of any explanation as to why the adjectives used by the [redacted] references merited [redacted], but the comparable or identical adjectives used by CGI's references merited [redacted].

The SSP defined [redacted] to require an "outstanding track record" [redacted], with "no reasonable doubt" that the offeror will [redacted]. An [redacted] required an "above-average" track record with "little doubt" that the offeror [redacted]. AR 77-78. The Administrative Record includes no explanation or documentation of why, or on what basis, GSA determined that there was **any** doubt that CGI would [redacted]. CGI received no negative comments on [redacted] from any of its references; it has the same "outstanding track record" of [redacted] and the record provides "no reasonable doubt" of CGI's ability to [redacted]

The only possible basis for the rating difference reflected in this comparison is that GSA obtained a larger number of references – nine – for [redacted], as opposed to [redacted]. Here, GSA's arbitrary and unreasonable failure to obtain additional past performance references, as it did for other offerors, had a substantial prejudicial effect on CGI. But for GSA's disparate treatment of CGI, CGI would have had more references, would have been in the same favorable position as [redacted] and would have received [redacted], thus increasing its overall past performance score to [redacted], and placing CGI in line for award.

The same analysis applies to the [redacted]: GSA arbitrarily assigned [redacted] while assigning awardees with comparable references an [redacted] as the following chart demonstrates.

| [redacted] **– Script questions** (AR 88, 90) [redacted] | | |
|---|---|---|
| **CGI** [redacted] ***Rating*** | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |

| | | |
|---|---|---|
| (AR 3500) | (AR 1414) | [redacted] (AR 9903-9904) |
| [redacted] [redacted] (AR3503) | [redacted] [redacted] (AR 1416) | [redacted] [redacted] (AR 9906) |
| [redacted] [redacted] (AR 3507) | [redacted] [redacted] (AR 1418) | [redacted] (AR 9910) |
| [redacted] [redacted] (AR 3511) | [redacted] [redacted] (AR 1424) | [redacted] (AR 9912) |
| [redacted] [redacted] (AR 3497) | [redacted] [redacted] (AR1433) | [redacted] [redacted] (AR 9916) |
| | [redacted] | [redacted] [redacted] |

| | | |
|---|---|---|
| | [redacted] (AR 1430) | (AR 9920) |
| | [redacted] (AR 1407-08) | [redacted] (AR 9927)(PPIRS) |

There is no rational basis for assigning different scores based on the comments made by the references for these three offerors. There is no explanation in the Administrative Record as to why GSA found [redacted]" but had [redacted] as required by the SSP standards. AR 78. As with [redacted] (Note: these are the only [redacted]). GSA's refusal to obtain additional references for CGI – as it did for other offerors – once again caused substantial prejudice to CGI. Had CGI not been evaluated on a different basis than these two offerors and others, it would have received [redacted], increasing its Past Performance score to [redacted], and placing it in line for an award.

**D. <u>GSA's arbitrary and unreasonable evaluation prejudiced CGI</u>.**

Both the design and the implementation of GSA's past performance evaluation process were fundamentally flawed, resulting in disparate treatment of all offerors, but most especially of CGI. In Seattle Sec. Services Inc. v. United States, 45 Fed. Cl. 560 (2000), this Court summarized the legal standard which prohibits such disparate treatment:

> [T]he GAO has aptly stated that "it is fundamental that the contracting agency must treat all offerors equally; it must evaluate offers **evenhandedly against common requirements and evaluation criteria**. [Citation omitted]. Similarly in Wind Gap Knitwear, Inc., B-261045, 95-2 CPD ¶ 124 at 2, the GAO summarized the controlling legal standard, explaining "[w]here a solicitation requires the evaluation of offerors' past performance, an agency has discretion to determine the scope of the offerors' performance histories to be considered, provided **all proposals are evaluated on the same basis and consistent with the solicitation requirements**."

Seattle Sec. Services, 45 Fed. Cl. 560 at 569 (emphasis added.) See also, Family Entm't Services, Inc., Comp. Gen. B-298047.3, 2006 WL 4480999 (C.G. Sept. 20, 2006) (sustaining protest where agency's use of disparate methods to obtain past performance information, including setting deadlines for the return of questionnaires for some but not all references, resulted in disparate and unequal treatment of offerors).

