[redacted]

**Agreed-Upon Redacted Copy May Be Made Public**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | |
|---|---|
| **SERCO INC.; STANLEY ASSOCIATES INC.; CGI FEDERAL INC.; STG INC.; ARTEL, INC.; ADVANCED TECHNOLOGY SYSTEMS, INC.; APPTIS INC., AND NORTEL GOVERNMENT SOLUTIONS INCORPORATED; and THE CENTECH GROUP, INC.,** | **Consolidated Nos. 07-691C, 07-732-C, 07-741-C, 07-747-C, 07-760-C, 07-761-C, 07-766-C, 07-771-C and 07-803C** |
| **Plaintiffs,** | **Judge Allegra** |
| **v.** | **REDACTED COPY** |
| **THE UNITED STATES,** | |
| **Defendant** | |
| **and** | |
| **INDUS CORPORATION; ELECTRONIC DATA SYSTEMS CORPORATION; INTERNATIONAL BUSINESS MACHINES CORPORATION; and GENERAL DYNAMICS ONE SOURCE, LLC,** | |

## CONSOLIDATED PLAINTIFF NORTEL GOVERNMENT SOLUTIONS INCORPORATED'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

In accordance with the Court's November 2, 2007 Scheduling Order, Consolidated-Plaintiff Nortel Government Solutions Incorporated ("NGS") hereby respectfully submits its Motion for Judgment on the Administrative Record.

## TABLE OF CONTENTS

Table of Authorities.................................................................Page 3

Statement of Issues.................................................................Page 5

Statement of the Case.................................................................Page 6

Argument.................................................................Page 20

Conclusion.................................................................Page 28

Appendix 1 (Offeror Ranking Comparison)

Appendix 2 (FAR Part 15 – Relevant Excerpts)

Appendix 3 (Exhibit C to Source Selection Memorandum)

Appendix 4 (Annex D to Source Selection Plan)

Appendix 5 (Annex E and Annex I to Source Selection Plan – call scripts)

Appendix 6 (Call Transcripts for NGS references)

# TABLE OF AUTHORITIES

**Statutes and Regulations**

5 U.S.C. §706(2)(A)

10 U.S.C. §2305(a)(3)(A)(ii)

40 U.S.C. § 11302(e)

41 U.S.C. §253a(c)(1)(A)

41 U.S.C. §253h(d)

Federal Acquisition Regulation ("FAR") Part 15

FAR 15.101-1

FAR 15.303(b)(3)

FAR 15.304(b)(2)

FAR 15.305(a)(1)

FAR 15.306

FAR 15.304(b)(2)

FAR 15.308

FAR 15.406

FAR 15.406-3

**Cases**

*Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed.Cir. 2000)

*Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999).

*Beautify Professional Servs. Corp.*, B-291954.3, Oct. 6, 2003, 2003 CPD P at 5.

*Coast Fed. Bank,* 323 F.3d at 1038

*e-LYNXX Corporation*, B-292761, Dec. 3, 2003, 2003 CPD 219

*Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1086 (Fed.Cir.2001);

*Grumman Data Sys.,* 88 F.3d at 997

*Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1331-32 (Fed.Cir.2001)

*Johnson Controls World Servs., Inc.*, B-289942, B-289942.2, May 24, 2002, 2002 CPD ¶ 88

*Opti-Lite Optical*, B-281693, Mar. 22, 1999, 99-1 CPD ¶ 61

*Peat Marwick, L.L.P.*, B-271673, July 15, 1996, 96-2 CPD¶53

*Ready Transp., Inc.*, B-285283.3, B-285283.4, May 8, 2001, 2001 CPD ¶ 90

*Scanwell Labs., Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970)

*Shumaker Trucking and Excavating Contractors, Inc.* , B290732, Sept. 25, 2002, 2002 CPD 169
*S. J. Thomas Co., Inc.,* B-283192, Oct. 20, 1999, 99-2 CPD P 73

*The MIL Corporation,* B- 294836, 2005 CPD 29.

*TRW, Inc.*, B-260788.2, Aug. 2, 1995, 96-1 CPD ¶ 11

## STATEMENT OF ISSUES

1. Did the General Services Administration ("GSA") act in an arbitrary and capricious manner, contrary to law and the stated requirements of the Alliant Request for Proposals (Solicitation No. TQ2006MCB0001 or "the Solicitation") when it decided to award [redacted] of the [redacted] contracts to Offerors solely based on their technical ranking without conducting individual tradeoff analyses between and among each of the Offerors despite the fact that a number of those awardees had prices [redacted] than the Independent Government Cost Estimate ("IGCE") and [redacted] than other Offerors?

2. Was GSA arbitrary, capricious, and did it abuse its discretion and act inconsistent with law and the Solicitation in not subjecting all Offerors' proposals to the stated criteria in the Solicitation, namely giving equal weight to Past Performance and Basic Contract Plan evaluations in arriving at the overall Technical evaluation, reviewing Cost/Price and then subjecting *all* Offerors to the same best value trade-off analysis?

3. Was GSA's past performance evaluation discriminatory, lacking a valid rationale and employing a flawed script for evaluators to obtain information from Offerors' references because it was not applied uniformly to all references' interviews? Did the questions contained in the script adopted by GSA used to conduct interviews of references produce feedback that permitted consistent comparisons of results among an individual Offeror's references and could those questions elicit data that was consistent with the Solicitation's stated evaluation criteria? Did the resulting data undermine the ability to apply evaluations of past performance consistently to all Offerors?

