**IN THE UNITED STATESCOURT OF FEDERAL CLAIMS**
**Washington, D.C.**

**BID PROTEST**

| | |
|---|---|
| SERCO INC.; STANLEY ASSOCIATES INC.; CGI FEDERAL INC.; STG, INC.; ARTEL, INC.; ADVANCED TECHNOLOGY SYSTEMS, INC.; APPTIS INC.; NORTEL GOVERNMENT SOLUTIONS, INC.; and THE CENTECH GROUP, INC. | Consolidated Nos. 07-691C, 07-732C, 07-741C, 07-747C, 07-760C, 07-761C, 07-766C, 07-771C, and 07-803C |
| Plaintiffs, | Judge Allegra |
| v. | **AGREED-UPON REDACTED COPY MAY BE MADE PUBLIC** |
| THE UNITED STATES, | |
| Defendant, | |
| and | |
| INDUS CORPORATION; ELECTRONIC DATA SYSTEMS CORPORATION; INTERNATIONAL BUSINESS MACHINES CORPORATION; and GENERAL DYNAMICS ONE SOURCE, LLC. | |
| Defendant-Intervenors. | |

**<u>MOTION FOR J UDGMENT ON THE ADMINISTRATIVE RECORD</u>**

Kenneth A. Martin
**THE MARTIN LAW FIRM, PLLC**
6723 Whittier Ave., Suite 200
McLean, VA 22101
Tel: (703) 918-0350; Fax: (703) 918-0386
*Counsel for THE CENTECH GROUP, INC.*

*Of Counsel:*
Max V. Kidalov, Vice President & General Counsel
THE CENTECH GROUP, INC.

[redacted]

Dated: November 30, 2007



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ..... iii

STATEMENT OF THE ISSUES ..... 2

STATEMENT OF THE CASE ..... 3

I. NATURE OF THE CASE ..... 3

II. STATEMENT OF FACTS ..... 5

A. Background ..... 5

B. Evaluation Criteria ..... 7

C. Debriefing ..... 13

ARGUMENT ..... 17

I. THE STANDARD OF REVIEW ..... 17

II. LEGAL ANALYSIS/ARGUMENT ..... 17

A. The GSA Deviated from its Disclosed Evaluation Criteria to Deny CENTECH a Contract in Violation of Law ..... 17

B. GSA Failed to Treat all Proposals Equally ..... 19

C. GSA failed to properly evaluate cost and/or price in accordance with the terms of the RFP, and thus rendered improper best value determinations ..... 23

D. GSA failed to properly evaluate the technical merit of the CENTECH's proposal, including its past performance and Basic Contract Plan, thus depriving CENTECH of an opportunity for award. ..... 25

E. GSA's evaluation of CENTECH's Basic Contract Plan violated applicable procurement laws and regulations by failing to adequately document the basis for its evaluation of individual sub-factors ..... 26



[redacted]

F. GSA's evaluation of CENTECH's ability to manage subcontractors violated applicable procurement laws and regulations where GSA deemed CENTECH incapable of managing subcontractors based on its status as a "small business concern ........ 28

G. The GSA Illegally Discriminated Against CENTECH With Regards to Subcontracting Management and Subcontracting Plan Administration Based on CENTECH's Small Business Status Through an Arbitrary Refusal to Evaluate CENTECH's Well-Known Performance Record, Unlawfully Downgrading CENTECH, and Making an Unlawful De Facto Non-Responsibility Determination ........ 30

III. CENTECH MEETS ALL APPROPRIATE FACTORS FOR DECLARATORY, INJUNCTIVE, AND MONETARY COSTS RELIEF ........ 34

A. CENTECH Suffers Irreparable Harm ........ 34

B. The Balance of Harms Strongly Favors CENTECH........ 36

IV. CONCLUSION ........ 37




[redacted]

# TABLE OF AUTHORITIES

**Cases**

A&D Fire Protection, Inc. v. United States, 72 Fed. Cl. 126, 131 (Fed. Cl. 2006) ...................... 17

Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)........................................ 17

Beta Analytics Internat'l, Inc. v. United States, 44 Fed. Cl. 131 (Fed. Cl. 1999) ........................ 20

Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ................................................................................................. 35

Comprehensive Health Serv., Inc. v. United States, 70 Fed. Cl. 700, 720 (Fed. Cl. 2006).......... 17

CSE Const. Co. v. United States, 2003 U.S. Claims LEXIS 277 (Aug. 26, 2003)....................... 33

Drexel Heritage Furnishings, Inc. v. United States, 7 Cl. Ct. 134 (Cl. Ct. 1984).......................... 4

Gentex Corp. v. United States, 58 Fed.Cl. 634 (2003) ............................................................... 34

Geo-Seis Helicopters, Inc. v. United States, 77 Fed. Cl. 633 (2007).......................................... 34

Griffy's Landscape Maintenance, LLC v. United States, 46 Fed.Cl. 257 (2000)........................ 33

Hawaiian Dredging Constr. Co. v. United States, 59 Fed.Cl. 305, 317 (2004) ........................... 34

Hospital Klean, 65 Fed.Cl. at 624 .............................................................................................. 35

Isometrics, Inc. v. United States, 5 Cl. Ct. 420 (Cl. Ct. 1984)............................................... 4, 19

Parcel 49C Limited Partnership v. United States, 31 F.3d 1147, 1153 (Fed.Cir. 1994).............. 36

Rotech Healthcare Inc. v. United States, 71 Fed. Cl. 393, 401 (2006) ....................................... 17

Seattle Sec. Servs., Inc. v. United States, 45 Fed.Cl. 560, 571 (2000) ....................................... 35

Siller Bros., Inc. v. United States, 655 F.2d 1039, at 1043 (Ct. Cl. 1981)........................ 31, 35, 36



[redacted]

**Statutes**

5 U.S.C. § 706 .......... 17, 25, 27

5 U.S.C. § 706.1 .......... 25, 26, 27

15 USC §631 .......... 29, 32

15 USC § 631(a) .......... 36

15 USC §637 .......... 31

15 USC §637(b) .......... 35

15 USC § 637(b)(7) .......... 28, 31

15 USC 637(d)(1) .......... 29, 32

15 USC § 644(a)(2) .......... 36

28 U.S.C. §1491(b)(2) .......... 17

28 U.S.C. § 1491(b)(3) .......... 36

40 U.S.C. § 1412(e) .......... 5

41 U.S.C. § 253 a(c) .......... 19

41 U.S.C. § 253 h(d) .......... 5

**Regulations**

FAR 3.501 .......... 12, 24

FAR 15.101-1 .......... 7

FAR 15.304(c)(1) .......... 19

FAR 15.304(c)(3)(iii) & (c)(5) .......... 32

FAR 15.305 .......... 28, 33

FAR 15.305(5) .......... 32



[redacted]

FAR 15.305(a) ........ 25, 26, 27

FAR 15.404-1 ........ 12, 23

FAR 15.404-1(g) ........ 12, 24

FAR 15.506 ........ 6

FAR 52.252-1 ........ 7

**Other Authorities**

RCFC 52.1(b) ........ 17

**Miscellaneous**

Abt Assocs., Inc., B-237060.2, 90-1 CPD ¶ 223 ........ 18, 24

Antenna Prods. Corp., B-227116.2, Mar. 23, 1988, 88-1 CPD ¶ 297 ........ 33

Am. Dev. Corp., B-251876.4, 93-2 Comp. Gen. Proc. Dec. ¶49 (July 12, 1993) ........ 20

Classicists, Inc., 2000 Comp. Gen. Proc. Dec. ¶63, B-282075.2; B-282075.3 (March 15, 2000) ........ 22

Clegg Industries, 70 Comp. Gen. 679 (1991) ........ 33

Consolidated Engineering Services, Inc., B-279565.2, 99-1 CPD ¶ 75 (1998) ........ 33

Comark Fed. Sys., B-278343, B-278343.2, Jan. 20, 1998, 98-1 CPD P 34 at 4-5 ........ 17

