**EXHIBIT A**

offers a wide range of contract types, including fixed-price, cost reimbursement, labor-hour and time and material.

### A. The Solicitation

GSA issued the Solicitation on September 29, 2006. The Solicitation advised that GSA "contemplate[d making] approximately 25 to 30 awards . . . but reserves the right to place fewer or more awards, depending upon the quality of the proposals received."[4] Those receiving awards under the Solicitation are eligible to perform task orders under the contract. The Solicitation indicated that "[a]ward will be made to responsible Offerors whose proposals are determined to provide the 'best value' to the Government."

The Solicitation indicated that the procedure for evaluating proposals would begin with an "acceptability review," to be graded on "pass/fail" basis, focusing on whether a given offer contained all requested information in the appropriate formats. Acceptable proposals were then to be subject to a technical evaluation, a cost/price evaluation and, ultimately, a best value tradeoff. Regarding this last step, the Solicitation advised: "Consistent with FAR 15.101-1, the Government will conduct a 'best value' tradeoff, in which differences in non-price factors and evaluated price will be compared between the Offerors in order to determine which Offeror represents the best value to the Government."[5] This provision emphasized that technical factors would be "significantly more important than cost or price," but added an important caveat, stating "the closer the technical scores of the various proposals are to one another, the more important cost or price considerations become in determining the overall best-value for the Government."

#### 1. Proposal Requirements

The Solicitation indicated that two technical evaluation factors – Past Performance and the Basic Contract Plan – "are approximately equal in importance to each other, and when combined, are significantly more important than Cost or Price." The Solicitation encouraged offerors to include their "best terms from a technical and cost/price standpoint," as GSA

---

[4] As recounted in the Source Selection Decision (SSD), the number of expected awards "was based upon market research, responses to the [requests for information], outreach meetings, and discussions with potential customers." The SSD further indicated that "[t]his number was arrived at to assure adequate competition under the GWAC, meet the objectives of the procurement, and finally to provide the industry a reasonable basis upon which to bid and formulate both their pricing and basic contract plan." Under the Solicitation, GSA reserved the right, over the term of the contract, to terminate particular awardees (an "off ramp") or to add additional awardees (an "on ramp") through a new procurement, as the government's needs dictate.

[redacted]

"intend[ed] to evaluate proposals and award contracts without discussions with Offerors, except for clarifications, as described in FAR 15.306(a)."

**a. Past Performance Proposal Requirements**

The Solicitation indicated that in evaluating past performance, the agency would "look 'retrospectively' and consider the Offeror's history of success in delivering high quality service and solutions on contract efforts of similar scope and complexity to those anticipated under the Alliant Contract." To facilitate this, the Solicitation required offerors to present information about contracts comparable to Alliant in two tables. Table 1 was to include contracts the offeror had performed in a "multiple-award environment," such as GWACs and other forms of multiple award contracts, while Table 2 was to highlight the offeror's efforts under unique, single-award contracts. Offerors could list up to twenty and fifty efforts in Tables 1 and 2, respectively, and could select up to three of the customers identified in Table 2 for the Government to contact as references. The Solicitation also permitted offerors to submit a narrative summary, not to exceed five pages, of the past performance efforts listed in the tables, including "whatever information [offerors] believe[d] may be relevant to the Government as it evaluates [the] proposal[s.]"

The Solicitation advised offerors that GSA "intends to use reasonable efforts to check "approximately ten (10) efforts (total) for each Offeror, selected from Tables 1 and 2, including the three (3) efforts which the Offeror has identified." However, the agency reserved the "right to check more or fewer efforts, at its discretion," adding that it could not "guarantee that it will contact any particular effort listed in Table 1 or Table 2, even the efforts specifically listed by the Offeror."[6] The Solicitation also stated that the agency might rely upon past performance information from other sources, including the interagency Past Performance Information Retrieval System (PPIRS).