Here, GSA used one method to gather past performance information for [redacted], and [redacted], making efforts in addition to its established procedures to remedy a lack of information; but without explanation or justification, GSA refused to make such efforts for the identically situated CGI. The resulting prejudice to CGI, because [redacted] references were available for evaluation, is manifest. In addition, GSA actions, which clearly favored other offerors over CGI, violated FAR 15.306(e). 48 C.F.R. § 15.306(e)(1) (2006).

Moreover, material flaws in GSA's evaluation methodology – including the absence of a common baseline for references and the inconsistent use of unscripted follow-up questions – fostered the arbitrary collection of past performance information and arbitrary evaluations. CGI was prejudiced because the Calyptus employee assigned to contact its references typically transcribed only one-or-two-word responses and apparently asked no follow-up questions. The most cursory review of the past performance evaluations for the awardees – not to mention [redacted] comments that "we will need more than one or two word adjectives for question responses . . . [o]therwise we will not have enough detail to support our ratings" (AR 20211) – makes clear that detailed responses from past performance references were preferred and typically resulted in higher ratings. GD did not transcribe any detailed responses for CGI.[8] And, while GD also interviewed other offerors' references, the prejudicial impact of GD's failure to obtain details was greatly magnified for CGI because CGI had substantially fewer references.

In Seattle Security, the government evaluated one offeror's past performance references using an evaluation form with a point system, but evaluated three of another offeror's references without using that form. The Government argued that the scores might have been no different, even if the evaluation had been properly performed using the specified form. The Court disagreed:

> The defendant argues . . . that we do not know what the scores would have been on these other references and that the scores might have been the same or even higher than the [score] received. But, this assertion misses the point for while the

---

8 [redacted] AR 3498-3501.

> CO clearly would have considerable discretion in evaluating [the affected] performance on the evaluation forms, **the CO does not have discretion to employ a rigid point system for evaluating one bidder's references and not use the same system to evaluate another bidder's references.**

45 Fed. Cl. at 569-670 (emphasis added). Here, GSA's scripted questions provided no rating system or common baseline for responders. GSA's open-ended questions inevitably resulted in disparate and non-comparable past performance information for different offerors, which precluded any rational, fair, or equal evaluation. <u>See also</u> <u>Dismas Charities</u>, 2003 WL 21665202, at *1 (sustaining protest where past performance references received materially differing instructions with regard to how to score an offeror's past performance).

Finally, despite the comparable quality of references for CGI and those awardees who received [redacted], GSA arbitrarily and unreasonably assigned CGI [redacted]. There is no rational distinction between the descriptive adjectives used by CGI's references for these subfactors, and those used by the references of the awardees who used higher ratings; nor does the Administrative Record contain any explanation as to why GSA assigned an [redacted] to CGI but [redacted] to the others. GSA's arbitrary and inconsistent evaluation is improper and constitutes a clear and prejudicial violation of FAR 15.306(3)(1). 48 C.F.R. § 15.306(3)(1)(2006).

Without these errors in GSA's evaluation process, CGI would have had a better "track record," i.e., [redacted]; and its overall past performance score would have been increased from [redacted] – placing it squarely in line for award.

## II. GSA's Basic Contract Plan Evaluation Lacked a Rational Basis, Violated Applicable Laws and Regulations, and Was Characterized by Disparate Treatment of CGI's Proposal.

GSA's evaluation CGI's Basic Contract Plan was improper and unlawful because it was based on unstated evaluation criteria; arbitrarily failed to address directly relevant information in CGI's proposal; and was derived from an irrational "reassessment" process that unequally affected CGI and had no basis in either the terms of the RFP or in logic.

### A. Explanation of BCP scoring process.

Any discussion of GSA's evaluation of the BCP factor must include an explanation of GSA's scoring process. The BCP accounted for one-half of the technical evaluation score. It included three sub-factors, which, in turn, were divided into 15 separate "elements," each of which were scored separately. AR 23702-12. Scoring of BCP elements was based on the average of adjectival ratings (subsequently converted to numerical scores) assigned by four GSA evaluators. AR 51; see also AR 923-33. The ratings were assigned points as follows: EH = 5; S = 4; A = 3; M = 2; L/H = 1. AR 992. The final BCP score sheet discloses that point scores were evaluated to [redacted] AR 1008. [redacted].