## STATEMENT OF THE CASE

This case concerns the manner in which GSA conducted its evaluation of offers submitted in response to Solicitation No. Q2006MCB0001 ("the Alliant solicitation or RFP"). GSA, through Alliant, sought proposals for Government-wide Acquisition Contracts ("GWACs") to meet the needs of Federal Government departments and agencies for any and all components of an integrated Information Technology ("IT") solution. (RFP, Section B.1; AR 122.) GWACs are authorized pursuant to 40 U.S.C. § 11302(e). Under the GWACs to be awarded, various departments and agencies within the Federal Government can issue orders for the services offered under the contracts. The Alliant solicitation contemplates five-year contracts to each selected firm with one additional five-year option for a total potential duration of ten years. (RFP, Section F.2.; AR 141) GSA envisions that Alliant will be the primary contract for purchasing IT services across the federal market for the next decade. Alliant is available to all civilian and defense agencies for purchasing IT systems design, software engineering and other services, and GSA has established a contract ceiling of $50 billion over the life of the contract. (RFP, Section B.4; AR 122)

In the Alliant solicitation, GSA described that it intended to award more than one contract under the solicitation. (RFP, Section B.1; AR 122.) GSA stated that it intended to award multiple-award task order contracts. To award multiple-award task order contracts, GSA must satisfy the requirements of 41 U.S.C. §253h(d). Under these kinds of contracts, the Government can solicit task orders among the multiple contract

awardees, or a subset of such awardees. GSA stated its intention to award 25 to 30 contracts. (AR 210.)

The Alliant solicitation contemplated contracts with vendors who could provide a wide breadth of information technology services to the Federal Government. (RFP, Section C; AR 129-138.) Offerors were expected to provide prices for 80 different labor categories in two circumstances, when performing services on the contractor's site and when performing services on a government site. Labor rates were to be provided for each of the 10 years of the contemplated contract. (RFP, Section J, Attachments 2 and 3; AR 251-294.)

GSA conducted the Alliant solicitation using the competitive negotiation selection procedures in Federal Acquisition Regulation ("FAR") Part 15. The RFP specified that "[a]ward will be made to responsible Offerors whose proposals are determined to provide the "best value" to the Government" and promised that "FAR Part 15 competitive negotiation selection procedures utilizing the 'best value' trade-off approach will be utilized." (RFP, page M-1; AR 241. The RFP went on to state that "consistent with FAR 15.101-1, the *Government will conduct a best value tradeoff in which differences in non-price factors and evaluated price will be compared between the Offerors* in order to determine which Offeror represents the best value to the Government [emphasis added]." (RFP, Section M.3, page M-2; AR 242.) See Appendix 2 for a copy of FAR 15.101-1.

A review of the record makes it clear that the only trade-off process employed by GSA was between an Offeror's proposal and up to three other Offerors' proposals chosen by GSA using a selection process that is described no where in the

Source Selection Decision Memorandum ("SSDM") and lacks any consistency. (AR 1011-1013.)[1] The sole description of the Best Value and Cost/Tech Tradeoff process contained in the SSDM was as follows:

[redacted]

(AR 992-993.) No rationale for how the SSET selected which three Offerors' proposals to compare to a particular proposal is set forth.

The irrationality of those decisions is highlighted in Appendix 1 which is a summary containing information on each Offeror's proposal as to rankings, the total evaluated price for that Offeror and the identity of which of the proposals of other Offerors were compared to that Offeror's proposal. A review of the number of times a particular Offeror's proposal was the subject of a trade-off analysis reveals the following frequency of participation in competitons with other Offeror's proposals under GSA's procedure:

| Number of Offerors | Number of Tradeoff Analyses |
|---|---|
| [redacted] | |

[1] In fact, one Offeror's proposal was the subject of [redacted] different tradeoff analyses, while [redacted] other Offerors' proposals were subject to but one.

NGS was one of the [redacted] who were only given one opportunity to participate in these "mini-competitions." Given NGS's Price ranking of [redacted], it is curious that Offerors with Price rankings of [redacted] and [redacted] (those highlighted in pink) were given the opportunity to be evaluated against the awardees with total evaluated prices that not only [redacted] the IGCE, but also exceeded NGS' total evaluated price by [redacted], [redacted] and [redacted], respectively. GSA has neither provided any rationale why it did not conduct more such analyses, nor why it chose to use such a discriminatory procedure. The SSDM did acknowledge that [redacted] awardees ([redacted]) "[redacted]." Without further discussion or explanation, the SSA simply stated that "[redacted] and, thus, these companies were awarded contracts. (AR 997-998.)

The result is that awards were made to [redacted] Offerors, [redacted], whose total evaluated price [redacted] the Independent Government Cost Estimate ("IGCE") of [redacted] by [redacted], [redacted] and [redacted], respectively. Even more egregiously from NGS' perspective, [redacted] total evaluated price exceeded NGS' total evaluated price of [redacted] by [redacted], [redacted] and [redacted], respectively. Despite these [redacted] price differences, the SSA neither made a comparison between these Offerors and NGS nor subjected them to a rigorous price/non-price "best value" tradeoff process with documentation justifying why the technical merit justifies pricing that is almost [redacted] higher than the prices of NGS.

In fact, GSA fell even further out of compliance with FAR 15.101-1's requirement that "[t}he perceived benefits of the higher priced proposal shall merit the additional cost, and the rationale for tradeoffs must be documented in the file in accordance with 15.406" when it dismissed Offerors price advantages with the following language contained in its Debriefing Letter to NGS:

[redacted]

(AR 23632-23633.) No explanations are provided as to how they concluded that NGS' [redacted] was associated with [redacted]. In fact, such conclusory and self-serving language supports a finding that GSA did, in fact, award [redacted] of the [redacted] contracts without consideration of price and simply went through the motions of a 'best value" tradeoff analysis. A review of the Exhibit C narratives for other Offerors falling outside the Technical range that the SSA established for award reveals [redacted]. See Appendix 1 for citations to the Administrative Record for such narratives for Offerors falling outside of the [redacted] highest technically-ranked Offerors. This notion that contract award decisions were made based solely on Technical merit is buttressed by the PowerPoint presentation, entitled Consensus Team Lead Briefing Alliant Program, dated May 25, 2007. In that

presentation, a [redacted] between the Offerors is discussed between [redacted] which was technically ranked [redacted] at that time, but ultimately was ranked [redacted] and [redacted] which was technically ranked [redacted] at that time, but ultimately was ranked [redacted]. (AR 12398-12408.) Later in the presentation, [redacted] Offerors were designated as [redacted] along with [redacted]. This determination was well before the "best value" price/non-price tradeoff analysis had even taken place. NGS was among those Offerors designated as [redacted] at this early stage in the procurement. (AR 12409-12413.)