Grey Advertising, Inc., B-184825, 76-1 CPD ¶ 325 ........ 18

GTS Duratek, Inc., B-280511, 98-2 CPD ¶ 130 (1998) ........ 34

Hattal & Associates, B-243357; B-243357.2, 91-2 CPD ¶ 90 ........ 18, 24

Tidewater Homes Realty, Inc., B-274689, 96-2 Comp. Gen. Proc. Dec. ¶241 (December 26, 1996) ........ 20, 23, 28

U.S. Property Mgmt. Ser. Corp., B-278727, 1998 U.S. Comp. Gen. LEXIS 99 (March 6, 1998) ........ 20



[redacted]

**IN THE UNITED STATESCOURT OF FEDERAL CLAIMS**
**Washington, D.C.**

**BID PROTEST**

| | |
|---|---|
| SERCO INC.; STANLEY ASSOCIATES INC.; CGI FEDERAL INC.; STG, INC.; ARTEL, INC.; ADVANCED TECHNOLOGY SYSTEMS, INC.; APPTIS INC.; NORTEL GOVERNMENT SOLUTIONS, INC.; and THE CENTECH GROUP, INC. | Consolidated Nos. 07-691C, 07-732C, 07-741C, 07-747C, 07-760C, 07-761C, 07-766C, 07-771C, and 07-803C |
| Plaintiffs, | Judge Allegra |
| v. | **FILED UNDER SEAL** |
| THE UNITED STATES, | |
| Defendant, | |
| and | |
| INDUS CORPORATION; ELECTRONIC DATA SYSTEMS CORPORATION; INTERNATIONAL BUSINESS MACHINES CORPORATION; and GENERAL DYNAMICS ONE SOURCE, LLC. | |
| Defendant-Intervenors. | |

**MOTION FOR J UDGMENT ON THE ADMINISTRATIVE RECORD**

CENTECH GROUP, Inc, by counsel, pursuant to Rule 52.1 of the Rules of this Court ("RCFC"), respectfully requests that the Court grant judgment in favor of the Plaintiff CENTECH Group, Inc. and against Defendant United States and Intervenors.



[redacted]

**PLAINTIFF'S BRIEF**

**STATEMENT OF THE ISSUES**

1. Whether the General Services Administration ("GSA") failed to properly consider the paramount importance of technical factors over cost and/or price in its award decisions as required by the Solicitation, due to, in part, its decision to award Alliant contracts (under Solicitation No. TQ2006MCB0001) to Offerors evaluated to be technically inferior to CENTECH, but who submitted lower priced proposals, and

2. Whether GSA failed to meet its obligation to treat CENTECH equally with other Offerors, and to consistently apply the stated evaluation criteria, particularly in the area of management and subcontracting.

3. Whether GSA failed to properly evaluate cost and/or price in accordance with the terms of the RFP, and thus rendered improper best value determinations.

4. Whether GSA failed to properly evaluate the technical merit of the CENTECH's proposal, including its past performance and Basic Contract Plan, thus depriving CENTECH of an opportunity for award.

5. Whether GSA's evaluation of CENTECH's Basic Contract Plan violated applicable procurement laws and regulations by failing to adequately document the basis for its evaluation of individual sub-factors, ignoring information contained in CENTECH's proposal that was inconsistent with pre-determined conclusions in the evaluation performed, arbitrarily assigning lower ratings to CENTECH's proposal than those of other Offerors' whose proposals were comparable and failing to apply and correlate the evaluation to the stated criteria for each sub-factor in the Solicitation when assigning ratings for those sub-factors, such that this disparate treatment of CENTECH's proposal resulted in prejudice to CENTECH.



[redacted]

6. Whether the General Services Administration illegally and unfairly downgraded CENTECH's proposal by assigning it a "neutral" rating for subcontractor management based on that its status as a "small business concern.

7. The GSA Illegally Discriminated Against CENTECH With Regards to Subcontracting Management and Subcontracting Plan Administration Based on CENTECH's Small Business Status Through an Arbitrary Refusal to Evaluate CENTECH's Well-Known Performance Record, Unlawfully Downgrading CENTECH, and Making an Unlawful De Facto Non-Responsibility Determination

## STATEMENT OF THE CASE

## I. NATURE OF THE CASE

Plaintiff, CENTECH asserts this action for preliminary and permanent injunctive relief, and declaratory judgment against Defendant, the United States of America, through its General Services Administration ("GSA"), to prohibit the United States from awarding a contract or expending any funds for its Government-wide Acquisition Contract ("GWACs") for the "Alliant" Program, except under a lawfully awarded contract made in accordance with applicable procurement laws and regulations, and the evaluation scheme published in the Request for Proposals ("RFP"); to declare that CENTECH should be entitled to be chosen as an awardee under such contract when lawfully made in accordance with all applicable laws, regulations, and procedures; to compel the Defendant to do so upon compliance with all applicable laws, regulations, and procedures; and to provide CENTECH related bid and proposal costs.

In deciding whether to grant injunctive relief, the court must consider the following factors: "(1) the likelihood of plaintiff's success on the merits; (2) the public interest...; (3) the



[redacted]

possibility of irreparable injury to the plaintiff if the injunction is not granted, including, but not limited to, the absence of adequate remedy at law…." Isometrics, Inc. v. United States, 5 Cl. Ct. 420 (Cl. Ct. 1984); *see also*, Drexel Heritage Furnishings, Inc. v. United States, 7 Cl. Ct. 134 (Cl. Ct. 1984).

As is demonstrated below, the Court should grant Plaintiff's Motion for Judgment on the Administrative Record and demand for Permanent Injunctive Relief because the GSA's award decisions for the Alliant program are arbitrary and capricious, and resulted from GSA's deviation from its disclosed source selection evaluation criteria, its unequal treatment of offerors and from its violations of federal procurement laws and regulations.

Plaintiff suffers irreparable harm for which it has no adequate remedy at law due to GSA's wrongful and illegal acts. CENTECH's injury includes its loss of the opportunity to receive a contract under the Alliant, and its' consequential loss of profits resulting from its exclusion from participating in the GSA's estimated $50 billion dollar program. CENTECH's harm also results from GSA's denial of a full and fair opportunity to compete for an Alliant program contract. The loss of this contract opportunity damages CENTECH business reputation.

The public interest and Defendant's interest are served by the relief CENTECH requests. By enjoining the GSA from proceeding with the illegal contract awards it has made after CENTECH and others participated in the Government's procurement process on the presumption of being treated fairly and in accordance with federal procurement laws and regulations, the Court preserves the integrity of the government's procurement process.



[redacted]

## II. STATEMENT OF FACTS

### A. *Background*

On September 29, 2006, GSA issued solicitation number TQ2006MCV0001 (the "Solicitation" or the "RFP"). The Solicitation sought proposals for Government-wide Acquisition Contracts ("GWACs") for a program called Alliant. (AR 121) GWACs are authorized pursuant to 40 U.S.C. § 1412(e). Under GWACs, various departments and agencies of the Federal Government could issue orders for the services included in the contracts. The maximum size of the Alliant program is $50 billion. (Id). The contracts would last up to ten years (RFP, Section F.2).

In the Solicitation, GSA announced that it intended to award more than one contract under the solicitation. (AR 141 ). GSA stated that it would operate this GWAC as a multiple-award task order contract; such contracts are subject to 41 U.S.C. § 253 h (d). Under this type of contract, the Government is able to compete task orders among the contract awardees, or some subset thereof. (AR 122-123). In its RFP, GSA announced that it intended to award up to 30 contracts under the Solicitation. (AR141).

The solicitation contemplated contracts under which the contractors could provide a very broad variety of information technology services to the Federal Government. (AR 130). Offerors were to propose a total of 80 different labor categories (AR 251, RFP, Attachments J-2 & J-3).