**b. Basic Contract Plan Proposal Requirements**

In contrast to past performance, the purpose of the Alliant "Basic Contract Plan" (BCP) was to allow the agency to "look 'prospectively' and consider the Offeror's level of commitment to the Alliant program and potential for high quality service and solutions." The Solicitation indicated that in this plan, the offeror should explain "how it will continuously identify, mitigate, manage and control risks within its holistic approach for managing the comprehensive scope of the Alliant program." Offerors were asked, *inter alia*, to "identify any gaps or weaknesses in past

---

[redacted]

Case 1:07-cv-00691-FMA Document 166 *SEALED* Filed 03/03/2008 Page 7 of 59

highly rated. For the schedule subfactor, the agency evaluated an offeror's "ability to meet all schedule goals related to completion of the contract, task orders, milestones, delivery schedules and administrative requirements." With regard to cost control, the agency evaluated the offeror's "ability to deliver a service at the agreed to price/cost to include their ability to effectively forecast, manage and control contract costs, as well as report and analyze variances." Under the business relations subfactor, the offeror needed to demonstrate its ability to "integrate and coordinate all activity needed to execute the contract" and to be an "effective business partner," including such things as the timeliness, completeness, and quality of problem identification; corrective action plans; quality of proposals, change orders, and task order requests; and the contractor's history of cooperative behavior and customer satisfaction. Finally, the Solicitation indicated that the agency would evaluate the offeror's "ability to select, trace and manage subcontractors" and whether they had "met their small business utilization goals in the past."[7]

### b. Basic Contract Plan Criteria

The BCP technical factor was broken into three subfactors: (i) resources – including internal performance capabilities and the ability to supplement core internal capabilities; (ii) program management, which focused, *inter alia*, on the offeror's program management information system and quality control program; and (iii) corporate commitment, in which the offerors were to describe "how the Alliant program will be optimized through its business development, technological innovations, proposal management and contract administration efforts." According to the Solicitation, these subfactors, as listed above, were "in descending order of importance when determining the overall rating for specific Technical Evaluation Factors." Although offerors were not told exactly how these subfactors would be weighted for evaluation purposes, [redacted]. Additionally, as discussed below, for its evaluations, GSA further subdivided the three subfactors into differing numbers of "elements" of equal weight, tracking the language of the Solicitation. As revealed by the Solicitation, the plans were also to be evaluated to determine whether they "sufficiently addresse[d] any gaps or weaknesses not addressed in past performance."

---

[redacted]

[redacted]

[redacted]

[redacted]

The same set of adjectival ratings, albeit with slightly different individual descriptions, were used to evaluate past performance. For the past performance factor only, the Solicitation also listed a "neutral" evaluation, reserved for where "[p]erformance in this area is not applicable to effort assessed, indicating neither a favorable nor unfavorable past performance evaluation."

### 2. Past Performance Evaluation and Scoring

As anticipated in the Solicitation, to facilitate the past performance evaluations, GSA retained a polling firm, Calyptus, to conduct telephone interviews of references identified in offerors' proposals.[8] Calyptus used a Government-prepared "call sheet" listing references to contact, and questionnaire "scripts" that were [redacted]

[redacted]

The scripts required the Calyptus personnel to ask open-ended questions, such as "[h]ow effectively did the Offeror conform to the contract requirements?" or "[t]o what extent did the Offeror successfully manage risk under the contract?" Although the Calyptus personnel were encouraged to ask follow-up questions, they were provided minimal guidance as to what to ask.

---

[8] In the Solicitation, offerors were notified that "the General Service Administration may use the services of non-government evaluators."

Nor were they provided with any guidance as to the type of information the questions were intended to elicit or the significance that particularly-worded answers might have in assigning adjectival ratings to particular subfactors.[9] [redacted]

The three members of the PPET reviewed the Calyptus transcripts and, using the information contained therein, assigned adjectival ratings to five subfactors for each proposal, recording those scores on rating sheets, together with their notes.[10] At this point, the team met to discuss the evaluations, sometimes causing an evaluator to reconsider the score he had given for a subfactor. Once the evaluators' final scores were complete, each team leader prepared a consensus evaluation of each offeror, containing both adjectival ratings for each of the subfactors and narrative comments discussing the offeror's strengths, weaknesses, and other notable qualities. The composite adjectival ratings were then assigned a numeric score – 5 for EH, 4 for S, 3 for A, 2 for M and 1 for L/N. These numbers were then added together and divided by 5,

---

[redacted]

[redacted]

[redacted]

[10] If the evaluators came across adverse past performance information in the interviews, the established procedures required them to forward the information to the Contracting Officer for him to determine whether to provide the affected offeror with an opportunity to respond to the negative information.

management and corporate commitment, respectively. The three subfactor scores were then averaged in a weighted calculation – 50 percent for resources, 30 percent for program management and 20 percent for corporate commitment – to produce a composite figure enumerated as the "BCP Average Evaluation Score."[12]

The Past Performance (PP) Evaluation Consensus Score and the BCP Average Evaluation Score were then averaged (added together and divided by two) to produce a figure enumerated as the "Weighted BCP-PP Average Score." The latter score was used to rank the technical proposals of each offeror – from 1 to 62.