By way of example: As shown on Attachment 3 and 3e to the SSD Memo (AR 869-78; 923-33), the numerical scores representing the adjectival ratings of each of the four evaluators for each element were added together, then divided by four, to arrive at

the final numerical score for that element. For [redacted], the scores for the second element "Resumes of Key Personnel," were [redacted]; its score was thus [redacted]. AR 23690; 23702. If the first "[redacted]" score were changed to an "[redacted]" score, the result would be: [redacted]. Following the math through, as described in the SSD Memo, AR 842-56, [redacted] score for the Resources Subfactor, from [redacted]. [redacted] overall technical score to increase so that it would displace [redacted], and move from [redacted] rank overall. AR 1006.

[redacted] GSA should have been particularly conscientious in its evaluation of BCP and each of its individual elements. That was not the case, and GSA's BCP evaluation was instead characterized by the same arbitrary and inconsistent patterns as its evaluation of past performance.

**B. <u>GSA arbitrarily failed to evaluate [redacted] in CGI's proposal solely in accordance with the stated evaluation criteria.</u>**

GSA's evaluation of [redacted] for CGI lacked a rational basis and was inconsistent with the stated evaluation criteria in violation of FAR 15.305(a), because the four individual evaluators applied sharply differing standards to what should have been an objective analysis. As a result, CGI received only [redacted] score rather than the [redacted] to which it was entitled for this element, calculated and reflected on the final BCP overall average ratings as follows (AR 870, 925):

| Evaluator | Rating | Score |
| --- | --- | --- |
| [redacted] | | |

In planning acquisitions, agencies must consider whether to [redacted]

[redacted]

AR 247. This established an objective test: does an offeror [redacted]

Under the RFP criteria, an offeror with [redacted] was to receive the most favorable rating. [redacted] ignored this criteria; [redacted] See AR 923-33. None of the other BCP evaluators took this position, see, e.g., AR 4577-96 ([redacted]

[redacted] evaluations were inconsistent with the RFP, which permitted the most favorable rating for offerors [redacted]

CGI was prejudiced by [redacted] improper evaluation. Although CGI's [redacted] nevertheless improperly gave CGI [redacted] rather than [redacted]. AR 3552. Because CGI's final rating for [redacted] was a mathematical calculation, this had the result of improperly lowering CGI's score.

A second GSA evaluator assigned inconsistent and arbitrary ratings to different offerors for this element. [redacted] AR 15272-73, 15131-32 ([redacted]); AR 11937-38, 11787 ([redacted]). This high rating was inconsistent with the RFP and had no rational basis; the [redacted]

CGI's [redacted] AR 3311-12. However, in stark contrast to his [redacted]. AR 3563.

The third evaluator, [redacted] appropriately gave CGI [redacted] AR 3556. The fourth evaluator gave [redacted] (AR 3549) – but arbitrarily and without any explanation, despite the clear instructions in the Source Selection Plan that evaluators were to explain and justify their ratings. AR 51.

If all four of GSA's evaluators had evaluated [redacted] in accordance with the stated evaluation criteria and consistently among offerors, CGI would have received the maximum favorable rating, [redacted] placing it in line for an award.

**C. <u>GSA arbitrarily reassessed certain BCP scores, in a manner that treated CGI unequally.</u>**

After the initial BCP ratings by individual evaluators were recorded on a spreadsheet (AR 23654-64 ("BCP Spreadsheet")), certain of them were re-assessed "via a quasi team consensus meeting" because one or more individual ratings "**noticeably deviated from the norm.**" AR 855 (emphasis added).[9] This reassessment was arbitrary, based on a flawed and inconsistent logic, and deeply prejudicial to CGI.

The BCP Spreadsheet shows handwritten circles around the "deviant" ratings. The deviant ratings were reassessed by the individuals who assigned them in the first place, and the ratings were either revised or left in place. The revised ratings were listed in another chart ("BCP Revised Chart") (AR 23650-53), and the resulting final

---

9 The record does not explain what a "quasi team consensus meeting" is or was.

ratings were converted to numerical scores and included in Attachment 3 to the SSD Memo. AR 23702-12.