The language in Section M of the RFP certainly led NGS, and almost certainly every other Offeror, to believe that price would be a factor in each decision to award a contract. Despite those assurances in the evaluation criteria, GSA proceeded to award contracts to those Offerors ranked [redacted] under the Technical Evaluation. (Appendix 3, page EC-1.) It then employed this same "mini-competition" process to evaluate Offerors [redacted] to ascertain whether to award a [redacted] contract, declining to even consider NGS even though its price was [redacted] than [redacted] and [redacted] and awarded a contract to [redacted] which was ranked [redacted] in the Technical Evaluation. (AR 998-1001 and Appendix 1.)

With respect to the Technical evaluation of proposals, the Alliant solicitation provided that there were two Technical Evaluation Factors approximately equal in importance to each other: (1) Past Performance and (2) the Alliant Basic Contract Plan, one focusing on how an Offeror had done in the past and the other focusing on what one might expect as to an Offeror's ability to perform in the future. (AR 984.) When combined, these two factors were deemed to be significantly more

important than Cost or Price. The Government was to conduct its evaluation of these Technical factors by measuring each proposal against a set of standards contained in the Source Selection Plan ("SSP") in Annex D, attached here to as **Appendix 4** (AR 77-84), which contained assessment criteria and evaluation standards applicable to each evaluation factor. Each of the Technical Evaluation Factors consists of various subfactors. The subfactors in Past Performance were to be of approximately equal importance to each other, whereas the subfactors in the Alliant Basic Contract Plan were to be considered in descending order of importance when determining the overall rating of the specific Technical Evaluation Factors. (RFP, Section M.2(b) (AR 241).) GSA's technical evaluation standards consisted of scoring proposals based on differing levels of confidence in an Offeror's ability to meet each specific technical subfactor. The rating system for evaluation of factors had five different levels, in descending order: (1) "Exceptionally High Confidence" rating [redacted]; (2) "Significant Confidence" rating [redacted]; (3) "Acceptable Confidence" rating [redacted]; (4) "Marginal Confidence" rating [redacted]; and (5) "Little to No Confidence" rating [redacted]. (AR 992.)

For Past Performance, the specific subfactors identified in the Solicitation were Quality of Service, Schedule, Cost Control, Business Relations and Subcontract Management Socioeconomic Goals, each of equal value. (RFP, Section M.5.1 (AR 244.)) To obtain data with respect to an Offeror's Past Performance, each Offeror was required to designate references in two Tables, 1 and 2. Table 1 references were to be those representing experience in a multiple-award environment and Table 2 references

were for how well an Offeror performed in a particular contract requirement. (AR 986.) The GSA stated that it intended to contact as many 10 references for each Offeror, with three of those being self-identified by the Offeror. (RFP, Section M.5.1.2 (AR 245.)) In fact, GSA made efforts to contact [redacted] for each Offeror. (AR 986.) To elicit the information from references, GSA contracted with an outside supplier to develop the questionnaire and to conduct the interviews. Annex E (AR 107-109) and Annex I (AR 85-90) to the Source Selection Plan ("SSP") constituted the scripts for contacting references. These are attached hereto as **Appendix 5**.

A review of the scripts reveals very open-ended questions that provide the reference with little or no guidance as to the specific information needed to measure against the evaluation criteria set forth in Annex D (Appendix 4). Under the procedures adopted by GSA for conducting the interviews, it was determined that evaluators would not conduct those interviews, but rather that support personnel from the outside contractor would conduct them. Answer to Question 96, (AR 313.). A review of the transcripts for the NGS interviews confirms the vague and curt answers that were elicited in response to these very general questions. See **Appendix 6** which includes those transcripts (AR 23501-23518).

Under the Alliant Basic Contract Plan, three subfactors were identified, which were in descending order of importance. The first subfactor was Resources, and within Resources, GSA identified five specific elements that were equivalent in weighting to each other. Under Resources, the elements evaluated by GSA included Recruiting/Retention & Secret/Top Secret Clearances, Resumes of Key Personnel, Business Systems and Purchasing System, Subcontract Management and Supplement

Core Capabilities and OCONUS & COOP. Program Management was the second subfactor and the elements evaluated by GSA under that subfactor included MIS, EVMS and Quality Controls and Surveillance Methodologies. The last subfactor evaluated by GSA under the Alliant Basic Contract Plan was Corporate Commitment and the elements under that subfactor included Corporate Structure Organizational Chart & Lines of Authority, Proposal Management, Risk Mitigation, Business Process Improvements, Technological Innovation and Business Development. (AR 987-988.)

GSA's overall consensus evaluation of NGS' Past Performance was [redacted] yet NGS' Past Performance Rank Order was [redacted] proposals that GSA received. A review of the commentary clearly shows significant strengths in all Past Performance subfactors, including statements such as NGS is [redacted] and that NGS [redacted] Under Schedule, NGS was [redacted] and another reference stated [redacted] In Business Relations, [redacted] and NGS [redacted] Under the remaining subfactors, which were Cost Control and Subcontract/Socioeconomic Goal, not a single weakness was noted. (AR 23644-23645.)

It appears that the differentiation between NGS attaining an [redacted] was based on [redacted] and under Schedule where the Technical Evaluation Board [redacted]

[redacted] Lastly, under Business Relationship, the Technical Evaluation Board [redacted] Although the solicitation specifically provided a requirement that "[c]onsistent with FAR 15.306, the SSP provided that if an Offeror's past performance was "adverse" then the Offeror would be afforded an opportunity to respond. (AR 986-987.) NGS was never given an opportunity to do so because the SSA concluded:

> [redacted]

(AR 987.) Obviously, if NGS had been made aware of these negative comments, it would have wanted the opportunity to respond.