The GSA issued its RFP pursuant to the procedures outlined at Federal Acquisition Regulation ("FAR") Part 15. Consistent with these procedures, in its RFP the GSA disclosed that it would apply two Technical Evaluation subfactors of equal importance: (1) Past performance and (2) Basic Contract Plan. Combined, the two Technical Evaluation subfactors



[redacted]

were represented as being significantly more important than the Cost/Price evaluation factor. The rating system for evaluation factors had five different levels, in descending order, as follows: (1) Exceptionally High Confidence, (2) Significant Confidence, (3) Acceptable Confidence, (4) Marginal Confidence, and (5) Little to No Confidence. (AR 243).

On November 17, 2006, CENTECH submitted a timely and acceptable proposal. (AR 23714). Thereafter, GSA notified CENTECH that its proposal was not accepted for award, and CENTECH immediately submitted a request for a debriefing in accordance with FAR 15.506. (AR 24109).

GSA provided a written debriefing to CENTECH on August 20, 2007. (AR 24112). In its debriefing letter, GSA disclosed that it had rejected 4 of 66 proposals received, and evaluated the remaining 62. GSA also disclosed that it awarded contracts based on initial proposals without any conducting any discussions with offerors. (Id.).

On August 27, 2007 CENTECH filed a protest with the General Accountability Office ("GAO") complaining that GSA failed to adhere to its evaluation scheme in the RFP, and that GSA failed to award its Alliant contracts in accordance with federal procurement laws and regulations. On October 24, 2007, the GAO notified CENTECH that it dismissed its protest because the matter involved was pending before the Claims Court based due to filings made by other similarly situated interested parties who were irreparably harmed by the unlawful and arbitrary and capricious competition that the GSA performed.



[redacted]

### *B. Evaluation Criteria*

In its RFP, the GSA advertised that it would apply and follow the proposal evaluation scheme contained in Section M of the RFP. (AR 241). The RFP specified the following Evaluation Factors for Award:

**SECTION M**

**EVALUATION FACTORS FOR AWARD**

M.1 FAR 52.252-1 SOLICITATION PROVISIONS INCORPORATED BY REFERENCE (FEB 1998)

**M.2 BASIS FOR AWARD**

**(a) Best Value** – Award will be made to responsible Offerors whose proposals are determined to provide the "best value" to the Government. FAR Part 15 competitive negotiation selection procedures utilizing the "best value" trade-off approach will be utilized.

**(b) Relative Importance** – The two Technical Evaluation Factors, (1) Past Performance (Section M.5.1) and the (2) Alliant Basic Contract Plan (Section M.5.2), are approximately equal in importance to each other, and when combined, are significantly more important than Cost or Price (Section M.6)....

**M.3 EVALUATION PROCEDURE FOR CONTRACT AWARD**

The procedure for evaluating Proposals shall be as follows:

**(a) Acceptability Review** – The Government will conduct an acceptability review of each proposal received as described below in Section M.4. The Offeror's proposal will only proceed to the evaluation phase if it is deemed to "ass" the acceptability review.

**(b) Technical Evaluation** – The Government will evaluate an Offeror's Technical Proposal as further described below in Section M.5.

**(c) Cost/Price Evaluation** – The Government will evaluate an Offeror's Cost/Price Proposal, as further described below in Section M.6.

**(d) Best Value Tradeoff** – Consistent with FAR 15.101-1, the Government will conduct a "best value" tradeoff, in which differences in non-price factors and evaluated price will be compared between the Offerors in order to determine



[redacted]

which Offeror represents the best value to the Government. ***The technical factors combined are significantly more important than cost or price…;***

**M.5 TECHNICAL EVALUATION FACTORS**

The Government will evaluate its confidence level in the Offeror's ability to manage risk and to deliver high quality service and solutions under the Basic Contract, by assigning adjectival/confidence ratings to the following two Technical Evaluation Factors.

**(a) Past Performance** for which the Government will look "retrospectively" and consider the Offeror's history of success in delivering high quality service and solutions are contract efforts of similar scope and complexity to those anticipated under the Alliant Contract pursuant to Section C.

**(b) Alliant Basic Contract Plan** for which the Government will look "prospectively" and consider the Offeror's level of commitment to the Alliant program and potential for success. The Government will evaluate the Offeror's proposal resources devoted to Alliant and the degree to which the Offeror's corporate structure and program management system will facilitate high quality service and solutions for all work described in Section C.

**M.5.1 Past Performance**

The Government will look "retrospectively" and consider the Offeror's Past Performance Considerations in determining the Government's confidence level, with approximate equal importance to each other, are the subfactors: (a) Quality of Service; (b) Schedule; (c) Cost Control; (d) Business Relations; and (e) Subcontract Management/Socioeconomic Goals.

**(a) Quality of Service** – The Government will evaluate the Offeror's ability to provide a service that met the customer's quality requirements and conformed to contract requirements. The Government will consider whether risk factors were identified, mitigated and managed resulting in high quality service and solutions. Offerors that employed innovative and unique quality assurance tools and methodologies to ensure efficient and effective design, development and implementation of quality solutions will be more highly rated. Offerors whose performance metrics and quality control solutions are comprehensive, verifiable and effective will be evaluated more favorably.

**(b) Schedule** – The Government will evaluate the Offeror's ability to meet all schedule goals related to completion of the contract, task orders, milestones, delivery schedules and administrative requirements (timely submission of accurate Small Business Subcontracting reports; invoices; contract closeout documentation, etc.).



[redacted]

**(c) Cost Control** (does not apply to FFP and FFP w/EPA) – The Government will evaluate the Offeror's ability to deliver a service at the agreed to price/cost to include their ability to effectively forecast, manage and control contract costs, as well as report and analyze variances.

**(d) Business Relations** – The Government will evaluate the Offeror's ability to integrate and coordinate all activity needed to execute the contract and evaluate the degree to which the Offeror cooperated in order to be an effective business partner. Elements that may be considered include the timeliness, completeness and quality of: problem identification, corrective action plans, proposal submittals, change orders and task order requests (TORs); as well as the contractor's history of cooperative behavior and customer satisfaction.

**(e) Subcontract Management/Socioeconomic Goals** – The Government will evaluate the Offeror's ability to timely award and manage subcontracts and whether they have met their small business utilization goals in the past, with those exceeding their goals being evaluated more favorably.

### M.5.1.1 Acceptable Past Performance

Only Past Performance information submitted, which is deemed acceptable and relevant pursuant to the requirements set forth in Section L.12.3, will be evaluated.

### M.5.1.2 Method of Selecting Past Performance Efforts for Evaluation

The Government intends to use reasonable efforts to check approximately ten (10) efforts selected from Tables 1 and 2, including the three (3) efforts, which the Offeror has identified. The Government reserves the right to check more or fewer efforts, at its discretion, and does not guarantee that it will contact any particular effort listed in Table 1 or Table 2, even the efforts specifically listed by the Offeror.

### M.5.1.3 Evaluation Method

Past Performance is a measure of the degree to which an Offeror, as an organization, has satisfied its customers, while fulfilling its absolute duty to comply with applicable laws and regulations. Relevant Past Performance will be evaluated to determine the relative merits of the Offeror's past performance.

In the event any Offerors are deemed virtually equivalent, the following discriminators may be used: Offerors with demonstrated success in providing integrated IT solutions including all three component areas in Section C will be evaluated more favorably. Offerors with successful performance on efforts that



[redacted]

include OCONUS work, Cost-type contracts or include significant subcontract management will be rated more highly.

### M.5.2 Alliant Basic Contract Plan

The Government will look "prospectively" and consider the Offeror's Alliant Basic Contract Plan. Considerations in determining the Government's confidence level, in descending order of importance, are the subfactors: (a) Resources; (b) Program Management; and (c) Corporate Commitment. As part of its evaluation of the contract plan, the Government will evaluate the Offeror's overall capability to support the Alliant program by determining whether the plan sufficiently addresses any gaps or weaknesses not addressed in past performance.

**(a) Resources** – The Government will evaluate the Offeror's plan to determine the adequacy of internal and external resources available to perform all three component areas of Section C including OCONUS work and effectively and efficiently administer the Alliant program. The Offeror's Program Management systems and processes will be evaluated as a separate subfactor. See (b) below.