### 4. Cost And Price Analysis

As described above and in the Solicitation, GSA used a spreadsheet to develop a total estimated price for each offeror, based upon estimated demand over a ten-year term. The agency developed its Alliant labor estimate from various sources of information, including, *inter alia*, usage rates experienced under existing GSA IT services contracts. The three-member CPET inquired into whether an offeror's cost structure appeared reasonable, assuming reasonable efficiency by examining offerors' previously audited rates and verifying their cost submissions.

The evaluation team presumed that because of the competitive nature of the procurement and the number of bidders, the prices received were fair and reasonable.[13] Nonetheless, the team

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

cost control information, assigning strengths (in the case of several awardees) and weaknesses (in the case of at least one protester) on this basis – even though the Solicitation prohibited GSA from considering performance under firm, fixed-price contracts in evaluating cost controls.[30]

It is conceivable that these errors were the result of faulty individual ratings, rather than systematic problems with the survey questions themselves. But, one merely needs to compare the rating standards to the questions in the script to conclude that the latter was a major culprit here. It is also conceivable that unresponsive answers might have been provided even if the questions posed had been more precise. Perhaps tacitly recognizing this, cases evaluating the reasonableness of the use of past performance surveys have also considered whether the agency took other steps to ensure the reliability of the survey responses – for example, by employing survey personnel who knew the rating system or, at least, training the surveyors to identify unresponsive answers. On this count, however, there was a double failure here. First, while GSA encouraged the Calyptus employees to ask follow-up questions, it gave them little guidance as to when it was necessary to ask such questions and, if so, what to ask. Perhaps more important, given the nature of the results, no guidance was provided on how to obtain answers that would allow the evaluators to distinguish rationally between EH and S ratings.[31] [redacted] Thus, GSA did not compel its contractor to provide a copy of the completed transcript to each reference for corrections and additions. In fact, although the record here does not include the evaluation materials for all sixty-two offerors, it is significant that, among the twenty or so offerors covered by the record, there is evidence that this corroboration step occurred only with respect to one offeror – IBM – and that those transcripts were returned heavily-edited.[32] This demonstrates that GSA not only failed to take adequate steps to ensure that

---

[30] The distinction drawn in the Solicitation between firm, fixed-price contracts and cost-reimbursement contracts is logical and consistent with the FAR. Under the former type of contract, the contractor absorbs all cost risk, whereas under the latter, the government must reimburse the contractor's allowable costs. *See* 48 C.F.R. §§ 16.202-1, 16.301-1. Accordingly, while a contractor's ability to control costs is critically important to the government in a cost-reimbursement contract, it is of little moment in a firm, fixed-price contract.

[31] To be sure, one paragraph of the instructions that came with the scripts urged the interviewers to "[a]ttempt to identify specific performance metrics that were met or exceeded." But, neither this paragraph nor anything else alerted the interviewers that the degree to which those metrics were exceed was critical to whether the offerors would receive an EH ("exceeds many requirements") or a S rating ("exceed some requirements"). Moreover, while this same paragraph cautioned interviewers that specific answers were better than having the reference just state that the offeror did a "good" job, a review of the transcripts reveals dozens of such generic answers, suggesting that the agency did not enforce this instruction, either.

[32] At oral argument, defendant speculated that the evidence documenting this confirmation simply did not find its way into the administrative record. The court has several

into whole numbers (*e.g.*, 4) and averaged them into an average PP score (*e.g.*, 4.50). [redacted]. Rather, it first assigned adjectival ratings to each of the elements that made up the three BCP subfactors (*e.g.*, S). It then converted those ratings into whole numbers and developed an average number for each element (*e.g.*, 4.25) and used those averages to calculate a value for each subfactor (*e.g.*, 4.21 ), which were then weighted to calculate the weighted average BCP score (*e.g.*, 3.125). The average PP score and the weighted average BCP score were then averaged, yet again, to produce the "Weighted BCP/PP Average Score," expressed in numbers carried out to three decimals (*e.g.*, 3.813).

But were these numbers actually significant to three decimals, such that GSA could make rational distinctions based upon the thousandths of a point – as it did? There are strong indications that the answer to this question is no.