Although there are exceptions (seemingly due to carelessness), the circled items on the BCP spreadsheet reflect that, in general, a rating was regarded as "deviant" if it was two scores away from a lower score. For example, if the four evaluators' ratings were: "A A A EH" the EH rating was circled. See, e.g., AR 23654 ([redacted] rating for Technical Innovation). This EH rating for [redacted] was, in fact, reassessed and revised from an EH to an S. AR 23650. Similarly, if the four ratings were: "A S A EH" the EH rating would be circled. See, e.g., AR 23654 ([redacted] rating for Quality Controls, Surveillance Methodologies). This EH rating was reassessed, but was not revised. AR 23650.

This reasonably consistent approach was dramatically different, however, when the four evaluators assigned scores in one of two particular patterns:

- Pattern 1: A S S EH
- Pattern 2: M A A S

In both of these patterns, the high rating was two scores away from the low rating, while the two "middle" ratings were identical. Although Pattern 2 is one notch "lower" on the rating scale than Pattern 1, the patterns are identical. But, in determining whether the high or low ratings were "deviant," GSA adopted inconsistent approaches for the two identical patterns. For Pattern 1, GSA determined that none of the scores "noticeably deviated from the norm" or required reassessment. For Pattern 2, GSA determined that the **higher** score, "S" was deviant, meaning that the S score required reassessment. See, e.g., BCP Spreadsheet for [redacted], where a number of EH ratings with Pattern 1

were circled, but then crossed out. AR 23658. None of the crossed-out EH ratings were reassessed. AR 23667.

There is no explanation of this illogical and inconsistent analysis in the record, but the effect was to artificially protect from further scrutiny selected EH ratings (generally assigned to awardees) – while also ensuring that selected S ratings (generally assigned to non-awardees including CGI) were likely to be lowered even further. Analysis of the BCP Spreadsheet and the BCP Revised Chart, demonstrates that (with some random exceptions as noted above), GSA did not reassess the EH in Pattern 1 scores, but did reassess the "S" rating in Pattern 2 scores. And, when GSA reassessed those "S" ratings, almost 45% were revised downward to an "A." [redacted] 23656, 23650. The effect of GSA's decision not to reassess Pattern 1 scores was that none of the "deviant" EH scores were lowered.

A rational, consistent approach to these re-evaluations would have resulted either in a determination that **neither** of these patterns involves scores that "noticeably deviate from the norm," or that **both** do – not one of each, as GSA inexplicably determined. With the first approach, [redacted]. With the second approach, when the Pattern 1 EH scores were reassessed, the likely result would be multiple downward adjustments of those scores, since GSA's reassessments as reflected in the BCP Revised Chart resulted in downward adjustments 35-45% of the

time.[10] Such reassessments of the Pattern 1 EH scores would have lowered the scores of several offerors (including, primarily, the awardees who had a disproportionate share of such scores) – placing CGI in a better position relative to those awardees.

**D. For [redacted] only one BCP evaluator explained his adjectival rating; that explanation is not supported by the record; and it is based on unstated evaluation criteria.**

Only one BCP evaluator, [redacted], provided any explanation of his adjectival rating of CGI [redacted]. Compare AR 3551 with AR 3548, 3555, 3560-61. Similarly, under the [redacted], only evaluator [redacted] provided comments purporting to explain his rating. Compare AR 3555 with AR 3548, 3551, 3560. These statements – which are the only "analysis" in this record for these three elements under the BCP evaluation factor – are not supported by the record, and are based on unstated evaluation criteria in violation of 48 C.F.R. § 15.305(a) (2006).

With respect to the [redacted], the RFP stated that offerors were [redacted]." AR 233. [redacted] comment on this element asserted [redacted] AR 3551. CGI's proposal addressed [redacted], as required by the RFP (AR 3282); but [redacted] were not evaluation criteria and there is no reasonable nexus between the RFP requirement for a description of [redacted]

---

[10] Upward reassessments were rare, and almost 50% of reassessments result in no revision to the score at all. See AR 23650-53.