Under Quality of Service, offerors were to be rated "Exceptionally High Confidence" where there was "essentially no reasonable doubt that the Offeror will successfully perform the required effort and deliver high quality service and solutions under the Alliant contract." (Appendix 4; AR 77.) Under Schedule, offerors were to be rated "Exceptionally High Confidence" where "essentially no reasonable doubt exists that the Offeror will successfully meet schedule, reporting and contract administration requirements under the Alliant contract." (Appendix 4; AR 77-78.) Lastly, under Business Relations, an offeror is to be rated "Exceptionally High Confidence" where "essentially no reasonable doubt exists that the offeror strives to provide highest customer satisfaction." (Appendix 4; AR 78.) In the above cases, GSA seized on isolated and

minor comments from [redacted] and concluded that [redacted] This unfairly skewed the results. GSA should have considered that feeback in the context of the other interview results, or provided NGS with an opportunity to respond.

Generally, in order to conclude that reasonable doubt exists, there is a requirement that there be a "real doubt" based upon reason and common sense after careful and impartial consideration of all the evidence, or lack of evidence. Under the circumstances, GSA could not have reasonably concluded that such reasonable doubt existed, and as a result [redacted] It should also be noted that [redacted], yet these elements were also rated by GSA as [redacted] There is no reasonable basis that supports the conclusions reached by GSA in assessing NGS [redacted] Moreover, notwithstanding the adjectival rating assigned, there was no significant or meaningful difference between the underlying past performance information that would have provided a reasonable basis for ranking NGS [redacted] By "rank ordering" proposals as it did, GSA unreasonably accentuated minor differences that should not have been decisive in a properly- executed best value procurement. See **Appendix 3** which includes Exhibit C to the SSDM, page ECb-1 showing that small

differences in past performance ratings can move an Offeror up significantly [redacted]

GSA's overall consensus evaluation of NGS' Alliant Basic Contract Plan [redacted] As with Past Performance, the record fails to reasonably support the assessment reached by GSA. Several examples, in our view, illustrate that there is inadequate justification and support for the conclusions reached by GSA. In evaluating the Key Personnel element under Resources, GSA [redacted] (AR 23645.) Despite that assessment, NGS was given [redacted] (**Appendix 4**; AR 80.) Given GSA's own assessment, there is no reason that NGS should not have been awarded [redacted] was noted by GSA.

Under the Resources subfactor, GSA rated NGS [redacted] GSA recognized that [redacted] (AR 23646.) NGS rating in this element should, at a

minimum, [redacted] (**Appendix 4**, AR 81.) GSA also rated NGS [redacted]

Under Program Management, GSA rated NGS' EVMS [redacted] (AR 23646.) [redacted] See Exhibit 6 at Section H.1.2.3. of the NGS Proposal (AR 23359-23360). Also see Section H.2 of the NGS Proposal (AR 23365-23372). [redacted]

Lastly, under the Corporate Commitment subfactor, GSA evaluated NGS [redacted]

[redacted] (**Appendix 4**, AR 83). It should also be noted that the Instructions to Offerors in Section L did not request Offerors to submit a detailed plan for business process improvement which is directly contrary to the level of detail GSA expected in this part of its evaluation.

If GSA had used an interview methodology that would produce verifiable results regarding past performance, adequately reviewed the totality of NGS' proposal and encouraged evaluators to interact when there were questions regarding particular capabilities, NGS' technical rating would have been [redacted] Under those circumstances, NGS' [redacted] would not have been ignored and GSA would certainly have awarded a contract NGS. This result is further assured if GSA had actually conducted an appropriate "best value" price/non-price tradeoff analysis between and among all of the vendors. If GSA's actions are allowed to stand, Government agencies will be deprived of better priced, innovative choices to meet their IT needs.

It is clear from the record that GSA recommended that the Source Selection Authority (SSA) award to the [redacted] technical proposals without any consideration of the respective pricing contained in those proposals. While the solicitation indicated that technical

factors when combined were significantly more important than price, the solicitation failed to advise Offerors that the award recommendation to the SSA would be based on technical factors alone. There appears to have been no consideration of price in the recommendations made to the SSA regarding which Offerors should be selected for award and in fact, [redacted], were in fact awarded Alliant contracts. Rather, GSA appears to have accepted the fact that a higher technical ranking warranted the acceptance of a [redacted] proposal without any analysis or documentation that, in fact, the technical benefits warranted the increased expense. In essence, GSA completely ignored price in making all or the majority of these awards.

**ARGUMENT**

The proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057-58 (Fed.Cir.2000). In bid protest cases filed under the ADRA, the court implements this Administrative Procedure Act ("APA") standard by applying the standard as previously interpreted by the district courts in the so-called *Scanwell* line of cases, referring to the 1970 case upholding district court APA review of Government procurement decisions. *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1331-32 (Fed.Cir.2001) (citing *Scanwell Labs., Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970), and explaining the history of judicial review of Government procurement decisions). Under the APA standard as applied in the *Scanwell* line of cases, and now in ADRA cases, "a bid award may be set

aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Id.* at 1332. When a challenge is brought on the first ground, the test is "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a `heavy burden' of showing that the award decision had no rational basis." *Id.* at 1332-33 (citations omitted). "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333. To establish prejudice under this second ground, a protester must show that there was a "substantial chance" it would have received the contract award absent the alleged error. *Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1086 (Fed.Cir.2001); *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999). In other words, the protestor's chance of securing the award must not have been insubstantial. See *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334.