**(1) Internal Resources** – The Government will evaluate the adequacy of the Offeror's current core capabilities which include but are not limited to the: ability to recruit, train and retain qualified personnel, number of personnel possessing security clearances and the level of the clearances, quality of key personnel and effectiveness of business systems.

Offerors that propose Program Managers with proven track records of managing program similar to the Alliant in scope and magnitude will be evaluated more favorably. Offerors that propose Contract Administrators with proven expertise in applying FAR rules and regulations in administering contracts similar to Alliant will be evaluated more favorably.

Offerors with approved purchasing systems will be evaluated more favorably.

**(2) External Resources** – The Government will evaluate the Offeror's methodology for supplementing its cure capabilities to meet all three component areas identified in Section C for completeness and soundness of approach. Emphasis will be placed on those areas not addressed by internal resources or reflected in past performance.

The Government will evaluate the Offeror's methodology for selecting, monitoring, and managing subcontractors and teaming arrangements, as applicable; methodology for providing OCONUS support; and approach to support continuity of operations in response to sudden workload surges including contingency/disaster recovery situations.



[redacted]

**(b) Program Management** – The Government will evaluate the Offerors program management strategy to determine how well it facilitates success of the Alliant program.

The Government will evaluate the viability of the Offeror's Program Management Information System to support the Basic Contract including the data deliverables in Section F.5. Offerors providing comprehensive and thorough descriptions that demonstrate a program management information system, which effectively employs electronic commerce/electronic business processes and is capable of producing timely quality data products will be evaluated more favorably.

Offerors providing a comprehensive and effective program management strategy with quantifiable performance metrics that link incentives to performance and quality controls that ensure a comprehensive and verifiable approach for monitoring and reporting performance will be evaluated more favorably.

Offerors with approved EVMC will be evaluated more favorably.

**(c) Corporate Commitment** – The Government will evaluate the Offeror's plan to determine the level of corporate commitment to the Alliant program including whether it has a dedicated Alliant IT organization adequate to support the Alliant program.

The strategy for business development, proposal management, contract administration and pursuit of technological innovations will be evaluated for completeness, understanding of the requirement and potential for optimization of the Alliant program.

Offerors that provide well-defined lines of authority, responsibility and communication in their corporate structure as well as detailed processes for early problem identification with efficient and effective mitigation will be evaluated more favorably.

Offerors with plans that demonstrate their ability to develop and implement successful business process improvements will be evaluated more favorably.

## M.6 COST/PRICE EVALUATION

The technical factors combined are significantly more important than cost or price; however, the closer the technical scores of the various proposals are to one another, the more important cost or price considerations become in determining the overall best-value for the Government.



[redacted]

Cost/price proposals will be evaluated using proposal analysis techniques consistent with FAR 15.404-1 to ensure that proposed direct and indirect rates for each labor category during the base period and option period are fair, reasonable, and predictable for anticipated work under the Basic Contract.

Pursuant to FAR 15.404-1(g), an offer may be rejected if the Government determines that the lack of balanced pricing poses an unacceptable risk to the Government.

As defined in FAR 3.501, an Offeror may be rejected if the evaluation determines that an Offeror submitted prices below anticipated costs. Proposals that include unrealistically low labor rates, or that do not otherwise demonstrate cost realism, will be considered a high risk assessment and will be evaluated for award in accordance with that assessment.

**M.6.1. Price Analysis**

Price analysis is the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit.

The Government may use various price analysis techniques and procedures to ensure a fair and reasonable price such as, but not limited to, the following:

**(a)** Comparison of proposed Loaded Hourly Labor Rates received in response to the Solicitation. Normally, adequate price competition establishes price reasonableness.

**(b)** Comparison of previously proposed Loaded Hourly Labor Rates for the same or similar labor categories using independent Government Price estimates.

**(c)** Overall evaluated price using independent Government estimates for labor hours as set forth in Section L, Attachments 2 and 3.

**M.6.2. Cost Analysis**

Cost analysis is the review and evaluation of the separate cost elements and profit in an Offeror's proposal and the application of judgment to determine how well the proposed costs represent that the cost should be, assuming reasonable economy and efficiency.

The Government may use various cost analysis techniques and procedures to ensure a fair and reasonable price, given the circumstances of the acquisition such as, but not limited to, the following:

**(a)** Verification that the Offeror's cost submissions are in accordance with the contract cost principles and procedures in FAR Part 31 and, when applicable, the requirements and procedures in 48 CFR Chapter 99 (Appendix to the FAR loose-leaf edition), Cost Accounting Standards.

**(b)** Verification from DCAA/DCMA that the Offeror's cost controls and surveillance systems are adequate as demonstrated through approved cost accounting and estimating systems, including all the Offeror's approved provisional billing rates and forward pricing rate agreements from DCAA.

**(c)** The application of audited indirect cost rates and direct labor rates in the Offeror's basis of estimate for each Loaded Hourly Labor Rate, and if necessary, a cost realism analysis to demonstrate the Offeror's understanding of the requirements of this Solicitation.

**M.7 SMALL BUSINESS SUBCONTRACTING PLAN**

The Government will evaluate the Offeror's proposed Individual Small Business Subcontracting Plan for providing subcontracting opportunities for the socio-economic categories indicated in Section L.5.1 to determine the extent and enforceability of the Offeror's commitment to the socio-economic goals of the Basic Contract. This plan is provided to the Government at the time of proposal submission per Section L.12.2, Folder E, and is subject to negotiation by the Contracting Officer. Failure to negotiate a satisfactory Individual Small Business Subcontracting Plan will render a proposal unacceptable and therefore no longer eligible for award. Offerors qualifying as small businesses under North American Industry Classification System (NAICA) code 541512, Computer Systems Design Services, are not required to submit Small Business Subcontracting Plans.

### *C. Debriefing*

In the Contracting Officer's debriefing letter to CENTECH the Contracting Officer disclosed the following technical scores applicable to CENTECH's proposal:

**PAST PERFORMANCE**

Quality of Service: [redacted]

Schedule [redacted]

Cost Significant [redacted]

Business Relations [redacted]



[redacted]

SubK/Socioeconomic Goals [redacted]

**ALLIANT CONTRACT PLAN (BCP)**

Resources [redacted]

Program Management [redacted]

Corporate Commitment [redacted]

**COST/PRICE ANALYSIS**

Cost Analysis. [redacted]

Price Analysis (Total Evaluated Price). [redacted] (AR 24112).

The Contracting Officer disclosed that the GSA applied the following source selection methods to reach its determination [redacted]



[redacted]

[redacted]

[redacted]

[redacted]

[redacted]



[redacted]

Based on the actual proposals evaluations that occurred, GSA failed to follow its proposal evaluation scheme advertised in the RFP. Specifically, GSA failed to properly consider the paramount importance of technical factors over cost and/or price in its award decisions as required by the Solicitation, and awarded contracts to offerors whose technical proposals were technically inferior to CENTECH's proposal, but who offered significantly lower prices. (AR 1000). The GSA failed to treat CENTECH equally with other Offerors. GSA's past performance evaluation was discriminatory, lacked a value rationale, and employed a flawed script for evaluators to obtain information from Offerors' references such that it was not applied uniformly to all referenced interviews, did not produce feedback that permitted consistent comparisons of results among individual Offerors' references, did not accurately reflect the Solicitation's stated evaluation criteria, and undermined any ability to apply evaluations of past performance consistently to all Offerors. (AR 23889). GSA also violated applicable procurement laws and regulations by failing to adequately document the basis for its evaluations of individual sub-factors, ignoring information contained in CENTECH's proposal that was inconsistent with pre-determined conclusions in the evaluation performed, arbitrarily assigning lower ratings to CENTECH's proposal than those of other Offerors' whose proposals were comparable, and failing to apply and correlate the evaluation to the stated criteria for each sub-factor in the Solicitation when assigning ratings for those sub-factors, such that the disparate treatment of CENTECH's proposal resulted in prejudice to CENTECH. (AR 24605). GSA also failed to fairly evaluate CENTECH's ability to manage subcontractors in violation of applicable procurement laws and regulations where GSA deemed CENTECH incapable of managing subcontractors based on its status as a "small business concern." (AR 24066). In the process



[redacted]

GSA illegally failed to provide a "maximum practicable opportunity" for small business participation in its acquisition process.