Precision of thought is not always reflected in the number of digits found to the right of a decimal point – indeed, as with other constructs, there can be, to paraphrase Holmes, a "kind of precision that obscures." Regarding statistical accuracy, a prominent treatise on numerical analysis explains that numerical computations may be impacted by "errors in the input data," adding that "input data can be the result of measurements with a limited accuracy, or real numbers, which must be represented with a fixed number of digits." Lars Elden & Linde Wittmeyer-Koch, Numerical Analysis: An Introduction 7 (1990). Numerical calculations may also be impacted by rounding errors – those that "arise when computations are performed using a fixed number of digits in the operands." *Id.* Introducing accuracy and rounding errors into a calculation does not mean that the product thereof is meaningless; it does mean, though, that the error bound on that calculation must reflect the uncertainty of the inputs, thereby potentially reducing the number of digits in the output that are significant – *e.g.*, those digits to the right of the decimal point. *Id.* at 12 ("When approximate values are used in computations then, of course, their errors will give rise to errors in the results."); 16 McGraw-Hill Encyclopedia of Science & Technology 461 (9th ed. 2002) ("Computations cannot improve the precision of the measurement."). Generally speaking, the result of a computation that involves multiple numbers should be reported at the same precision level as the least precise measure – to the digit precision of the "weakest link," so to speak.[35]

---

[35] *See* Joseph S. Danowsky, "Statistical Report Flaws: A Spotter's Guide," 18 No. 8 Acct. & Fin. Planning for L. Firms 1 (2005) ("Use of excess precision may cast doubt on the mathematical competence of a report preparer . . . since calculations [cannot] generate more 'significant digits' than the input with the least accuracy."); James Tanton, Encyclopedia of Mathematics 168 (2005) ("Generally, the result of a calculation should be presented as no more accurate than the least accurate initial measurement."); The Concise Encyclopedia of Mathematics 610 (2d ed. 1989) ("If a calculation is carried out with approximate values, then, in general, the result will likewise be only approximately correct."). One deskbook describes this concept in the following terms –

Here, of course, GSA made a host of fine-line distinctions using the average BCP/PP technical scores, determining, most prominently, which firms were among the "presumptive awardee" group based, ultimately, upon as few as 8 thousandths of a point. Yet, there are strong reasons to suspect that these comparisons were undermined by false precision, particularly since no error propagation analysis of the sort described above was performed. For one thing, there is no indication that the initial numerical data generated in evaluating the offerors' proposals – data that, in the first instance, was captured in whole numbers (*e.g.*, 3, 4, or 5) – had anywhere near the level of accuracy reflected in the final evaluation scores (*e.g.*, 3.841). Indeed, in assigning adjectival scores to the various subfactors involved here, agency personnel effectively engaged in rounding (performing a computation with one digit in the operand) – they were, in other words, forced to choose one versus another adjectival rating even when a fraction (*e.g.*, 3.8 rather than 4) would have been more accurate. Such imprecision and rounding is most evident in the evaluation of past performance, the accuracy of which depended, at the least, upon the following variables: (i) the accuracy associated with the scripts that were used by the contractor to query references; (ii) the accuracy of the contractor's various employees in interpreting and transcribing the answers received from the references; and (iii) the accuracy and potential rounding errors that occurred when the narrative answers recorded by the contractor were converted to adjectival scores and then to numbers. That the results of these observations were, by virtue of repeated calculations, eventually expressed in figures that were carried to three decimals gives those figures no more reliability than they had *ab initio*. Again, while repeated division creates decimals that can add an aura of precision, it does not actually increase accuracy. Nor can defendant reasonably claim that systematic imprecision was not introduced into the process by the aforementioned variables – a review of the record, including the examples highlighted above, demonstrates otherwise.[36] Yet, in so many ways, it appears that GSA donned blinders to the error propagation that the imprecision of its initial data ultimately injected into its final technical rankings – occluding uncertainties that, as we will see, had serious ramifications for the integrity of the award analysis here.

In short, there is little doubt in the court's mind that GSA should have reported fewer significant digits in its findings to better reflect the uncertainty in its technical rankings. Had it done so, many of the observations that were predicated upon the detailed BCP/PP averages, including the notion that there was a "natural break" somewhere along the rankings, would have vanished, requiring GSA to make its award decisions on some other, albeit perhaps less convenient, basis. Indeed, one of the grandest ironies in this case is the fact that the supposed "natural break point" here kept shifting – as identified by the SSET, it was between the 27th and 28th ranked offerors; as set by the SSA, it was between the 28th and 29th ranked offerors; and, ultimately, after Stanley was given an award, it settled between the 29th and 30th ranked offerors. This should have been a telltale sign that the break point here was not so "natural" and that more

---

[redacted]