[redacted]. See Global Analytic Info. Tech., Comp. Gen. B-298840.2, 2007 WL 1063064, at *3 (C.G. Feb. 6, 2007). [redacted] comment, which is the only documentation in this record reflecting the alleged basis for GSA's evaluation of this element, was thus based entirely on an unstated evaluation criterion. A proper evaluation, properly documented, would have caused CGI's rating for this element to be [redacted]

With respect to the [redacted] element, [redacted] stated that CGI [redacted]," and, [redacted] AR 3555. [redacted] explanation of his adjectival rating incorporates unstated evaluation factors and also ignores directly relevant information in CGI's proposal. The RFP stated that GSA would [redacted] (AR 246), and CGI addressed these requirements, in detail, in its proposal. AR 3279-88. [redacted] failed to evaluate that information, or even acknowledge it. In addition, the RFP did not list [redacted] as an evaluation criterion, and to the extent that [redacted] asserted that a failure to [redacted], that assumption had no basis in the RFP. Again, [redacted] remarks constitute the **only** documentation in the record reflecting GSA's evaluation of this element; and [redacted] evaluation was improper, inconsistent with the evaluation criteria, and lacked a rational basis. A proper analysis of CGI's proposal, properly documented, would have [redacted]

Finally, [redacted] comments on the [redacted] element, AR 3555, make clear that CGI was entitled to at least [redacted] – and in fact, [redacted]. The other evaluators [redacted]

Contracting agencies are required to provide a coherent and reasonable explanation of their exercise of discretion, including documentation of the source selection decision. See 48 C.F.R. § 15.308 (2006); see also Earl Indus., LLC, Comp. Gen. B-309996, B-309996.4, 2007 WL 3313140, at *6 (C.G. Nov. 5, 2007). Mere adjectival ratings are not substitutes for adequate documentation identifying strengths and weaknesses in the offeror's proposal that support the assigned scores. See Panacea Consulting, Inc., Comp. Gen. B-299307.4, B-299308.4, 2007 WL 2296507, at *3-4 (C.G. July 27, 2007). The minimal documentation in this record with regard to CGI's proposal under these [redacted], does not reflect intelligent decision-making; is not supported in the record; and is inconsistent with the stated evaluation criteria. For that reason, GSA's evaluation lacks a rational basis. Id. at *2.

## III. GSA's Method of Evaluating Price and Performing Its Tradeoff Analysis Lacked a Rational Basis and Resulted in Prejudice to All Offerors, Including CGI.

By statute, price must be an evaluation factor in all source selections. 10 U.S.C. § 2305(a)(3)(A)(ii); 41 U.S.C. § 253a(c)(1)(B); see also 48 C.F.R. § 15.304(c)(1) (2006). Despite this requirement, GSA's source selection decision was based entirely on the technical ranking of the offerors without regard to price. In addition, GSA's purported price reasonableness analysis was a sham, and the agency performed no meaningful cost realism analysis.

**A. <u>Price was not an evaluation factor, in violation of applicable law and regulations and despite the express terms of the RFP.</u>**

The RFP stated that price was the least important evaluation factor, although "the closer the technical scores of the various proposals are to one another, the more important cost or price considerations become…" AR 247. Technical scores in this procurement were, in fact, [redacted]. AR 1006. GSA selected the 28 highest-technically ranked offerors for award, and then added the [redacted]-ranked offeror as an afterthought. AR 997-98.

Once technical rank had been established, GSA performed no meaningful best-value analysis to determine whether the prices of very high-priced offerors were reasonable or justified by the [redacted] differences in their technical scores. AR 973-1013. Rather, in every instance, the purported best value analysis does nothing but parrot back selected strengths noted in consensus summary documents (or, in the case of losing offerors, weaknesses/risks). <u>See</u> documents in Tab 24 and 24A of the Administrative Record ("Exhibit C Documents"). This does not constitute rational analysis, and does not comply with the statutory mandate to consider price as an evaluation factor.