The solicitation is ambiguous only if its language is susceptible to more than one reasonable interpretation. See *Grumman Data Sys.,* 88 F.3d at 997. If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning; the Court may not resort to extrinsic evidence to interpret them. *Coast Fed. Bank,* 323 F.3d at 1038. Finally, the Court must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions. *Id.*

**GSA'S IMPLEMENTATION OF THE "BEST VALUE" TRADE-OFF ANALYSIS CONTEMPLATED BY THE RFP IS IN DIRECT VIOLATION OF FAR PART 15.**

GSA's conduct in performing the contemplated "best value" tradeoff analysis was both irrational and in contravention of both law and regulation. As discussed above, the Administrative Record is devoid of any explanation of the procedures used to determine which Offerors would be subjected to "best value" tradeoff analyses and against whose offer they would be matched. Rather, it appears through a review of the SSMD that such decisions were made on the fly to facilitate the result that [redacted] be awarded contracts regardless of the prices they offered. GSA's failure to document these procedures is in direct violation of FAR 15.406-3 which requires that the contracting officer document "the extent to which the contracting officer relied on the cost or pricing data submitted and used." Furthermore, the Adminstrative Record lacks any documentation of the specific technical merits of awarded Offerors'proposals that warranted [redacted] higher prices than those offered by other Offerors. Under a proper "best value" tradeoff analysis, FAR 15.101-1 requires that "[t]he perceived benefits of the higher priced proposal shall merit the additional cost, and the rationale for tradeoffs must be documented in the file in accordance with 15.406." The failure to adequately consider the [redacted] violates FAR 15.304, 10 U.S.C. §2305(a)(3)(A)(ii) and 41 U.S.C. §253a(c)(1)(A) which mandate that price or cost to the Government must be evaluated in every source selection. Finally, GSA's failure to document the cost/price evaluation when it decided to award contract to [redacted] is

contrary to the requirements of FAR 15.305(a)(1) which mandates that cost or price evaluations must be documented.

While it is true that so long as the solicitation's evaluation criteria permit it, agencies may make price/technical tradeoffs, and the extent to which one is sacrificed for the other is governed only by the test of rationality and consistency with the stated evaluation criteria. *KPMG Peat Marwick, L.L.P.*, B-271673, July 15, 1996, 96-2 CPD ¶ 53 at 5. Absent any documentation regarding the specific procedures used, it is impossible to gauge whether there was any rationality or consistency to GSA's evaluation. Where a price/technical tradeoff is made, the source selection decision must be documented, and the documentation must include the rationale for any tradeoffs made, including the benefits associated with additional costs. FAR § 15.308; *Opti-Lite Optical*, B-281693, Mar. 22, 1999, 99-1 CPD ¶ 61 at 5. This explanation can be given by the source selection authority in the award decision, or it can be evidenced from the documents on which the source selection decision is based. *TRW, Inc.*, B-260788.2, Aug. 2, 1995, 96-1 CPD ¶ 11 at 4. GSA's conclusory assertion that

[redacted]

(AR 2335) is not sufficient to satisfy all of these regulatory and statutory mandates to document the benefits associated with the higher prices. GSA's failure to do so was both irrational and in contravention of law.

**GSA's FAILURE TO SUBJECT ALL OFFERORS' PROPOSALS TO THE EVALUATION CRITERIA SET FORTH IN THE SOLICITATION IN A CONSISTENT MANNER VIOLATES FAR PART 15.**

In not according all Offerors the opportunity to be compared to all other Offerors's proposals using the same procedures violates FAR 15.303(b)(3) which requires the SSA to "ensure consistency among the solicitation requirements, notices to Offerors, proposal preparation instructions, evaluation factors and subfactors, solicitation provisions or contract clauses and data requirements. Although the solicitation contemplated that all Offerors would be evaluated based on their technical merit through a non-discriminatory review of past performance and the Alliant Basic Contract, and then be subjected to a "best value" tradeoff analysis. That did not happen. The evaluation procedures for technical evaluations employed a scoring system that did not permit a "meaningful comparison and discrimination between and among competing proposals as required by FAR 15.304(b)(2). The interview methodology and script lacked the content and objectivity needed to produce discernable results that would ensure that all Offerors were treated equally. There was not reasonable correlation between the questions asked and the evaluation criteria applicable. Compare **Appendices 4 and 5**. Entrusting the conduct of these interviews to support personnel at the outside contractor retained to perform them ensured that no real rigorous dialogue would be elicited from the references. While it is difficult to project the outcome of what-if scenarios where many factors play into the outcome, if GSA had adopted an interview script that was more closely related the the evaluation criteria that were to be applied, the results of the Past Performance review would have produced far more meaningful data upon which an appropriate evaluation could be based.

Similarly, the use of the scoring systems for both Past Performance and the Alliant Basic Contract produced results that undermined meaningful comparison because of the large groupings of Offerors with the same scores. Despite this shortcoming, GSA plunged ahead [redacted]. Indeed, it appears, based on the May 25th, 2007 Consensus Team Lead Briefing, the decision to award contracts to those [redacted] (AR 12377-12414.) That document leaves one with the impression that subsequent "review" efforts were just going through the motions.

Finally, GSA's rigid adherence to the use of scoring and tables to justify its decision is unreasonable and prejudicial to those Offerors like NGS that were deprived of a fair and reasonable opportunity to compete for this business. The propriety of the price/technical tradeoff decision turns not on the difference in the technical scores or ratings per se, but on whether the selection official's judgment concerning the significance of the difference was reasonable and adequately justified in light of the RFP's evaluation scheme. *Johnson Controls World Servs., Inc.*, B-289942, B-289942.2, May 24, 2002, 2002 CPD ¶ 88 at 6. Like in the *Ready Transportation* case, the record shows that the focal point of GSA's price/technical tradeoff decision here was [redacted] The record contains no evidence that the agency compared the advantages of the awardee's proposal to those of each one of the other Offerors, or considered why any advantages of the awardee's proposal were worth [redacted]

[redacted] As we have previously stated, point scores are but guides to intelligent decision making. *Ready Transp., Inc.*, B-285283.3, B-285283.4, May 8, 2001, 2001 CPD ¶ 90 at 12. Like GSA's tradeoff analysis, the Forest Service's tradeoff is inadequate because its mechanical comparison of the offerors' point scores was not a valid substitute for a qualitative assessment of the technical differences between the offers, so as to determine whether an offeror's technical superiority justified the price premium involved. *Opti-Lite Optical*, supra, at 5. An agency's mechanical comparison of the point scores for individual technical factors is no more sufficient an explanation than a mechanical comparison of total point scores; it is not a valid determination of what the difference in technical scores signifies, such that it warrants the additional price involved. See *Johnson Controls World Servs., Inc.*,supra.