## ARGUMENT

## I. THE STANDARD OF REVIEW.

RCFC 52.1(b) sets forth the standard of review of agency action on the basis of the administrative record. *See,* A&D Fire Protection, Inc. v. United States, 72 Fed. Cl. 126, 131 (Fed. Cl. 2006). The Court must decide by a preponderance of the evidence whether "a party has met its burden of proof based on the evidence in the record." *Id.* (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)). See, Rotech Healthcare Inc. v. United States, 71 Fed. Cl. 393, 401 (2006). The Court of Federal Claims resolves challenges to agency actions in the bid protest context under the standards of the Administrative Procedures Act, 5 U.S.C. § 706, *see* 28 U.S.C. § 1491(b)(4); Comprehensive Health Serv., Inc. v. United States, 70 Fed. Cl. 700, 720 (Fed. Cl. 2006). This standard requires the Court to determine whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Comprehensive Health, 70 Fed. Cl. at 720 (citing 5 U.S.C. § 706).

## II. LEGAL ANALYSIS/ARGUMENT

### *A. The GSA Deviated from its Disclosed Evaluation Criteria to Deny CENTECH a Contract in Violation of Law*

Where, as here, an agency invites firms to submit a "technical and cost proposal" in response to an RFP, the GAO will review the agency's actions to ensure that the evaluation is fair and reasonable and consistent with the terms of the RFQ. Comark Fed. Sys., B-278343, B-278343.2, Jan. 20, 1998, 98-1 CPD P 34 at 4-5. When agencies establish evaluation criteria, they must adhere to those criteria in evaluating proposals. An agency's failure to follow its



[redacted]

stated evaluation criteria is arbitrary and capricious. Grey Advertising, Inc., B-184825, 76-1 CPD ¶ 325. Improper and unreasonable evaluations are illegal, and when presented to the GAO or other judicial review, will be set aside. Abt Assocs., Inc., B-237060.2, 90-1 CPD ¶ 223. In Hattal & Associates, B-243357; B-243357.2, 91-2 CPD ¶ 90, the GAO set aside an award where it found that the agency failed to properly weigh technical factors and cost factors consistent with its evaluation criteria published in the solicitation.

In its RFP the GSA disclosed that "award will be made to responsible Offerors whose proposals are determined to provide the "best value" to the Government. (AR 241). To make its best value determinations, the GSA further disclosed that "the Government will conduct a "best value" tradeoff, in which differences in non-price factors and evaluated price will be compared between the Offerors in order to determine which Offeror represents the best value to the Government. (AR 242). However, the GSA also disclosed that ***"the technical factors combined are significantly more important than cost or price."*** (AR 241). Notwithstanding the paramount emphasis that GSA stated it would place on technical considerations over price, it is clear that price constituted the driving factor in its decision to award a contract [redacted] (AR 24113). In the Conclusion of the Contracting Officer's Officer debriefing letter, she discloses:

[redacted]

The Contracting Officer also disclosed: [redacted]



[redacted]

[redacted] (AR 24121). The SSA ultimately adopted this recommendation." (Id.).

The GSA's stated reason for not selecting CENTECH, on its face, violates the "best value" tradeoff analysis and evaluation scheme disclosed in the RFP. On an overall proposal evaluation basis, the GSA [redacted] (AR 24121). Yet, [redacted] Contrary to the evaluation scheme disclosed, GSA did not perform a [redacted] The lowest-priced awardee, [redacted] had a technical score of [redacted] and an evaluated price of about [redacted] (AR 817 and 1010). In contrast, the highest-priced offeror, [redacted] had a technical score of [redacted] and an evaluated price of about [redacted] (Id.). This means that each technical evaluation point cost the government [redacted] Yet, no explanation appears for how or why the GSA determined that the evaluated points [redacted] received are so much more valuable than those [redacted] received. (AR 9486-74; 10512-20; 11524-33). Despite the mystery, one fact appears clear, in selecting [redacted] to receive an award to enable the Government to access its cheap price, GSA violated its evaluation scheme disclosed in the RFP, and in the process, violated federal procurement laws and regulations as well. (See, 41 U.S.C. § 253a(c) and FAR 15.304(c)(1)).

***B. GSA Failed to Treat all Proposals Equally***

For purposes of considering whether or not injunctive relief is appropriate, an agency is deemed to have acted unreasonably where a plaintiff's proposal was treated unfairly and held to a stricter standard of compliance than a competitor's proposal. Isometrics, Inc. v. United States, 5 Cl. Ct. 420 (Cl. Ct. 1984). In Isometrics, Inc., the Court granted Plaintiff injunctive relief



[redacted]

where Plaintiff demonstrated that the agency treated its proposal differently than the awardee's proposal. Moreover, the Court of Federal Claims recognizes that when the Government awards a contract "...based on a facially noncompliant proposal, [it impos[es] a disadvantage upon the other offerors simply for their following the solicitation's mandatory terms." Beta Analytics Internat'l, Inc. v. United States, 44 Fed. Cl. 131 (Fed. Cl. 1999). In *Beta*, although the awardee's proposal deficiency "...had minor technical impact on the award, the court was constrained to find a clear violation of a mandatory procurement statute and regulation." *Id.* at 137.

The GAO has similarly held that; ***"it is fundamental that the contracting agency must treat all offerors equally; it must even-handedly evaluate offers against common requirements and evaluation criteria.*** See, e.g., U.S. Property Mgmt. Ser. Corp., B-278727, 1998 U.S. Comp. Gen. LEXIS 99 (March 6, 1998); Tidewater Homes Realty, Inc., B-274689, 96-2 Comp. Gen. Proc. Dec. ¶241 (December 26, 1996); Am. Dev. Corp., B-251876.4, 93-2 Comp. Gen. Proc. Dec. ¶49 (July 12, 1993) (emphasis added). However, where an agency is shown to have treated offerors differently, or deviated from its stated evaluation criteria, or evaluated proposals unreasonably, the GAO can and should set aside the contract award. In this case, GSA treated CENTECH differently from other offerors, [redacted] To access [redacted] proposal's for award, GSA illegally elevated the significance of price, and reduced the significance of the technical subfactors. (AR 24121). Contrary to the evaluation scheme disclosed in Section M of the RFP, GSA did not analyze costs or perform a meaningful technical/cost tradeoff analysis or reconcile the significant delta that exists between its own Independent Government Cost Estimate and [redacted] proposal. (AR 817) Rather, GSA simply [redacted] for award because it offered a price that [redacted] below the Independent Cost Estimate. (AR 956).



[redacted]

This contrasts with CENTECH's proposed price which [redacted]

In Section M of the RFP, the GSA disclosed that "an Offeror may be rejected if the evaluation determines that an Offeror submitted prices below anticipated costs. Proposals that include unrealistically low labor rates, or that do not otherwise demonstrate cost realism, will be considered a high risk assessment and will be evaluated for award in accordance with that assessment. (AR 247). On this point however, applicable [redacted] and contrary to its disclosed evaluation scheme, the SSA stated the following in his debriefing letter to CENTECH:

[redacted]

However, as demonstrated above, [redacted] was not similarly situated to CENTECH, and it submitted an inferior proposal. Based on the evaluations GSA performed, it determined that CENTECH submitted a highly ranked technical proposal that it scored accordingly as follows:

**PAST PERFORMANCE**

Quality of Service: [redacted]

Schedule [redacted]

Cost Significant [redacted]

Business Relations [redacted]

SubK/Socioeconomic Goals ([redacted]

**ALLIANT CONTRACT PLAN (BCP)**

Resources [redacted]

Program Management [redacted]



[redacted]

Corporate Commitment [redacted]

The GSA determined CENTECH's [redacted] to be competitive and reasonable as follows:

[redacted]

Therefore, CENTECH submitted a higher ranked technical proposal [redacted], and submitted a cost proposal "[redacted]

Nevertheless, the SSA [redacted] so it could access its cheap price. This is the definition of unequal treatment, and if the Court is to protect the integrity of the government's procurement systems, it cannot be allowed to stand.