**B. <u>GSA's purported evaluation of price reasonableness was meaningless and lacked a rational basis.</u>**

In purporting to evaluate price reasonableness, GSA relied first on "adequate price competition," repeating the identical mantra for **every** offeror regardless of their price: the offeror's "*Overall Price* is in line with adequate price competition and is, therefore, considered fair and reasonable." <u>See, e.g.</u>, AR 2390 (emphasis in original). There is no rational basis for saying an offeror's "overall price is in line with adequate

price competition and is, therefore, considered fair and reasonable," with regarded to [redacted]. This statement is circular, lacks any rational foundation, and does not demonstrate price reasonableness.

GSA also purportedly "compared" each offeror's price to the Independent Government Cost Estimate ("IGCE") ($[redacted]), and to the mean overall price of all offerors ($[redacted]). AR 858, 861-63. Offerors with prices below the IGCE were to be "evaluated favorably." AR 992.[11] Notwithstanding this comparison, GSA awarded [redacted] contracts to awardees [redacted].

| Offeror | Price | % +/- IGCE | % +/- Mean | Standard Deviation Above/Below Mean |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] standard deviations |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] standard deviations |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] standard deviations |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] standard deviations |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] standard deviations |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] standard deviations |

AR 1006. [redacted] offerors, [redacted], proposed prices that were within [redacted] standard deviation of the mean, and [redacted], proposed prices below the IGCE. AR 1010.

In an open competition where there are more than 60 competitors, a pricing evaluation that permits award to a contractor with a price that is [redacted] standard deviations above or below the mean, when [redacted] are within [redacted] standard deviation, has no rational basis. Particularly where the differences in technical scores

[11] [redacted]. AR 3620-21.

were [redacted] (and the RFP stated that, as technical scores became closer, price would become more important), there is no rational justification for accepting offers from [redacted]. In doing precisely this, GSA ignored price. Its so-called "evaluation" effectively swept in all offers irrespective of price.

As the Comptroller General has recently explained:

> In a distribution [based on standard deviations] that is approximately normal, plus or minus one deviation will include approximately 68 percent of the total observations in the sample; plus or minus two deviations will include approximately 95 percent of the total observations; and plus or minus three deviations will include approximately 99.7 percent of the total observations.

Multimax, Inc., Comp. Gen. B-298249.6-20, 2006 WL 3300346, at *12 n.2 (C.G. Oct. 24, 2006). Here, [redacted] offerors ([redacted] of those evaluated) were within [redacted], and [redacted] ([redacted]) were within [redacted]. [redacted]. AR 1010. [redacted] Id. Any meaningful price reasonableness analysis and best-value tradeoff would have resulted in rejection of these offers. Multimax, 2006 WL 3300346, at *8.

**C. GSA failed to perform a meaningful cost realism analysis.**

Because task orders issued under the Alliant contract will include cost-reimbursement contracts, a cost realism analysis was required to determine whether an offeror's proposed costs match its likely actual costs. 48 C.F.R. §§ 15.305(a)(1), 15.404-1(d)(1) (2006); Earl Indus., LLC, Comp. Gen. B-309996, B-309996.4, 2207 WL 3313140, at *7(C.G. Nov. 5, 2007). The Alliant RFP reflects this requirement:

> [A]n Offeror may be rejected if the evaluation determines that an Offeror submitted prices below anticipated costs. Proposals that include unrealistically

> low labor rates, **or that do not otherwise demonstrate cost realism, will be considered a high risk assessment** and will be evaluated for award in accordance with that assessment.

AR 248 (emphasis added). GSA failed to perform any meaningful cost realism analysis. In the absence of such an analysis, the best value determination lacks a rational basis. Priority One Services, Inc., Comp. Gen. B-288836, B-288836.2, 2001 WL 1872433, at *3 (C.G. Dec. 17, 2001). Three examples are illustrative.

- [redacted] Id. GSA's conclusion has no rational basis.

- [redacted] AR 14875. This conclusion has no rational basis.

- [redacted]

[redacted] AR 15799. GSA's comment has no rational basis.

## IV. Prejudice

CGI has documented errors in GSA's evaluation of its proposal that would have resulted in material changes in its scoring. Without these errors, CGI's past performance score would have been [redacted]; and its BCP score would have been at least [redacted] Its "weighted BCP/PP" average score would thus become [redacted] placing it well within the range of the first 29 awardees. AR 1006. Correction of other errors in GSA's evaluation would reduce the scores of certain awardees, further enhancing CGI's relative position. Combined with CGI's price, [redacted], there is a substantial chance that CGI would have received an award.