GAO has held on numerous occasions that in a best value procurement, the SSA must perform a tradeoff between price and non-price factors to determine whether one proposal's superiority under the non-price factors is worth a higher price. An agency must meaningfully consider cost or price to the government in making its source selection decision even where, as here, price is stated to be of less importance than the non-price factors. See *S. J. Thomas Co., Inc.*, B-283192, Oct. 20, 1999, 99-2 CPD P 73 at 3. Although the price/technical tradeoff process allows an agency to accept other than the lowest-priced submission, the perceived benefit of the higher-priced alternative must merit the additional price. See *e-LYNXX Corporation*, B-292761, Dec. 3, 2003, 2003 CPD 219 at 5; *Beautify Professional Servs. Corp.*, B-291954.3, Oct. 6, 2003, 2003 CPD P at 5.

Rather than documenting or even analyzing tradeoffs between [redacted] proposals awarded Alliant contracts and the [redacted], GSA awarded Alliant contracts to the [redacted] proposals. The assessment that was done with [redacted] offerors also failed to document or analyze tradeoffs between that selected group and the proposal that was "not" selected. In addition, GSA failed to address the significant price differential between the proposals across the board, and appears to have utilized a mechanical approach which failed to make a qualitative assessment of the technical differences among the competing proposals to determine whether the perceived technical superiority of those proposals for all non price factors justified paying the evaluated price premium associated with those proposals. See *The MIL Corporation,* B- 294836, 2005 CPD 29.

An agency's cost technical tradeoff must be rational and consistent with the stated evaluation criteria. GAO has held on numerous occasions that even where, as here, a solicitation provides that technical factors will be more important than price in source selection, selecting a technically superior, higher price proposal is proper only where the agency reasonably concludes that the price premium is justified in light of the proposal's technical superiority. The propriety of such a price/technical tradeoff decision turns not on the difference in the technical scores or ratings per se, but on whether the selection official's judgment concerning the significance of the difference was reasonable and adequately justified in light of the RFP's evaluation scheme. *Shumaker Trucking and Excavating Contractors, Inc.* , B290732, Sept. 25, 2002, 2002 CPD 169 at 6. The price/technical tradeoff decision must be documented, and the documentation must

include the rationale for any tradeoffs made, including the benefits associated with additional costs. FAR 15.308; *Shumaker Trucking and Excavating Contractors, Inc.*

GSA's procedures for collecting past performance data, scoring the Technical evaluation and performing the "best value" tradeoff analysis were all flawed and its decision to award contracts in the face of those flaws constitutes arbitrary and capricious action. Its actions deprived [redacted] of a right to compete for this business in a fair and non-discriminatory manner. Its actions, if left unchecked, will also deprive federal agencies of more rigorous price competition when they seek to obtain the goods and services to be supplied under these contracts. Although NGS was [redacted] if the past performance evaluations had been conducted with rigorous data collected through a process that more closely tied information requests with evaluation criteria; technical evaluations considered the totality of Offerors' proposals and a "best value" tradeoff had been conducted in accordance with the requirements of the regulations, statutes and case law, NGS would have been awarded a contract.

## CONCLUSION

In conducting this solicitation, GSA has acted in violation of the requirements of FAR Part 15, ignored the stated requirements of the RFP it issued and has demonstrated a predilection for a course of conduct that deprives Offerors of a fair opportunity to compete for business. GSA did not conduct a proper and reasonable evaluation of NGS' proposal. Had GSA done so and thereafter conducted a proper "best value" determination that was consistent with the evaluation criteria and did not violate

applicable statutes and regulations, NGS would clearly have been awarded an Alliant contract.

**WHEREFORE**, NGS respectfully requests the Court to require GSA to:

(1) Make award to NGS as another offeror providing best value to the government; or, in the alternative,

(2) Create a new interview script and data collection process for past performance and re-canvas the references provided by all Offerors; review the totality of Offerors' proposals to ensure that the Basic Contract evaluation accurately reflects the offer tendered; ensure that no evaluation factors considered are inconsistent with the terms of the solicitation; and conduct a lawful "best value" tradeoff analysis comparing all Offerors to the other Offerors following a request for Best and Final Offers ("BAFO;" and

(3) Reimburse NGS its costs associated with this protest action, including, but not limited to, attorneys' fees

Respectfully submitted,

s/ Roger A. Briney

**Roger A. Briney**
**Roger A. Briney, Attorney at Law**
**3495 Rocks Mill Lane**
**Charlottesville, VA 22903**
**(202) 777-3648**
**(202) 777-3649 (fax)**
**rogerbriney@rotundalaw.com**

**Counsel of Record for Plaintiff**
**Nortel Government Solutions Incorporated**

**Dated: November 30, 2007**

## APENDICIES

| | |
|---|---|
| Appendix 1 (Offeror Ranking Comparison) | 3 pages |
| Appendix 2 (FAR Part 15 – Relevant Excerpts) | 6 pages |
| Appendix 3 (Exhibit C to Source Selection Memorandum) | 9 pages |
| Appendix 4 (Annex D to Source Selection Plan) | 8 pages |
| Appendix 5 (Annex E and Annex I to Source Selection Plan – call scripts) | 8 pages |
| Appendix 6 (Call Transcripts for NGS references) | 18 pages |

**CERTIFICATE OF FILING**

I hereby certify that a copy of the foregoing Nortel Government Solutions Incorporated's Motion for Judgment on the Administrative Record was filed electronically on this 30th day of November, 2007. I understand that this document will be sent to all parties via the Court's electronic filing system.

_s/ Roger A.Briney______

**Roger A. Briney**
**Roger A. Briney, Attorney at Law**
**3495 Rocks Mill Lane**
**Charlottesville, VA 22903**
**(202) 777-3648**
**(202) 777-3649 (fax)**
**rogerbriney@rotundalaw.com**

**Counsel of Record for Plaintiff**
**Nortel Government Solutions Incorporated**

# APPENDIX 2

## FAR PART 15

## FAR Subpart 15.1—Source Selection Processes and Techniques

### 15.100 Scope of subpart.

This subpart describes some of the acquisition processes and techniques that may be used to design competitive acquisition strategies suitable for the specific circumstances of the acquisition.