The issue of unequal treatment of offerors is discussed by the GAO in Classicists, Inc., 2000 Comp. Gen. Proc. Dec. ¶63, B-282075.2; B-282075.3 (March 15, 2000). In that case the GAO stated that an award must be set aside when the agency fails to treat the offerors equally as follows:

> First, under the "understanding the problem" factor, the evaluators deducted a total of [deleted] points because Car's contract compliance matrix included food service and housing/hygiene inspections, which were agency responsibilities and not SOW requirements. Tradeoff Memo P 8. Despite the fact that the entry correctly identified these tasks as agency responsibilities, Car's decision to



[redacted]

> include the entry led the evaluators, and the SSA in the Tradeoff Memo, to conclude that this "demonstrates a very poor understanding of what the Government is asking for." Id. ***However, while UP's contract compliance matrix contains a similar entry, its proposal was not similarly downgraded in the evaluation.***

Id. (emphasis added). In sustaining the protest the GAO emphasized:

> It is a fundamental principle of government procurement that the contracting agency must treat all offerors equally; it must evaluate offers evenhandedly against common requirements and evaluation criteria. Clearly, the agency failed to adhere to this standard with respect to its evaluation of the two offerors' similar entries here....While we find nothing inherently improper in the agency's assessment of this aspect of Car's proposal, the record suggests that the SSA placed undue emphasis upon it.

The GAO has similarly held that a proposal cannot be given a lower rating than another without sufficient agency record to justify the difference. Tidewater Homes Realty, Inc., B-274689, 96-2 Comp. Gen. Proc. Dec. ¶241 (December 26, 1996). In Tidewater, the GAO held that merely stating that one proposal received less points than another because it lacked sufficient detail without elaborating what information was missing amounts to unequal treatment of offerors contrary to the FAR. Id. This is precisely what has occurred in this case in violation of federal procurement laws and regulations.

***C. GSA failed to properly evaluate cost and/or price in accordance with the terms of the RFP, and thus rendered improper best value determinations.***

In Section M of the RFP, GSA disclosed that it would evaluate Cost/price proposals using proposal analysis techniques consistent with FAR 15.404-1 to ensure that proposed direct and indirect rates for each labor category during the base period and option period are fair, reasonable, and predictable for anticipated work under the Basic Contract.



[redacted]

Pursuant to FAR 15.404-1(g), the GSA disclosed in its RFP that it may reject offers if they lacked balanced pricing, or otherwise posed an unacceptable risk to the Government.

Additionally, GSA disclosed in its RFP that "as defined in FAR 3.501, an Offeror may be rejected if the evaluation determines that an Offeror submitted prices below anticipated costs." Proposals that include unrealistically low labor rates, or that do not otherwise demonstrate cost realism, will be considered a high risk assessment and will be evaluated for award in accordance with that assessment.

Despite these admonishments in the RFP, no evidence appears that GSA performed a meaningful cost analysis consistent with its disclosed evaluation criteria. GSA likewise did not perform a meaningful cost/technical tradeoff analysis. GSA's selection [redacted] proposed unreasonably low costs and prices, [redacted] To enable it to access [redacted] GSA elevated [redacted] despite the fact that it has no relevant past performance experience. [redacted] (AR 1008). GSA's evaluators documented problems with [redacted] (AR 1577-81). Despite these shortcomings, [redacted] GSA simply overlooked them in violation of its disclosed proposal evaluation scheme.

As the GAO has held, improper and unreasonable evaluations are illegal. Abt Assocs., Inc., B-237060.2, 90-1 CPD ¶ 223. In Hattal & Associates, B-243357; B-243357.2, 91-2 CPD ¶ 90. Here, GSA clearly performed an improper and unreasonable evaluation. Therefore, the



[redacted]

Court should grant CETNECH's motion for judgment to put an end to the harm GSA causes to the integrity of the government's procurement system by its illegal acts.

### *D. GSA failed to properly evaluate the technical merit of the CENTECH's proposal, including its past performance and Basic Contract Plan, thus depriving CENTECH of an opportunity for award.*

Basic Contract Plan" was one of two equally weighted components of the Technical Evaluation factor. Basic Contract Plan was itself divided into three subfactors, in descending order of importance: (1) Resources, (2) Program Management, and (3) Corporate Commitment. Each subfactor had from three to six elements.

CENTECH received a rating of only [redacted] This evaluation was arbitrary and capricious. The "Resources" subfactor contained two sub-elements, "Internal Resources" and "External Resources." In evaluating [redacted] the GSA failed to adequately document the basis of its conclusions that CENTECH's proposal possessed [redacted] The GSA also failed to document [redacted] were evaluated as strengths or weaknesses, and failed to disclose the significance of the features evaluated and how they impacted on GSA's best value determination. Instead, the GSA merely recited that it weighed several undisclosed "discriminators" that caused it to exclude CENTECH's offer from award consideration without any disclosure by the GSA of the analyses or judgments that it rendered in reaching its conclusions. By so conducting its source selection, the GSA violated FAR 15.305(a) and the standards of review in 5 U.S.C. § 706.1.

As with its evaluation of "Resources" GSA's evaluation of Corporate Commitment violated FAR 15.305(a) and the standards of review in 5 U.S.C. § 706, and rendered the



[redacted]

evaluation arbitrary and capricious. In evaluating CENTECH's proposal related to the [redacted] the GSA failed to adequately document the basis of its conclusions that CENTECH's proposal had [redacted]". The GSA failed to document whether any features of CENTECH's proposal were evaluated as strengths or weaknesses, and failed to disclose the significance of the features evaluated and how they impacted on GSA's best value determination. Instead, the GSA merely recited that it weighed several undisclosed "discriminators" that caused it to exclude CENTECH's offer from award consideration, and GSA made no disclosure during its debriefing of any analyses it undertook or judgments that it rendered that supported its conclusions. This violates FAR 15.305(a) and the standards of review in 5 U.S.C. § 706.1.

Without these errors, CENTECH would have received [redacted] thus magnifying the technical superiority of [redacted] "But for" the GSA's deviation from its stated evaluation criteria, and its elevation of price over technical considerations as its overriding selection criteria, CENTECH would have received a contract award.

### *E. GSA's evaluation of CENTECH's Basic Contract Plan violated applicable procurement laws and regulations by failing to adequately document the basis for its evaluation of individual sub-factors,*

"Basic Contract Plan" was one of two equally weighted components of the Technical Evaluation factor. Basic Contract Plan was itself divided into three subfactors, in descending order of importance: (1) Resources, (2) Program Management, and (3) Corporate Commitment. Each subfactor had from three to six elements.

CENTECH received a rating [redacted] for "Resources", and [redacted] for Corporate Commitment. This evaluation was arbitrary and



[redacted]

capricious. The "Resources" subfactor contained two sub-elements, "Internal Resources" and "External Resources." [redacted] The GSA also failed to document whether any features of CENTECH's proposal were evaluated as strengths or weaknesses, and failed to disclose the significance of the features evaluated and how they impacted on GSA's best value determination. Instead, the GSA merely recited that it weighed several undisclosed "discriminators" that caused it to exclude CENTECH's offer from award consideration without any disclosure by the GSA of the analyses or judgments that it rendered in reaching its conclusions. By so conducting its source selection, the GSA violated FAR 15.305(a) and the standards of review in 5 U.S.C. § 706.1.