## V. Remedies

CGI has demonstrated above that this procurement was legally flawed and that CGI was prejudiced as a result. Injunctive relief is appropriate here because: (1) CGI will suffer irreparable harm if injunctive relief is not granted; (2) the harm to CGI if an injunction is denied outweighs the harm to the government and third parties if an

---

12 [redacted]

injunction were issued; and (3) issuing an injunction serves the public interest. See IDEA Int'l, Inc. v. United States, 74 Fed. Cl. 129, 137 (2006).

**A. Irreparable injury**

It is well-settled in this Court that the lost opportunity to compete for a contract on a level playing field constitutes irreparable injury. Cardinal Maint. Serv., Inc. v. United States, 63 Fed. Cl. 98, 110 (2004). Clearly, CGI has suffered such a lost opportunity here, having been denied a contract award. The fact that GSA's Alliant program is a $50 billion procurement only magnifies the size and significance of this loss of opportunity. See, e.g., Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 279-80 (2004) (the "enormous scope" of the procurement at issue "rais[ed] the stakes and the harm to an unsuccessful offeror whose proposal was not fairly considered").

**B. Balancing of Harms**

This substantial and irreparable harm to CGI is not outweighed by any potential harm to the government or third parties resulting from the issuance of an injunction. In the RFP, GSA announced that it intended to award between 25 and 30 contracts, and expressly reserved the right to award more than that number. AR 210. Further, an award under this RFP simply constitutes an opportunity to compete for future task orders. Since GSA has only awarded 29 contracts, one additional award made to CGI will not harm the government, nor will it displace or disadvantage any of the awardees. Indeed, it would benefit GSA to be able offer other Federal agencies a more comprehensive contract vehicle, providing agencies the opportunity to award task orders to one additional well-qualified awardee – CGI.

Should the Court require GSA to re-evaluate all proposals and make a new and proper best value selection, GSA and other agencies would still benefit. It is to GSA's advantage to offer other agencies the chance to award task orders to all those awardees who are truly able to offer the best value for the services provided, based on a fair and complete evaluation. Other federal agencies that utilize the Allliant GWAC would also clearly benefit from such a reelavuation. See Metcalf Constr. Co. v. United States, 53 Fed. Cl. 617, 645 (2002).

**C. Public Interest**

It is fundamental that "the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." Seattle Sec. Services, 45 Fed. Cl. at 572 (citing Cincom Sys. Inc. v. U.S., 37 Fed.Cl. 266, 269 (1997)). CGI has demonstrated that by its actions in this procurement, GSA compromised the principle of honest and fair competition in many respects, most especially by inexplicably and unfairly treating CGI differently than any other offeror, causing substantial prejudice. Clearly, the public's interest in the integrity of the procurement system will be served by requiring GSA to award a contract to CGI, or to conduct a fair and reasonable source selection.

## VI. Conclusion

Plaintiff CGI Federal respectfully requests that this Court grant Plaintiff's' Motion for Judgment on the Administrative Record, and enter judgment in favor of Plaintiff and against Defendant as follows:

1. Declare unlawful the evaluation of CGI's proposal; and

   a. Order GSA to award a contract to CGI, or alternatively

b. Order GSA to re-evaluate CGI's proposal in accordance with law and to make a new and proper best value source selection; or alternatively

2. Declare unlawful the evaluations of all proposals and resulting contract awards under the Solicitation and order GSA to re-evaluate all proposals and make a new and proper best value source selection; and

3. Award CGI its bid preparation costs; and

4. Grant such other and further relief as the Court determines to be just and appropriate.

Respectfully submitted,

/s/ Patricia H. Wittie

Patricia H. Wittie
Counsel of Record

OLDAKER BIDEN & BELAIR LLP
818 Connecticut Ave., NW
Washington, D.C. 20006
Phone: 202-496-3493
Fax: 202-293-6111

OF COUNSEL:
Karla J. Letsche
Kathryn E. Swisher
Oldaker Biden & Belair LLP
818 Connecticut Ave., NW
Washington, D.C. 20006

Dated: November 30, 2007