### 15.101 Best value continuum.

An agency can obtain best value in negotiated acquisitions by using any one or a combination of source selection approaches. In different types of acquisitions, the relative importance of cost or price may vary. For example, in acquisitions where the requirement is clearly definable and the risk of unsuccessful contract performance is minimal, cost or price may play a dominant role in source selection. The less definitive the requirement, the more development work required, or the greater the performance risk, the more technical or past performance considerations may play a dominant role in source selection.

### 15.101-1 Tradeoff process.

(a) A tradeoff process is appropriate when it may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror.

(b) When using a tradeoff process, the following apply:

(1) All evaluation factors and significant subfactors that will affect contract award and their relative importance shall be clearly stated in the solicitation; and

(2) The solicitation shall state whether all evaluation factors other than cost or price, when combined, are significantly more important than, approximately equal to, or significantly less important than cost or price.

(c) This process permits tradeoffs among cost or price and non-cost factors and allows the Government to accept other than the lowest priced proposal. The perceived benefits of the higher priced proposal shall merit the additional cost, and the rationale for tradeoffs must be documented in the file in accordance with 15.406.

## FAR Subpart 15.3—Source Selection

### 15.300 Scope of subpart.

This subpart prescribes policies and procedures for selection of a source or sources in competitive negotiated acquisitions.

### 15.301 [Reserved]

### 15.302 Source selection objective.

The objective of source selection is to select the proposal that represents the best value.

### 15.303 Responsibilities.

(a) Agency heads are responsible for source selection. The contracting officer is designated as the source selection authority, unless the agency head appoints another individual for a particular acquisition or group of acquisitions.

(b) The source selection authority shall—

(1) Establish an evaluation team, tailored for the particular acquisition, that includes appropriate contracting, legal, logistics, technical, and other expertise to ensure a comprehensive evaluation of offers;

(2) Approve the source selection strategy or acquisition plan, if applicable, before solicitation release;

(3) Ensure consistency among the solicitation requirements, notices to offerors, proposal preparation instructions, evaluation factors and subfactors, solicitation provisions or contract clauses, and data requirements;

(4) Ensure that proposals are evaluated based solely on the factors and subfactors contained in the solicitation (10 U.S.C. 2305(b)(1) and 41 U.S.C. 253b(d)(3));

(5) Consider the recommendations of advisory boards or panels (if any); and

(6) Select the source or sources whose proposal is the best value to the Government (10 U.S.C. 2305(b)(4)(B) and 41 U.S.C. 253b(d)(3)).

(c) The contracting officer shall—

(1) After release of a solicitation, serve as the focal point for inquiries from actual or prospective offerors;

(2) After receipt of proposals, control exchanges with offerors in accordance with 15.306; and

(3) Award the contract(s).

### 15.304 Evaluation factors and significant subfactors.

(a) The award decision is based on evaluation factors and significant subfactors that are tailored to the acquisition.

(b) Evaluation factors and significant subfactors must—

(1) Represent the key areas of importance and emphasis to be considered in the source selection decision; and

(2) Support meaningful comparison and discrimination between and among competing proposals.

(c) The evaluation factors and significant subfactors that apply to an acquisition and their relative importance are within the broad discretion of agency acquisition officials, subject to the following requirements:

(1) Price or cost to the Government shall be evaluated in every source selection (10 U.S.C. 2305(a)(3)(A) (ii) and 41 U.S.C. 253a(c)(1)(B)) (also see part 36 for architect-engineer contracts);

(2) The quality of the product or service shall be addressed in every source selection through consideration of one or more non-cost evaluation factors such as past performance, compliance with solicitation requirements, technical excellence, management capability, personnel qualifications, and prior experience (10 U.S.C. 2305(a)(3) (A)(i) and 41 U.S.C. 253a(c)(1)(A)); and

(3)(i) Except as set forth in paragraph (c)(3)(iii) of this section, past performance shall be evaluated in all source selections for negotiated competitive acquisitions expected to exceed the simplified acquisition threshold.

(ii) For solicitations involving bundling that offer a significant opportunity for subcontracting, the contracting officer must include a factor to evaluate past performance indicating the extent to which the offeror attained applicable goals for small business participation under contracts that required subcontracting plans (15 U.S.C. 637(d)(4)(G)(ii)).

(iii) Past performance need not be evaluated if the contracting officer documents the reason past performance is not an appropriate evaluation factor for the acquisition.

(4) The extent of participation of small disadvantaged business concerns in performance of the contract shall be evaluated in unrestricted acquisitions expected to exceed $550,000 ($1,000,000 for construction) subject to certain limitations (see 19.201 and 19.1202).

(5) For solicitations involving bundling that offer a significant opportunity for subcontracting, the contracting officer must include proposed small business subcontracting participation in the subcontracting plan as an evaluation factor (15 U.S.C. 637(d)(4)(G)(i)).

(6) If telecommuting is not prohibited, agencies shall not unfavorably evaluate an offer that includes telecommuting unless the contracting officer executes a written determination in accordance with FAR 7.108(b).

(d) All factors and significant subfactors that will affect contract award and their relative importance shall be stated clearly in the solicitation (10 U.S.C. 2305(a)(2)(A)(i) and 41 U.S.C. 253a(b)(1)(A)) (see 15.204-5(c)). The rating method need not be disclosed in the solicitation. The general approach for evaluating past performance information shall be described.

(e) The solicitation shall also state, at a minimum, whether all evaluation factors other than cost or price, when combined, are—

(1) Significantly more important than cost or price;

(2) Approximately equal to cost or price; or

(3) Significantly less important than cost or price (10 U.S.C. 2305(a)(3)(A)(iii) and 41 U.S.C. 253a(c)(1)(C)).