As with its evaluation of "[redacted] GSA's evaluation of [redacted] violated FAR 15.305(a) and the standards of review in 5 U.S.C. § 706, and rendered the evaluation arbitrary and capricious. In evaluating CENTECH's proposal related to the [redacted], the GSA failed to adequately document the basis of its conclusions that CENTECH's proposal had only "Acceptable Confidence". The GSA failed to document whether any features of CENTECH's proposal were evaluated as strengths or weaknesses, and failed to disclose the significance of the features evaluated and how they impacted on GSA's best value determination. Instead, the GSA merely recited that it weighed several undisclosed "discriminators" that caused it to exclude CENTECH's offer from award consideration, and GSA made no disclosure during its debriefing of any analyses it undertook or judgments that it rendered that supported its conclusions. This violates FAR 15.305(a) and the standards of review in 5 U.S.C. § 706.1.



[redacted]

Without these errors, [redacted], thus [redacted] "But for" the GSA's deviation from its stated evaluation criteria, and its elevation of price over technical considerations as its overriding selection criteria, CENTECH would have received a contract award.

The GAO has held that a proposal cannot be given a lower rating than another without sufficient agency record to justify the difference. Tidewater Homes Realty, Inc., B-274689, 96-2 Comp. Gen. Proc. Dec. ¶241 (December 26, 1996). In Tidewater, the GAO held that merely stating that one proposal received less points than another because it lacked sufficient detail without elaborating what information was missing amounts to unequal treatment of offerors contrary to the FAR. Id. This is precisely what has occurred in this case in violation of federal procurement laws and regulations.

***F. GSA's evaluation of CENTECH's ability to manage subcontractors violated applicable procurement laws and regulations where GSA deemed CENTECH incapable of managing subcontractors based on its status as a "small business concern.***

Astonishingly, the agency apparently decided to ignore CENTECH's positive subcontracting record based on nothing other than CENTECH's status as a small business concern. Specifically, CENTECH was denied a positive evaluation rating and given a rating of [redacted] on its Subcontract Management/Socioeconomic Goals element of Past Performance. In addition, CENTECH received t[redacted] on its Subcontracting Management & Supplementing Core Capabilities element of Alliant Basic Contract Plan. However, the Small Business Act prohibits Federal agencies from downgrading companies simply by virtue of being a small business concern without a reference to the SBA



[redacted]

for a Certificate of Competency. See 15 USC § 637(b)(7). In addition, FAR 15.305 obligates the GSA to conduct a thorough and diligent past performance evaluation.

In discussing CENTECH's strengths on this issue in the Past Performance section, the GSA admitted that CENTECH's subcontract management earned "positive statements" from references, it nonetheless stated that "there was not a track record to rate CENTECH for this subfactor." The PCO justified this choice by explaining that "CENTECH was a small business concern at the time of proposal submission" and that "several references cited 'N/A,' or did not address the use of subcontractors." (italics added). The GSA apparently refused to look into this issue further. However, just a page later, in the Basic Contract Plan section, the PCO noted that CENTECH's "positive attributes noted include . . . [redacted] The GSA also d[redacted] rating by referencing [redacted] The GSA also alleged [redacted]

As noted in the Small Business Act, "It is the policy of the United States that small business concerns . . . shall have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency, including contracts and subcontracts for subsystems, assemblies, components, and related services for major systems." 15 USC 637(d)(1); see also 15 USC §631. The GSA's evaluation process nullifies this Congressional policy by effectively presuming that small businesses – even small businesses with a track record of managing 312 subcontractors – should be presumed to be unable to manage subcontracts or meet small business subcontracting goals. In its RFP, the Government



[redacted]

disclosed that would "evaluate the Offeror's proposed Individual Small Business Subcontracting Plan for providing subcontracting opportunities for the socio-economic categories indicated in Section L.5.1 to determine the extent and enforceability of the Offeror's commitment to the socio-economic goals of the Basic Contract. The GSA failed to perform this evaluation and as a consequence, CENTECH was prejudiced and failed to obtain an award by a single overall proposal ranking.

### *G. The GSA Illegally Discriminated Against CENTECH With Regards to Subcontracting Management and Subcontracting Plan Administration Based on CENTECH's Small Business Status Through an Arbitrary Refusal to Evaluate CENTECH's Well-Known Performance Record, Unlawfully Downgrading CENTECH, and Making an Unlawful De Facto Non-Responsibility Determination*

The GSA injured CENTECH with three arbitrary acts in connection with its subcontracting management evaluations and small business subcontracting plan administration evaluations by; (1) refusing to reasonably evaluate CENTECH's subcontracting based on the fact that "CENTECH was a small business concern at the time of proposal submission"; (2) unreasonably interpreting the results of its superficial "evaluation" of CENTECH's subcontracting management capabilities based on CENTECH's status as a "small business concern" despite an admitted "positive attribute" of CENTECH stemming from managing over 300 subcontractors; and (3) unfairly [redacted] based on this discriminatory treatment such that CENTECH barely missed the award on this multiple-award contract [redacted]

The Contracting Officer admits that CENTECH's small business status was the reason for lower subcontracting ratings which constitute exactly the kind of discrimination that Congress has tried to eradicate over the last several decades through the Small Business



[redacted]

Administration's Certificate of Competency procedure. The Small Business Act, 15 USC 637(b)(7), states:

> It shall also be the duty of the (Small Business) Administration and it is empowered whenever it determines such action is necessary: . . .To certify to Government procurement officers, and officers engaged in the sale and disposal of Federal property, with respect to all elements of responsibility, including, but not limited to, capability, competency, capacity, credit, integrity, perseverance, and tenacity, of any small business concern or group of such concerns to receive and perform a specific Government contract. A Government procurement officer or an officer engaged in the sale and disposal of Federal property may not, for any reason specified in the preceding sentence, preclude any small business concern or group of such concerns from being awarded such contract without referring the matter for a final disposition to the Administrator.

"The purpose of this provision, as reflected in the legislative history of its predecessors, was to end the discrimination against small business that existed because contracting officers had barred those businesses solely because of their smallness and disabilities allegedly resulting from that fact." Siller Bros. v. United States, 655 F.2d 1039, (Ct.Cl. 1981). If there was ever a clear case of discrimination and superficial, contrived evaluations due to "smallness" of a bidder, surely it exists here, and the GSA admits to it in writing.

Reference to the SBA is required regardless of whether the downgrade related to past performance on subcontracting management, or to the small business subcontracting plan. The ability to manage subcontractors and administer subcontracting plans clearly goes to a firm's tenacity and capacity. Small business concerns with subcontracting plans must also be referred to the SBA. While small businesses are not required to prepare subcontracting plans, such plans, and records of such plans relate to the concern's responsibility if and when prepared. *See* 15 USC §637 (declaring companies without subcontracting plans "ineligible for award" and stating that "[p]rior compliance of the offeror with . . . [small business] subcontracting plans



[redacted]

shall be considered by the Federal agency in determining the responsibility of that offeror for the award of the contract.").

The fact that CENTECH was not legally required to submit a small business subcontracting plan does not justify the GSA's discrimination in violation of the Small Business Act or its failure to afford CENTECH the protections required by Section 1091 of the Federal Acquisition Streamlining Act, P.L. 103-355. Section 1091 requires GSA to follow guidance of the Office of Federal Procurement Policy on ensuring that offerors are "afforded the opportunity to submit" relevant past performance information, that such information "is considered", and that no favorable or unfavorable ratings are given to offerors lacking any past performance information. Further, the Small Business Act provides that: "It is the policy of the United States that small business concerns . . . shall have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency, including contracts and subcontracts for subsystems, assemblies, components, and related services for major systems." 15 USC 637(d)(1); see also 15 USC §631. Subcontracting management and administration is unquestionably a past performance element. *See* Office of Federal Procurement Policy, *Best Practices for Collecting and Using Current and Past Performance Information*, www.whitehouse.gov/omb/procurement/contract_perf/best_practice_re_past_perf.html. Based on these policies, the Federal Acquisition Regulation directs the GSA to give "the highest rating" when evaluating small business subcontracting records of small business concerns. *See* FAR 15.305(5) ("Small business subcontracting evaluation. Solicitations must be structured to give offers from small business concerns the highest rating for the evaluation factors in 15.304(c)(3)(iii) and (c)(5)." These past performance evaluation factors relate to an agency determination where past performance evaluation may be skipped and situations where the



[redacted]

contract solicitation involves bundling, such as a multi-billion government-wide acquisition contract which is not set aside for small firms. As a result, the GSA was required to give CENTECH [redacted]

Likewise, the GSA is not helped by the fact that subcontracting management and administration were scattered as evaluation criteria in the RFP. "Under the Small Business Act, agencies may not find that a small business is nonresponsible under the guise of an assessment of the responsibility factors and thus avoid referring the matter to the Small Business Administration (SBA), which has the ultimate authority to determine the responsibility of a small business concern. See 52 Comp.Gen. 47 (1972); Antenna Prods. Corp., B-227116.2, Mar. 23, 1988, 88-1 CPD ¶ 297." Clegg Industries, 70 Comp. Gen. 679 (1991). Yet, this is precisely what GSA has done here.