[62 FR 51230, Sept. 30, 1997, as amended at 63 FR 36121, July 1, 1998; 64 FR 72443, Dec. 27, 1999; 65 FR 36014, June 6, 2000; 69 FR 59702, Oct. 5, 2004; 71 FR 57366, Sept. 28, 2006]

### 15.305 Proposal evaluation.

(a) Proposal evaluation is an assessment of the proposal and the offeror's ability to perform the prospective contract successfully. An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation. Evaluations may be conducted using any rating method or combination of methods, including color or adjectival ratings, numerical weights, and ordinal rankings. The relative strengths, deficiencies, significant weaknesses, and risks supporting proposal evaluation shall be documented in the contract file.

(1) *Cost or price evaluation.* Normally, competition establishes price reasonableness. Therefore, when contracting on a firm-fixed-price or fixed-price with economic price adjustment basis, comparison of the proposed prices will usually satisfy the requirement to perform a price analysis, and a cost analysis need not be performed. In limited situations, a cost analysis (see 15.403–1(c)(1)(i)(B)) may be appropriate to establish reasonableness of the otherwise successful offeror's price. When contracting on a cost-reimbursement basis, evaluations shall include a cost realism analysis to determine what the Government should realistically expect to pay for the proposed effort, the offeror's understanding of the work, and the offeror's

ability to perform the contract. Cost realism analyses may also be used on fixed-price incentive contracts or, in exceptional cases, on other competitive fixed-price-type contracts (see 15.404-1(d)(3)). (See 37.115 for uncompensated overtime evaluation.) The contracting officer shall document the cost or price evaluation.

(2) *Past performance evaluation.* (i) Past performance information is one indicator of an offeror's ability to perform the contract successfully. The currency and relevance of the information, source of the information, context of the data, and general trends in contractor's performance shall be considered. This comparative assessment of past performance information is separate from the responsibility determination required under subpart 9.1.

(ii) The solicitation shall describe the approach for evaluating past performance, including evaluating offerors with no relevant performance history, and shall provide offerors an opportunity to identify past or current contracts (including Federal, State, and local government and private) for efforts similar to the Government requirement. The solicitation shall also authorize offerors to provide information on problems encountered on the identified contracts and the offeror corrective actions. The Government shall consider this information, as well as information obtained from any other sources, when evaluating the offeror past performance. The source selection authority shall determine the relevance of similar past performance information.

(iii) The evaluation should take into account past performance information regarding predecessor companies, key personnel who have relevant experience, or subcontractors that will perform major or critical aspects of the requirement when such information is relevant to the instant acquisition.

(iv) In the case of an offeror without a record of relevant past performance or for whom information on past performance is not available, the offeror may not be evaluated favorably or unfavorably on past performance.

(v) The evaluation should include the past performance of offerors in complying with subcontracting plan goals for small disadvantaged business (SDB) concerns (see Subpart 19.7), monetary targets for SDB participation (see 19.1202), and notifications submitted under 19.1202–4(b).

(3) *Technical evaluation.* When tradeoffs are performed (see 15.101–1), the source selection records shall include—

(i) An assessment of each offeror's ability to accomplish the technical requirements; and

(ii) A summary, matrix, or quantitative ranking, along with appropriate supporting narrative, of each technical proposal using the evaluation factors.

(4) *Cost information.* Cost information may be provided to members of the technical evaluation team in accordance with agency procedures.

(5) *Small business subcontracting evaluation.* Solicitations must be structured to give offers from small business concerns the highest rating for the evaluation factors in 15.304(c)(3)(iii) and (c)(5).

(b) The source selection authority may reject all proposals received in response to a solicitation, if doing so is in the best interest of the Government.

(c) For restrictions on the use of support contractor personnel in proposal evaluation, see 37.203(d).

[62 FR 51230, Sept. 30, 1997, as amended at 63 FR 36121, July 1, 1998; 64 FR 51842, 51850, Sept. 24, 1999; 65 FR 46054, July 26, 2000]

**15.308 Source selection decision.**

The source selection authority's (SSA) decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation. While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment. The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.

**15.406-3 -- Documenting the Negotiation.**

(a) The contracting officer shall document in the contract file the principal elements of the negotiated agreement. The documentation (*e.g.*, price negotiation memorandum (PNM)) shall include the following:

(1) The purpose of the negotiation.

(2) A description of the acquisition, including appropriate identifying numbers (*e.g.*, RFP No.).

(3) The name, position, and organization of each person representing the contractor and the Government in the negotiation.

(4) The current status of any contractor systems (*e.g.*, purchasing, estimating, accounting, and compensation) to the extent they affected and were considered in the negotiation.

(5) If cost or pricing data were not required in the case of any price negotiation exceeding the cost or pricing data threshold, the exception used and the basis for it.

(6) If cost or pricing data were required, the extent to which the contracting officer --

(i) Relied on the cost or pricing data submitted and used them in negotiating the price;

(ii) Recognized as inaccurate, incomplete, or noncurrent any cost or pricing data submitted; the action taken by the contracting officer and the contractor as a result; and the effect of the defective data on the price negotiated; or

(iii) Determined that an exception applied after the data were submitted and, therefore, considered not to be cost or pricing data.

(7) A summary of the contractor's proposal, any field pricing assistance recommendations, including the reasons for any pertinent variances from them, the Government's negotiation objective, and the negotiated position. Where the determination of price reasonableness is based on cost analysis, the summary shall address each major cost element. When determination of price reasonableness is based on price analysis, the summary shall include the source and type of data used to support the determination.

(8) The most significant facts or considerations controlling the establishment of the prenegotiation objectives and the negotiated agreement including an explanation of any significant differences between the two positions.

(9) To the extent such direction has a significant effect on the action, a discussion and quantification of the impact of direction given by Congress, other agencies, and higher-level officials (*i.e.*, officials who would not normally exercise authority during the award and review process for the instant contract action).

(10) The basis for the profit or fee prenegotiation objective and the profit or fee negotiated.

(11) Documentation of fair and reasonable pricing.

(b) Whenever field pricing assistance has been obtained, the contracting officer shall forward a copy of the negotiation documentation to the office(s) providing assistance. When appropriate, information on how advisory field support can be made more effective should be provided separately.