The GSA's lack of diligence in evaluating CENTECH's subcontracting is all the more apparent in light of the fact that the GSA itself acknowledged CENTECH's management of 300+ subcontractors as a "positive attribute." Lack of positive and, indeed, any information about CENTECH from a few responders did not absolve the GSA from a thorough evaluation of its past performance responsibility record. Cf. CSE Const. Co. v. United States, 2003 U.S. Claims LEXIS 277 (Aug. 26, 2003) (even the SBA is required under FAR 9.104-3(b) to "consider the number of contracts involved and the extent of deficient performance in each contract" when making responsibility determinations). Regardless of whether discussions, clarification, or negotiations took place post-submission of bids, the GSA had a duty to inquire and evaluate past performance information under the Federal Acquisition Streamlining Act and under the FAR. *See* FAR 15.305; Griffy's Landscape Maintenance, LLC v. United States, 46 Fed.Cl. 257 (2000) ("[T]here was [a] duty to inquire. Consolidated Engineering Services, Inc.,



[redacted]

B-279565.2, 99-1 CPD ¶ 75 (1998) (agency may not ignore prior performance information of which it is aware); GTS Duratek, Inc., B-280511, 98-2 CPD ¶ 130 (1998) (protest sustained where agency improperly ignored relevant information that was known to the agency's evaluators). After all, the goal of negotiated procurement is to "ensure that the Government, when contracting by negotiation, receives the best value, while ensuring the fair treatment of offerors." 62 Fed.Reg. 51224 (September 30, 1997))". The GSA has not fulfilled this duty with regards to CENTECH, and this Court should enjoin it to do so.

## III. CENTECH MEETS ALL APPROPRIATE FACTORS FOR DECLARATORY, INJUNCTIVE, AND MONETARY COSTS RELIEF

CENTECH is seeking three forms of relief: declaratory, injunctive, and bid and proposal costs. The factors for consideration of injunctive relief or declaratory relief with the same effect include: (1) success on the merits; (2) irreparable harm; (3) the balance of harms; and (3) public interest. Further, bid and proposal costs may be recovered once a violation of statutes or regulations, or arbitrary and capricious decision-making is demonstrated. See Gentex Corp. v. United States, 58 Fed.Cl. 634 (2003).

### A. CENTECH Suffers Irreparable Harm

In connection with its loss of an Alliant contract, CENTECH suffers irreparable harm for which there is no adequate remedy at law, including damaged reputation, lost profits, limited credit-worthiness, and unavailability of Alliant program past performance information. See generally Geo-Seis Helicopters, Inc. v. United States, 77 Fed. Cl. 633 (2007) ("Although the 'mere loss of money does not qualify as irreparable harm if the party can be made whole through money damages,' Hawaiian Dredging Constr. Co. v. United States, 59 Fed.Cl. 305, 317 (2004), by statute, in a bid-protest case, the court is very constrained in the monetary relief it can grant.



[redacted]

*See* 28 U.S.C. § 1491(b)(2) ('any monetary relief shall be limited to bid preparation and proposal costs'). Thus, in a bid protest, "[a] lost opportunity to compete on a level playing field for a contract ... has been found sufficient to prove irreparable harm." Seattle Sec. Servs., Inc. v. United States, 45 Fed.Cl. 560, 571 (2000); *see also* Hospital Klean, 65 Fed.Cl. at 624 ("Here, absent injunctive relief, [plaintiff] will lose the opportunity to earn the profit it would have made under this contract."). CENTECH has actively sought bids on Federal government contracts since its submission of its Alliant proposal, but is unable to use its selection to receive an Alliant contract or its tangible and intangible proceeds in seeking other bid opportunities, financing and other business advantages such as its ability to attract technical talent in its core business space, which is where the Alliant program lies. The chain reaction of the loss created by GSA's illegal award decisions naturally impacts CENTECH's business operations, and no future contract award can adequately remedy it.

CENTECH has also suffered irreparable harm through the lost opportunity to compete in a fair competitive process as the law requires under terms determined to be fair by Congress and the Small Business Administration. The COC statute and regulations establish expansive due process rights by which small businesses are able to demonstrate compliance with responsibility criteria and requirements. See Siller Bros., Inc. v. United States, 655 F.2d 1039, at 1043 (Ct. Cl. 1981) (citing H.Rep. No, 639, 82d Cong., 1st Sess. 31.) ("Procurement officers would be directed to accept this authorization as conclusive. This provision would give small businesses definite assurance of a fair share of prime contracts.") and 15 USC §637(b); cf. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the



[redacted]

court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). CENTECH has clearly been deprived of the opportunity to utilize this process.

### B. <u>The Balance of Harms Strongly Favors CENTECH</u>

The balance of harms falls in CENTECH's favor. There will be no harm to the government if CENTECH obtains an Alliant contract. Indeed, GSA already determined that CENTECH [redacted] <u>Parcel 49C Limited Partnership v. United States</u>, 31 F.3d 1147, 1153 (Fed.Cir. 1994).

Moreover, the public interest supports the grant of relief to CENTECH that it requests. CENTECH is a small business. The Congressional purpose behind creating and expanding the legally binding SBA Certificate of Competency process was to avoid disastrous past procurement practices which resulted in closure of one-sixth of all American small business firms and America's military supplier base. <u>See</u> <u>Siller Bros., Inc.</u>, 655 F.2d 1039, at 1043 (Ct. Cl. 1981) (citing H.Rep. No, 639, 82d Cong., 1st Sess. 31.). This Court is required by the Tucker Act to give "due regard" to Congressional policies on national security and defense as set forth in the Small Business Act, and doing so is manifestly in the public interest. <u>See</u> 15 USC § 631(a) and § 644(a)(2); 28 U.S.C. § 1491(b)(3).



[redacted]

## IV. CONCLUSION

WHEREFORE, for the reasons stated, CENTECH respectfully requests that the Court grant CENTECH's request for preliminary and permanent injunctive relief, and issue judgment in favor of CENTECH and against the United States and Intervenors.

Dated: November 30, 2007

Respectfully Submitted,

/s/ Kenneth A. Martin

Kenneth A. Martin
THE MARTIN LAW FIRM, PLLC
6723 Whittier Ave., Suite 200
McLean, VA 22101
(703) 918-0350; (703) 918-0386 (fax)

*Counsel for THE CENTECH GROUP, INC.*

*Of Counsel:*

Max V. Kidalov[1]
Vice President & General Counsel
THE CENTECH GROUP, INC.
4600 North Fairfax Drive, Suite 400
Arlington, Virginia 22203
(703) 525-4444

[1] Mr. Kidalov is not admitted to the protective order and did not receive access to any protected materials.



[redacted]

**CERTIFICATE OF FILING**

I hereby certify that a copy of the foregoing Motion for Judgment on the Administrative Record was electronically filed on this 30th day of November 2007. I understand that this document will be sent to all parties via the Court's electronic filing system.

/s/ Kenneth A. Martin

Kenneth A. Martin



[redacted]